## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

JOHN DOE,
Address Withheld,

                    Plaintiff,

      v.

THE TRUSTEES OF PRINCETON
UNIVERSITY,
Princeton, NJ 08544

                Defendant.

**Civil Action No.:**

## <u>COMPLAINT</u>

John Doe, by his counsel, files this Complaint against The Trustees of Princeton University ("Princeton" or "the University") for breach of contract, gender-based discrimination in violation of 20 U.S.C. § 1681 (commonly known as Title IX), and negligence.  In support of his Complaint, Mr. Doe alleges as follows:

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................... 1

**PARTIES** ............................................................................................................ 5

**JURISDICTION AND VENUE** ......................................................................... 6

**STATEMENT OF FACTS** ................................................................................. 6

    I.  Princeton's Code of Conduct: "Rights, Rules & Responsibilities" ............... 6

    II. Disciplinary Bias at Princeton ................................................................... 8

    III. Jane's Manipulative Relationship With John ............................................ 24

    IV. The "Incidents" as They Actually Happened ........................................... 27

    V. John's Texts With Jane in the Following Weeks ........................................ 30

    VI. The Incidents are Reported and Investigated .......................................... 33

    VII. The Hearing ........................................................................................... 47

    VIII. The Panel's Decision and Sanction ...................................................... 58

    IX. The Appeal ............................................................................................. 61

**CAUSES OF ACTION** ..................................................................................... 66

    Count I – Breach of Contract ......................................................................... 66

    Count II – Breach of the Covenant of Good Faith and Fair Dealing .............. 68

    Count III – Violation of Title IX (20 U.S.C. § 1681) ...................................... 71

    Count IV – Gross Negligence ........................................................................ 73

**PRAYER FOR RELIEF** .................................................................................... 75

## INTRODUCTION

1.        Princeton convicts 98% of the students it puts through its student conduct process. In 2023, it convicted John Doe, too, and suspended him for two years.  It did this after two friends, working together, filed separate and false charges against him alleging curiously similar behavior—that he had choked each of them in public, one (Jane Roe) in the middle of the high traffic public sidewalk, and one (Sarah Smith) at a crowded party.

2.        Jane's allegations were almost comically weak.  The only non-party eyewitness to the alleged choking, Student 4, told Princeton that John never choked Jane at all.  Instead, he said that Jane, who was drunk and upset, collapsed to the ground in a crying fit after arguing with John.

3.        At first, even Jane herself told several people she didn't remember what had happened.  Then, during the investigation, her story see-sawed wildly—first accusing John of having "grabbed [her] throat and *lifted [her] off the ground*" for "5-6 seconds," then later of not having squeezed her neck at all, but rather just "press[ed] from the front" as they talked, and that she "was mostly upset about how he handled the aftermath."

4.        On a not unrelated note, Jane has settled a defamation suit against her by *another* student, Student X, whom she *similarly* falsely accused of threatening to choke her.  When she found out she was about to be sued, she texted John saying she would lie about it under oath if she had to: "[H]e can't prove [I said it]" and "[I]f it even got to court, which I doubt, . . . all I would say is 'no I didn't.'"  She also told John she could get Sarah—John's other accuser—to lie for her, too.  The panel that found John responsible saw all of those texts but refused John's request to call Student X as a witness at the hearing.

5.     Then there are Sarah's allegations.  She, too, first claimed that John had "choked" her in public at a crowded party, but by the end of the investigation—after being confronted by evidence showing that story was ridiculous—changed her story in *exactly the same way that Jane did*.  What started as a choking became John's pressing against her neck from the front as they talked and that, in fact, he hadn't actually "***meant* to choke [her]**" at all.

6.     As this Complaint will detail below, those glaring inconsistencies are only the tip of the iceberg.  Highlights include:

- Jane told Princeton that she first found out she'd been choked when Sarah told her about it.  Yet the day after the incident, she'd admitted in a text to John that Sarah had told her she'd seen no such thing.

- Jane told Princeton she'd cut off all contact with John in late July of 2022, but John submitted photos showing that he, Jane, and Sarah traveled together after that and even stayed with his family for several nights in late August.

- In her first interview, Sarah told Princeton that Jane didn't have any bruises on her neck after the alleged choking—a fact confirmed by contemporaneous photographs.  But in a later interview, Sarah changed her story and claimed that Jane *did* have bruising, but she had covered it with makeup and turtlenecks.

7.     By the time the hearing on her allegations occurred, **Jane had changed her testimony so many times that she didn't even bother to show up for the hearing**.

8.     Under Princeton's code of conduct, there had to be "clear and persuasive" evidence—far more than just a "preponderance"—to find John guilty.

9.     The evidence came nowhere close to that.  But what John didn't know is that he had at most a 2% chance of prevailing, because he was a respondent appearing before Princeton's Committee on Discipline ("COD").  And notwithstanding its exacting evidentiary standard, the COD—in more than 700 cases resolved by it in academic year 2021-2022— convicted *more than 98% of the respondents who appeared before it*.

10.     But John had it still worse, because he wasn't just a respondent being judged by the COD.  He was a man accused of assaulting two women, and Princeton for years had been under *additional* pressure to appear tough at all costs on claims of assault brought by women against men.  *See, e.g., Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

11.     Amid that prejudgment and pressure, the COD poisoned John's well from the very start: It resolved to conduct a *joint* investigation and hearing on Jane's and Sarah's claims, despite the fact that Sarah's allegation occurred weeks earlier and had *zero* factual overlap with Jane's.

12.     Forcing the joinder of two unrelated cases had exactly the same prejudicial effect here that it has in criminal cases.  The investigation was rife with procedural irregularities and treated John as if he were already guilty:

- While the investigator interviewed John only once, she interviewed both Jane and Sarah multiple times, giving them repeated opportunities to respond to what John said and reshape their stories accordingly.

- The investigator also interviewed Student 4 only once, despite the fact that he was the only non-party eyewitness to John's alleged choking of Jane.

- The investigator interviewed Sarah's female roommates for testimony supportive of Sarah's claims but refused to interview John's male roommate for testimony supportive of John's claims.

- The investigator asked several female witnesses who had seen Jane after the incident whether they noticed bruising on her neck, yet failed to ask either of the male witnesses who had seen her afterwards whether *they* noticed any bruising.

- The investigator failed to interview Student X, who had threatened (and would later settle) a defamation lawsuit against Jane and whom John told Princeton could provide evidence showing that Jane had also falsely accused him.

- The final evidence packet sent to the hearing panel contained unredacted testimony falsely accusing John of being racist, despite its complete lack of relevance to the case. Princeton redacted numerous portions of the evidence that it deemed prejudicial or irrelevant—yet intentionally left these allegations of racism unredacted.

13.    Like the investigation, John's hearing was also rife with bias and prejudgment. According to a source involved in the panel's deliberative process, most of the panel members had decided John was guilty before the hearing even started, and one of them—Professor Elizabeth Harman—even gave an impassioned speech arguing not just that John was guilty, but that it would be a "moral failing" to vote for anything other than *expulsion*, which the source believed intimidated the student members of the panel into finding him responsible.   Not surprisingly, the hearing was anything but fair to John:

- The hearing was to start at *7:15 p.m.*, which meant that people would inevitably get tired, panel members would pay less attention, and witness testimony would get cut short—all of which happened.

- As shown in a screenshot below, Professor Harman—who aggressively questioned John, but not Jane or Sarah—literally *fell asleep* while Sarah (the only complainant who appeared at the hearing) was testifying.



- The hearing panel denied John's request to call Student X as a witness.

- The panel questioned John and Student 4 (the lone eyewitness to Jane's incident) in an incredibly hostile manner—something it did to no other witnesses.  And its questioning of Student 4 occurred around 3:00-4:00 a.m. local time for Student 4.  The panel repeatedly suggested that to be found innocent, John had to offer some explanation *why* Jane had made things up—as though the burden of proof were his or the allegations alone were "clear and persuasive" evidence of their truth.

14.     The panel's decision finding John responsible for assaulting both Jane and Sarah betrayed its prejudgment and bias all the more.  Its entire rationale was only three sentences long, and the primary basis for it was, amazingly, "the women's continued and consistent descriptions of the incidents"—words no objective observer could possibly have used to describe accounts that literally changed as to *whether there was ever any choking at all*.

15.     The panel made *no* attempt to actually grapple with the changing stories Jane and Sarah had told, even though John had teed them up clearly in his written submissions and testimony.  It said nothing about all of the ways the evidence had contradicted them.  It didn't even say *which* version of each of their stories it was crediting:  Was it finding John responsible for having literally *lifted Jane off the ground while choking her* for 5-6 seconds?  Or was it instead for having pressed against her neck from the front?  The panel refused to say.  Instead, it threw up its hands said, "Well, you clearly did *something*."

16.     The panel suspended John from Princeton for two full years.  That finding and sanction are now a part of John's permanent record at Princeton.  As such, they will follow him around for life, ensuring that any transfer school, graduate school, or employer will learn what Princeton found him responsible for.  They will permanently alter the course of his career and his life.

17.     That finding and sanction are the result of violations of John's common law and statutory rights.  John respectfully comes to this Court for redress.

## PARTIES

18.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a citizen of a State other than New Jersey.  He matriculated as a freshman at Princeton in September of 2022.

19.     Defendant Princeton University is a private university located in Princeton, New Jersey.

## JURISDICTION AND VENUE

20.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Mr. Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because Mr. Doe is a citizen of a State other than New Jersey, Princeton has its principal place of business in the State of New Jersey, and the amount in controversy exceeds $75,000.

21.     The Court also has supplemental jurisdiction over Mr. Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

22.     Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

**I.      Princeton's Code of Conduct: "Rights, Rules & Responsibilities"**

**A.      The Contractual Relationship Between Mr. Doe and the University**

23.     Under New Jersey law, the University's codes and policies are terms in a contractual relationship between Mr. Doe and the University.  That includes the code of conduct at issue here: Princeton's Rights, Rules & Responsibilities (hereafter the "Code").

24.     That contractual relationship began in at least September of 2022, when Mr. Doe matriculated as a freshman at Princeton.  The terms of that contract include various University publications that Princeton gives to its students.

25.     Upon his matriculation, Mr. Doe received a copy of the Code.

26.     In consideration for his tuition and attendance at the University each year, Mr. Doe received and was given assurances by the University that it would follow and comply with the numerous policies and procedures adopted and put forth by the school in place at the time he paid that tuition, including those promises in its Code.

27.     The Code proscribes certain conduct by Princeton students, including "[a]ny physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results."

28.     The Code promises that Princeton will "investigate alleged infractions" of the Code.

29.     The Code also states that disciplinary charges will be resolved by being "presented to . . . the Committee on Discipline" at a hearing.  It says little about the conduct of those hearings, except (1) that an accused student may offer opening and closing statements, ask questions of witnesses, and in turn be questioned; (2) that "any person with information about the matter before the committee may be requested to appear by the student . . . subject to reasonable limits agreed on by the committee"; and (3) that the accused student "may be accompanied by an advisor," but not one with professional training—the advisor must be "a current member of the resident University community."

30.     The Code promises that the University will not find a student responsible for misconduct unless "the evidence presented constitutes a clear and persuasive case in support of the charges against the student."

31.     The Code states that the committee must "inform[] the student promptly of the decision" and, "[i]f a penalty is imposed," make a "special effort . . . to ensure that the student fully understands why the penalty was imposed[.]"

32.     The Code also promises that disciplinary decisions may be appealed on three grounds, including that "[t]he procedures" used to investigate and resolve the complaint "have not been fair and reasonable," and that "[t]he imposed penalty does not fall within the range of penalties imposed for similar misconduct."

## II.     **Disciplinary Bias at Princeton**

33.     In recent years, the COD has been heavily criticized by Princeton students for being biased against respondents—especially when it comes to allegations of assault.[1] In 2023, an anonymous member of the COD said they often felt pressured to go into hearings with the assumption that the student is guilty, and claimed that they had been encouraged in pre-hearing COD meetings to prepare questions derived from a presumption of guilt.[2] They noted that the COD members lack "even a pretense of impartiality," which plays out in questions by the COD members that take for granted that the student is guilty. The *Daily Princetonian* demanded an investigation into the COD's impartiality, which has not been conducted to date.

34.     Moreover, former professor in the School of Public and International Affairs Joshua Katz has repeatedly criticized the COD for its bias against defendants and its apparent presumption of guilt. He told the *Daily Princetonian*, "I think they're biased against

---

[1] https://www.dailyprincetonian.com/article/2023/06/princeton-opinion-committee-on-discipline-reform-impartiality-mental-health (May 31, 2023).
[2] https://www.dailyprincetonian.com/article/2023/06/princeton-opinion-committee-on-discipline-reform-impartiality-mental-health (May 31, 2023).

defendants…So I thought it was very important to provide assistance to students who found themselves attempting to defend themselves against discipline charges."[3]

35.     One of the few changes the COD has made in recent years was to allow accused students to be represented at a hearing by a "Peer Representative"—but that change was only approved in 2022 after Dean Joyce Chen Shueh was convinced that Peer Representatives would not *defend* accused students, but would just provide them with support.[4] One Peer Representative stated that previous perceptions of the student group as a team of "gung ho defense attorneys that were very adamant about the rights of the student and their ability to remain innocent" impeded the Peer Representative's involvement with the COD. *Id*. But "after conversations," Dean Chen Shueh saw the benefits that a student representative can have and understood that Peer Representatives were "not interested in defense [or] getting people off," but were simply "interested in providing compassionate care." *Id*. To ensure Peer Representatives do not defend students and merely provide compassionate care, Dean Chen Shueh trains them to do just that. *Id*.

36.     Indeed, the statistics released by the COD reflect that it has become increasingly biased against respondents in recent years.  In the 2021-2022 academic school year, the COD heard 742 cases of health and safety allegations and found 730 of the students responsible—a whopping 98.4% conviction rate.[5] On the other hand, of the cases that went before the Honor

---

[3] https://www.dailyprincetonian.com/article/2023/04/princeton-university-peer-representatives-retrospective-explainer (April 25, 2023).
[4] https://www.dailyprincetonian.com/article/2022/11/princeton-peer-representatives-committee-of-discipline-honor-committee (November 15, 2022).
[5] https://www.dailyprincetonian.com/article/2023/10/princeton-data-committee-on-discipline-honor-committee-punishments.

Committee—which hears cases of academic misconduct that occurred in the classroom—less than 20% of students were found responsible.

37.     Princeton has also been under separate pressure to appear tough at all costs on claims of assault brought by women against men.  For years, a steady stream of statements, directives, and actions by the University and its constituents has also shown that Princeton's response to claims of violence brought by women against men is deeply informed by gender bias.

38.     Beginning in 2011, Princeton came under heavy pressure from the federal government to appear tough at all costs on claims of sexual assault, especially those brought by women against men.  That pressure was exerted primarily through enforcement of a "Dear Colleague Letter" (DCL) published by the Education Department's Office for Civil Rights (OCR) in April of that year, which concerned the ways schools were to enforce Title IX and address claims of sexual assault on their campuses.

39.     Enforcement of the DCL's gender-biased regime was stepped up when Catherine Lhamon became the head of OCR in 2013.  (Out of office during the Trump administration, she reclaimed the position in October of 2021.)  As one national media outlet reported in October 2016, in a story on OCR's Title IX campaign:

> Lhamon says she is frustrated.  As she sat in her Washington, D.C. office during an interview with SI.com, she said she couldn't help but to think about the women who are suffering every day.

40.     Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will raise awareness about sexual assault and highlight men's roles in preventing

sexual violence."[6]  And in August 2015 she would tell a different national media publication,

"'We don't treat rape and sexual assault as seriously as we should,'" citing a statistic about the

rate of unwanted sexual activity experienced specifically by college women.[7]

41.     Ms. Lhamon also left no doubt about the consequences schools faced if they

failed adequately to heed OCR's mandates: They would lose all of their federal funding.  "Do

not think it's an empty threat," she told a group of university administrators in July 2014.[8]

"There is 'a need to push the country forward,'" she said in August 2015, echoing the same

sentiment.[9]  "It's nice when you carry the big stick of the federal government," she would say

---

[6] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rights-catherine-e-lhamon-visit-two-california-universities-highlight-successes-addressing-community-responses-sexual-assault, last visited January 25, 2018).

[7] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

[8] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault Complaints*, USA TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/ (last visited January 25, 2018); Robin Wilson, *2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited January 25, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html (last visited January 25, 2018).

[9] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

again in October 2016, leaving no doubt that the threat of having one's federal funding yanked remained very real.[10]

42.     That pressure was brought to bear directly upon Princeton.  In 2010 and 2011, it was the subject of three separate OCR complaints.  In response, OCR launched a multi-year investigation into Princeton's enforcement of Title IX and its handling of claims of sexual assault.  That investigation resulted in a finding, in November 2014, that Princeton had been in violation of Title IX and in a resolution agreement under which Princeton agreed to make critical changes skewed towards complainants, including the elimination of live hearings and adoption of a preponderance of evidence standard in place of the higher evidentiary standard it had used in such cases.  Upon information and belief, the resolution agreement required Princeton to submit documentation to OCR regarding its response to claims of sexual assault for some time after the signing of the agreement, ensuring it would remain under OCR pressure to vigorously enforce its gender-biased regime.

43.     Princeton continued to receive attention and pressure related to claims of sexual assault on its campus, and in particular sexual assault by males against females.

44.     On November 5, 2014, for example, a news article reported alleged sexual misconduct at one of Princeton's eating clubs, the Tiger Inn, stating that "an intoxicated first year female student" was photographed performing a sex act, and the photograph was subsequently distributed.[11]

---

[10] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited January 25, 2018).

[11] *See* Peter Jacobs, *Princeton Eating Club Under Investigation For Allegedly Distributing Photo Of Lewd Sex Act*, Business Insider (Nov. 5, 2014), https://www.businessinsider.com/princeton-eating-club-under-investigation-for-allegedly-distributing-photo-of-sexual-assault-2014-11.

45.     Likewise, upon information and belief, in May 2016, another complaint was filed with OCR alleging Princeton failed to adequately respond to a female student's claims of sexual misconduct by a male, and an investigation was opened in August 2016.

46.     Similarly in 2017, Princeton received widespread attention and pressure when it initially declined to terminate or suspend a male faculty member accused of sexual misconduct by a female graduate student.  The backlash led Princeton to adopt a default sanction of suspension for such violations.  That pressure motivated Princeton to be particularly harsh in its approach to claims of assault brought by women against men.

47.     That pressure continued in late 2017, when the Education Department rescinded the DCL and announced its intent to establish new regulations governing schools' responses to claims of sexual misconduct.  Students and administration leaders alike responded to rescission of the DCL by insisting that Princeton adhere to—or even exceed—the DCL's gender-biased regime, and exhibited the gender bias that informed Title IX enforcement at Princeton in other ways as well.

48.     Rescission of the DCL and its eventual replacement were motivated by a desire to provide common sense procedural protections to students accused of sexual misconduct, procedures widely viewed as appropriate to truth-seeking and taken for granted in so many contexts.   Secretary Betsy DeVos's press release preceding rescission of the DCL acknowledged the massive pressure the DCL had improperly placed on universities ("[n]o school or university should deprive any student of his or her ability to pursue their education because

the school fears shaming by—or loss of funding from—Washington") and noted that due process had to be "the foundation of any system of justice that seeks a fair outcome.[12]

49.    Even before the DCL was rescinded, Princeton's school newspaper, the *Daily Princetonian*, was warning the student body to be leery of any changes Secretary DeVos might make to the DCL, particularly given "the facts on the ground" that the DCL was meant to address: that "between 18 and 20 percent of women experience rape or some other form of sexual assault while in college."[13]

50.    Not surprisingly, then, the rescission of the DCL's gender-biased regime was overwhelmingly attacked at Princeton.  Administrators immediately stated that Princeton would not change its policies and procedures, insisting that its DCL-era procedures were "working well" and were "fair."[14]

51.    Indeed, in early 2018, the *Daily Princetonian*'s Editor-in-Chief penned an op-ed stating that Princeton's DCL-required Title IX procedures were not *biased enough* towards "the victims, the survivors."[15]  And when the Education Department published its new proposed regulations later that year, she wrote another, specifically noting that "[w]omen's rights groups" opposed the changes.[16]  She lamented that victims will have to "show[] they are indeed a victim" and that accused students would be "protect[ed]" by such basic procedural protections as "cross-examin[ation]."  *Id.*

---

[12] Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

[13] https://www.dailyprincetonian.com/article/2017/02/dump-devos (Feb. 8, 2017).

[14] https://www.dailyprincetonian.com/article/2017/09/devos-reverses-campus-sexual-assault-rules (Sept. 22, 2017).

[15] https://www.dailyprincetonian.com/article/2018/01/in-response-to-an-honor-code-fairer-than-title-ix-proceedings (Jan. 6, 2018).

[16] https://www.dailyprincetonian.com/article/2018/11/protect-our-students-protect-our-survivors (Nov. 21, 2018).

52.     Other articles in the *Daily Princetonian* warned of the backlash the University would face if it refused to toe the line drawn by the DCL: "The University, with its $25.9 billion dollar endowment, well-connected alumni, and strongly-opinionated student body, would likely face severe public backlash, as it has in the past, if it rolled back its Title IX protections for students. With a faculty-student sex scandal in 2017 and two others in 2014, the University's public image has the potential to be tainted more by lax Title IX enforcement, making the relaxation of policy all the more unlikely."[17]

53.     Not surprisingly, Princeton itself, as an institution, formally criticized the proposed regulations twice.  In January 2019, in conjunction with several other universities, it attacked the regulations' (1) requirement that schools provide for live cross-examination at disciplinary hearings, and (2) bar on using a lower standard of proof in sexual assault proceedings than in proceedings involving other student conduct violations.[18]  And in conjunction with the New Jersey State Bar Association, it again attacked the proposed regulations on those same grounds later that month.[19]

54.     Those actions did not appease student leaders, who continued to exert very public pressure on Princeton to make its handling of sexual assault still more biased in favor of complainants and women, just months before Jane would file her formal complaint.

55.     In May of 2019, a group called Princeton Students for Title IX Reform (PIXR) protested outside the University president's building for more than 200 hours straight and issued

---

[17] https://www.dailyprincetonian.com/article/2018/11/title-ix-changes-are-going-to-hurt-those-that-need-the-enforcement-the-most (Nov. 28, 2018).

[18] https://www.aau.edu/key-issues/aau-comments-department-educations-proposed-title-ix-rule (Jan. 24, 2019).

[19] https://tcms.njsba.com/personifyebusiness/Portals/0/NJSBA-PDF/Reports%20&%20Comments/CommentsProposedAmendmentsHigherEducation.PDF (Jan. 30, 2019).

a list of 11 demands.[20]  Those demands included, among other things: (1) a complete external audit of Princeton's Title IX regime; (2) social workers dedicated to helping "survivors" (but not respondents); (3) a fund to support "survivors'" mental health; and, most tellingly, (4) the "immediate departmentalization of the Program in Gender and Sexuality Studies" as a "key step in challenging *dominant paradigms of toxic masculinity*, homophobia, transphobia, and gender-based violence on campus."[21]  They also demanded the immediate firing of Princeton's Title IX Coordinator, Regan Crotty.  Their protest gained widespread support: more than 1,700 Princeton students and alumni pledged, at the protesters' request, not to give any money to the University until the protesters' demands were met.[22]

56.     PIXR specifically insisted that Princeton adhere to its current Title IX procedures as much as possible, "in spite of" the proposed regulations.[23]  It complained that those current procedures themselves were insufficient and that things would only become worse under the proposed regulations.  *Id.*

57.     After 200 hours of continuous presence outside his administrative building, Princeton's president, Christopher Eisgruber, agreed to meet with six representatives of PIXR.[24]  As explained further below, he would agree to commission two reviews of Princeton's Title IX regime as a result.

---

[20] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).
[21] https://docs.google.com/document/d/1nnilcneEcs-nKKdTIxTc0nEK26OKYjLHzBg6VS-mfsA/edit (emphasis added).
[22] https://www.change.org/p/princeton-university-princeton-title-ix-reform?recruiter=958527092&recruited_by_id=707a4290-714a-11e9-9617-5982860e6a9b&utm_source=share_petition&utm_medium=copylink&utm_campaign=psf_combo_share_initial&utm_term=share_petition (last visited May 2, 2022).
[23] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).
[24] https://www.dailyprincetonian.com/article/2019/05/title-ix-office-protests-come-to-a-close-after-demonstration-in-front-of-prospect-house (May 16, 2019).

58.     Pressure on Princeton came from other quarters as well.  At the 2019 Baccalaureate, approximately 200 students silently protested that year's speaker (Pulitzer Prize-winning columnist and author George Will) because of his prior statements on the treatment of campus sexual assault.[25]  That same weekend, a panelist on a panel about sexual assault walked off of the panel because one of her fellow panelists (renowned attorney Beth A. Wilkinson) had defended a man accused of sexually assaulting a woman and had been asked to discuss the need for fair procedures for adjudicating such claims.[26]  The panelist was followed out by dozens of students.  *Id.*

59.     In the wake of PIXR's very public criticism of Princeton's process and those implementing it—criticism expressly informed by gender bias—Princeton announced the following year, when the Education Department promulgated its final rule, that it would nonetheless strive to adhere as closely as possible to its "current system[]" in implementing that final rule.[27]  The *Daily Princetonian* quoted the President and CEO of the National Women's Law Center as stating that the final rule would "protect[] abusers and harassers" and noted that the DCL had warned against some of the procedural protections contained in the final rule.  *Id.* It also quoted a Princeton administrator as explaining, as if by way of apology, that Princeton was "required" to now implement such safeguards.  *Id.*

60.     Princeton showed itself to be highly susceptible to the pressure PIXR was exerting.  It responded by authorizing two separate reviews of its Title IX regime, one external

---

[25] https://www.dailyprincetonian.com/article/2019/06/george-will-gs-68-speaks-at-2019-baccalaureate-amid-student-protest (June 3, 2019).
[26] https://www.dailyprincetonian.com/article/2019/06/students-alumni-walk-out-of-metoo-panel-protest-at-p-rade-for-title-ix-reform (June 3, 2019).
[27] https://www.dailyprincetonian.com/article/2020/05/u-to-amend-sexual-misconduct-policy-after-devos-releases-new-title-ix-regulations (May 6, 2020).

and one internal.[28]  Both reviews resulted in lengthy reports that proposed various ways

Princeton might better address sexual misconduct, including by offering training sessions on

"toxic masculinity" and encouraging students "to attend functions at Princeton Women*s

Center."[29]

61.     PIXR continued to exert pressure on Princeton in other ways.   A piece written by

its members was published in the *Daily Princetonian* and claimed that the final version of the

regulations published by the Education Department was "clearly aimed at silencing survivors"

and called for increased funding for Princeton's Women's Center.[30]  It insisted that Princeton

reduce violence by "tackling destructive campus norms" via "increased funding to the Gender

and Sexuality Studies Program," echoing the gender bias it had advanced the year before.  *Id.*

The article insisted that Princeton use whatever discretion was left to it to limit the scope of the

new regulations.  *Id.*

62.     Princeton administrators responded accordingly the following month.  Its Vice

Provost for Institutional Equity and Diversity, Michelle Minter, labeled the new regulations

"problematic in a number of ways" in explaining how they would be implemented at Princeton.[31]

63.     The following month, the *Daily Princetonian* ran yet another piece critical of the

new regulations, one that contrasted the protections for survivors under the DCL with the new

rules that had "cast them out to sea."[32] It stated that "[o]ne in five women are sexually assaulted

---

[28] https://www.dailyprincetonian.com/article/2019/10/title-ix-reports (Oct. 24, 2019).
[29] https://sexualmisconduct.princeton.edu/sites/sexualmisconduct/files/external-review-report.pdf
[30] https://www.dailyprincetonian.com/article/2020/05/pixr-title-ix-devos-regulations (May 11, 2020).
[31] https://www.dailyprincetonian.com/article/2020/06/usg-town-hall-title-ix-policy-changes (June 15, 2020).
[32] https://www.dailyprincetonian.com/article/2020/07/resetting-sexual-misconduct-to-the-title-ixs (July 30, 2020).

during their time in college" and claimed that the new rules would prevent survivors from coming forward.  *Id.*  It reiterated the need for students and alumni to sign the petition PIXR had circulated the year before and for the University to accede to PIXR's demands.  *Id.*

64.    Princeton, in the wake of all of that pressure, chose to comply with the new regulations by adopting an admittedly "complicated" two-track system for resolving claims of sexual misconduct.[33]  Under that system, the procedural protections required by the new regulations would apply to only the narrowest set of claims required by those regulations.  *Id.*  The rest would be resolved under a separate set of procedures that did not provide parties with, among other things, the right to conduct live cross-examination through their advisors.  *Id.*

65.    The pressure on Princeton to combat sexual assault in gender-biased ways continued.  The *Daily Princetonian* ran an article on August 16, 2020, lamenting the sexual misconduct training incoming freshmen had received and insisting that prevention required addressing "the harmful implication of underlying causes like toxic masculinity."[34]

66.    Then, in December of 2021, a female student filed a lawsuit against Princeton, detailing a string of "highly improper" victim-blaming questions she had to answer in her sexual assault hearing, including questions about her sexual history and past abuse. [35] She claimed that the school failed to properly train its staff which led to hearings that unfairly targeted victims. *Id*. She complained that as a result of Princeton's failure to properly train its staff, staff members incorrectly advised her to refrain from involving faculty members as witnesses and that there was

---

[33] https://www.dailyprincetonian.com/article/2020/08/princeton-sexual-harassment-misconduct-betsy-devos-cross-examination (August 3, 2020).
[34] https://www.dailyprincetonian.com/article/2020/08/misconducting-sexual-misconduct-education-not-anymore (August 16, 2020).
[35] https://www.nj.com/education/2021/12/princeton-u-hearing-on-alleged-rape-turned-into-victim-blaming-ex-student-says-in-lawsuit.html (December 2, 2021).

no need for her to undergo a "rape kit" because it could not be admitted in a campus disciplinary hearing. *Id*. When she lost the hearing, Princeton told her that there was no avenue to appeal the decision. *Id*.

67.     In January of 2022, the *Daily Princetonian* published an account of a sexual assault survivor demanding that the University policy be changed.[36] The University had dismissed her complaint because the respondent did not attend Princeton. *Id*. The author accused the school of skirting liability by not investigating those who no longer attend Princeton and by ignoring commonly delayed reporting times of sexual assault. *Id*. The author felt that Princeton "broke" her by not investigating her delayed complaint, which she was unable to report closer to the time of the assault because she was not in a position to face reality. *Id*. She felt Princeton's actions failed to protect survivors and cited a study that found 27% of Princeton female undergraduates were sexually harassed or assaulted in 2017. *Id*.

68.     Princeton's Vice Provost for Institutional Equity and Diversity, Michele Minter, responded to the survivor's account the next day in a Letter to the Editor.[37]  Minter explained that the University loses jurisdiction over respondents who no longer attend Princeton at the time a complaint is filed, but assured readers that a long-term persona non grata could still be issued through the school and that the school always provides complainants with information to make reports to local law enforcement. *Id*. She empathized with the writer of the January opinion and stated that "Princeton's efforts to prevent sexual misconduct and support those who have

---

[36] https://www.dailyprincetonian.com/article/2022/01/princeton-sexual-assault-policy-anonymous-student (January 26, 2022).
[37] https://www.dailyprincetonian.com/article/2022/01/princeton-titleix-sexual-misconduct-policy-support (January 27, 2022).

experience sexual misconduct are ongoing projects" and that the school is committed to make the University a safe environment for everyone. *Id.*

69.     But the criticisms continued. In November of 2022, the *Daily Princetonian* released another Op-Ed entitled "The Graduate School and Title IX Office failed to keep me safe."[38] In it, the writer details allegations of being choked and strangled by a Princeton graduate student, causing her to be unable to breathe. *Id.* The writer stated that Princeton's process "failed to keep [her] safe" and she "would not wish the process [she] had to go through on anyone." *Id.* She stated that she had told many individuals in her life about the incident and those individuals did not believe her and accused her of lying and retaliation, yet they were called as witnesses at her hearing, which created a process that was not "trauma-informed." *Id.* Despite accusing her of lying about being strangled, the witnesses became teaching assistants for undergraduate classes at Princeton, which the writer criticized as the University's failure to protect its students. *Id.* The writer explained that she also had to answer difficult questions posed by the investigators in her case, which made her felt shamed and caused her to consider ending her own life. *Id.* The investigation dragged on for over five months, causing the writer depression, anxiety, PTSD, and multiple thoughts of suicide. *Id.* Her Princeton-contracted lawyer told her that she did not have corroborating witnesses and the writer felt that because she had not "invite[d] in a voyeur during [her] strangulation," her perpetrator was going to be found not responsible. *Id.* As such, she felt forced to resolve her case through alternative resolution, and wrote, "The University might like to pretend the process is now more humane and fair. I know that's not the case. Princeton needs to do so much better." *Id.*

---

[38] https://www.dailyprincetonian.com/article/2022/11/princeton-graduate-school-title-ix-sexual-assault-failure (November 3, 2022).

70.     A week later, the *Daily Princetonian* released another piece, criticizing Princeton for making it difficult for complainants to obtain No Contact Orders.[39] And in December of 2022, it released a similar piece titled "Princeton administrators and students alike must do better to protect survivors of sexual violence,"[40] which criticized the University of disempowering survivors and failing to use a trauma-informed process.

71.     A few months passed, and female complainants *still* felt the process was unfair towards them. In April of 2023, the *Daily Princetonian* released an Op-ed entitled, "Dear Princeton, you must do more on Title IX."[41] The author wrote that Princeton has repeatedly failed survivors of sexual violence and issued a list of demands, including that investigators be limited in the types of questions they can ask survivors, that there be enhanced sanctions for multiple offenses and patterns of sexual violence, and that the process provide increased support to those who experienced intersectional harm (i.e. providing resources for students whose race, sexual orientation, and other intersectional identities compound the violence they experience). *Id*.

72.     Nine days later, the paper released yet another piece attacking Princeton's handling of sexual violence complaints—this time, the writer complained that, as a result of Princeton's complying with the federal regulations requiring live hearings, and allowing months-long investigations, and upsetting interviews for complainants, the number of students who had experienced sexual violence and pursued the formal Title IX process had dropped drastically.[42]

---

[39] https://www.dailyprincetonian.com/article/2022/11/no-communication-orders-change-difficult-safety (November 10, 2022).

[40] https://www.dailyprincetonian.com/article/2022/12/editorial-board-titleix-sexual-misconduct-princeton-university (December 21, 2022).

[41] https://www.dailyprincetonian.com/article/2023/04/princeton-must-do-more-on-title-ix (April 3, 2023).

[42] https://www.dailyprincetonian.com/article/2023/04/title-ix-investigation-formal-process-alternate-resolution-sexual-assault-survivors-princeton-dilemma (April 12, 2023).

The piece quoted one student who said "the people within the Title IX office had no experience of handling gendered violence or trauma." *Id*. The writer complained that in 2017, only two students were found responsible for non-consensual sexual penetration, that investigators often asked questions that were "difficult and personal," and that complainants' character were often questioned during the process. *Id*.

73.     A month later, in May of 2023, the *Daily Princetonian* released an Opinion titled "Four years after we demanded change, survivors are still being failed by the University."[43] It explained the 2019 PIXR-led 200-hour protest and stated, "In the four years since the protest, the Princeton community has learned that we cannot rely on the University to ensure or provide opportunities for justice, healing, protection, or prevention." It detailed various complaints made by survivors about Princeton's Title IX process, including that the process penalized survivors for not being able to remember details about their assault, allowed intimidating, invasive, and survivor-blaming questioning, ignored complaints of misconduct, and dismissed racist harassment that occurred alongside sexual misconduct. *Id*. It noted that "[t]he University has no grievance process for intersectional sexual violations (i.e. sexual misconduct that also includes racists, homophobic, and ableist violence)." *Id*. It also stated that "[t]he University has made no effort to publicly maintain its commitment to protecting survivors' rights as outlined in current Title IX policies in the face of national rollback efforts." *Id*.

74.     In October of 2023, the University released the findings of an online survey called "We Speak: Attitudes on Sexual Misconduct at Princeton," which ended a five-year hiatus of not

---

[43] https://www.dailyprincetonian.com/article/2023/05/princeton-opinion-sexual-assault-title-ix-reform (May 11, 2023).

administering the survey.[44] The *Daily Princetonian* commented on the survey's findings, noting that sexual violence is pervasive and often goes unreported, as demonstrated by the fact that 17% of the survey respondents said they had experienced sexual violence, but in the 2021-2022 academic year, Princeton investigated just three cases of sexual misconduct and settled 16 cases through the alternate resolution process. *Id.*

75.     Princeton, in short, has implemented a COD disciplinary system that is extraordinarily biased against respondents in general, and it has simultaneously bowed to special pressure to resolve claims of violence by women against men in gender-biased ways that consciously skew in favor of complainants.  Those forces converged to deny John anything close to a fair hearing on Jane's and Sarah's allegations.

### III.     Jane's Manipulative Relationship With John

76.     Jane and John met when they were juniors in high school.  Jane was John's first close female friend, and he would eventually develop romantic feelings for her.  Jane sensed John's dependency on her and emotionally manipulated him, in ways he did not then appreciate, for her own social and emotional needs.  She did so both before—and *for months after*—John supposedly assaulted her.  When John finally became a hindrance to, rather than a crutch for, those needs, she retaliated and reported him for assault, just like she did with Student X.

77.     That dynamic is amply illustrated in texts that John submitted as evidence to Princeton but that were completely ignored by the COD.  For months after John supposedly assaulted her, Jane swung erratically between guilting him into catering to her needs, often at great cost to John, and threatening him with the very allegations at issue here.

---

[44] https://www.dailyprincetonian.com/article/2023/12/princeton-data-adpol-we-speak-title-ix-survey-2022 (December 7, 2023).

78.     On May 30, for instance, when Jane's ride from the airport cancelled on her, she asked John to pick her up instead, which he immediately agreed to do.  "[Y]ou are a life saver," she texted him.

79.     In late June, Jane discussed ideas for vacation trips for her and John to go on together.  She sent him pictures of places she wanted to go, with captions like, "CAN WE" and "[T]hese are not subtle hints.  [I]n fact, these are suggestions."

80.     On July 6, when Jane was drunk at a party at 1:20 a.m., it was John whom she asked to pick her up and hang out with her.  John demurred at first, given the hour.  But Jane continued to beg ("pls come hangout with me"; "this sucks").  She played on his feelings for her, telling him—months after the alleged assault—that he was "[her] best friend."  She then called him and begged him on the phone for four straight minutes until he finally relented.

81.     Then on July 12, when she was feeling down, she guilted John into taking care of her yet again, despite the toll it would take on him.  He told her he should "go to sleep soonish" if he was really going to drive to see her and asked if she still wanted that.  Jane told him he was the only "friend who recharges [her]," except perhaps for Sarah.  "I'm just worried about burning out at work," she continued.  John again relented and agreed to visit her "to help you recharge."

82.     Still later that summer, on July 16, she told John, "[I] want you around all the time."  She wanted John to make her life easier in the midst of a tough job.  "[I] feel like I'm going to scream because work is so stressful . . . so I normally would always prefer hanging out with you."  Later that summer, she asked him to drive to see her—a 25-minute drive for him—so that she could "pseudo cry in [his] car" unless he "need[ed] [Jane] space," acknowledging how much she drained him emotionally.  John again agreed ("If you need me to come get you for a bit, I can").

83.     Then on August 23—nearly a month after Jane learned John had stopped attending therapy—she posted an Instagram story, *which John submitted to the COD*, showing him visiting a state park with both Jane and Sarah.  In fact, both Jane and Sarah stayed at his family home for several nights, a fact he would *also* document for the COD with photo evidence.

84.     Around that same time, John caused friction between Jane and another friend of hers.  By then, she had developed another "co-dependent" friend—Sarah—and no longer needed John.  As she had done when Student X had also threatened one of her friendships, she retaliated and falsely reported John for assault.

85.     Yet *even then* she used John right up to the last minute—asking his advice on September 22 on how to deal with Student X's threatened lawsuit, ***after*** she (unknown to John) had already reported him to Princeton for assault—yet another fact documented for the panel through text messages.

86.     Whether part of her original plan or not, Jane also used her allegations to threaten and control John and keep him close to her on her terms.  Texts that were shared with the COD amply illustrated this:  Just *two weeks* after John supposedly choked her, Jane was demanding that John visit her at her university with Sarah, because Jane wasn't sure that Sarah would make the trip alone.  She told John he "choked out two" people and "I don't particularly see you trying to make amends."  John responded that he was "trying to understand why you are inviting me," given what she was claiming.  Jane not-so-subtly threatened to end the friendship if he didn't bend the knee, telling him, "I think being around you will probably determine if I can remain friends with you."  And John, as always, complied: "I'm not understanding why being unsure on going to [your school] is such a huge mistake.  But I see that it was.  I'd like to at least fix that

mistake and agree to go to [your school].”  “If going to [your school],” he continued, “is the way to improve or make you feel better or increase the chances we stay friends then I want to go.”

87.     Jane, in short, see-sawed as needed between trying to manipulate John by playing on his past (and in her mind, continuing) feelings for her and by threatening him with harm.

IV.   **The “Incidents” as They Actually Happened**

A.     **The Incident with Sarah on March 3, 2023**

88.     On the night of March 3, John and Sarah attended a party at a Princeton eating club.  Their mutual friend, Student 3, had recently been harassed at a different eating club event and felt uncomfortable.  John wanted to ask a mutual male friend of theirs to keep an eye on Student 3 at the party so that she would feel comfortable.  When Student 3 said she didn’t want the male friend following her around, John then asked Sarah if she would keep an eye on Student 3 instead.  Sarah agreed.

89.     Sometime later, John believed Sarah was not doing a good job of keeping an eye on Student 3.  Worried about Student 3, he confronted Sarah in actions he would come to regret. He spoke closely and loudly with Sarah, in part out of anger and in part because the noise of the party required it.  Three female students who walked by asked Sarah if she was okay, and she said that she was.  An event security guard who was standing nearby and could observe the interaction did not intervene.

90.     Sarah left the party, and John texted her multiple times to ensure she’d gotten home safely.  Sarah almost immediately complained to her roommates about how John had angrily yelled at her.  Multiple roommates of hers would testify that Sarah—even while angrily complaining about John’s actions—said nothing about the incident having a physical component

to it, let alone that it involved John choking her.  In her words, "'I only told them [John] yelled at me, not about the choking.'"

91.     By Sarah's own admission, she was not afraid to confront John about the incident; she did so the very next day.  And when she did so, she "did not mention" an alleged choking, but "only discussed the fact he had been screaming at her."

92.     All of the above was presented to the COD, and none of it was in dispute by the parties during John's disciplinary proceeding.

**B.     The Incident With Jane on April 1-2, 2023**

93.     At the end of March Jane came to stay with John for an entire week at Princeton during her spring break.  This was Jane's first time visiting John at Princeton, and she arrived to find John well settled with a new group of friends, including Sarah Smith.  This was the first time Jane had met Sarah, then one of John's closest friends at Princeton.  This was also the first time she had met Student 3, a female student at Princeton who had a crush on John.  Jane's position as the only young woman in John's life had clearly changed.

94.     On Jane's second night there, the two of them had drinks with Sarah, Student 3, and Student 4 in John's dorm room.  John's roommate, Student 5, was also present.  The entire group (minus Student 5) then left to walk to an event at an eating club.

95.     As they walked, John and Jane kissed briefly before Jane broke away.  Student 3—who had previously told John she was in love with him—became highly upset upon seeing it and broke a bit from the group.  Student 4 stayed with her to console her.

96.     As John, Sarah and Jane kept walking, Jane and Sarah, who had just met each other the day before, shared a romantic kiss.  This hurt John, not only because he had feelings for

Jane, but because Sarah—one of his best friends at Princeton—*knew* he had feelings for Jane. Sarah was more than moderately intoxicated.

97.     John and Jane got into an argument about the kiss.  Sarah, in her drunken state, lay on the ground as John and Jane argued.

98.     After some amount of arguing, Jane—whether to end the argument, to bind her newfound Princeton friends to her, or because she was having some sort of genuine incident—suddenly collapsed backwards into John, then fell to the ground screaming and crying loudly.

99.     John was completely bewildered, as was Student 4, who (as he would later tell the investigator) saw the whole thing as he was walking back towards John and Jane with Student 3. No one else ever saw, or would even claim to have seen, what transpired between John and Jane immediately before she collapsed to the ground.  Sarah would testify that John looked genuinely "bewildered" when she looked at him after she heard the commotion.

100.     When Sarah, Student 3 and Student 4 got to her, Jane—purporting to have a traumatic flashback—was saying words to the effect of, "Z choked me," and, "He choked me." "Z" was a former boyfriend of Jane's.  Jane, who admitted to being highly intoxicated, would claim in her first interview that she was "having flashbacks and did not remember where [she] was" and "was having PTSD from her prior rape when she had been choked."

101.     Jane then spent the next 1-2 hours on the ground as the group catered to her.  By Sarah's own admission, John appeared genuinely "bewildered" at what was happening.

102.     **All of the above was presented to the COD and was not disputed by the parties.**

103.     The group then took Jane to Sarah's dorm, where it was agreed by everyone that she would sleep for the night.  Jane—by her own admission in her first interview—then asked to

speak to John, *alone*, in a common room near Sarah's room.  She would never be asked why she felt safe being alone in a room with him after he had supposedly choked her, nor how she could be "furious" at him if she had no memory of what had occurred due to her purported PTSD reaction.

104.    At dinner the following night, Jane raised with John her claim that he had choked her.  John—who as yet had no reason to doubt Jane's sincerity, but knew he'd done nothing like that—told Jane he had zero memory of anything like that happening.  As Jane would report privately to non-Princeton friends by text message in the following days—texts that would be shared with Princeton—John genuinely seemed not to remember having allegedly choked her.

105.    At that point, Sarah—who had kissed Jane the night before, was now sharing a room with her, and with whom she would immediately become extremely close—said it was believable to her that John had choked Jane, because John had supposedly also choked *her* (Sarah) back at the eating club in March.  This was the first time Sarah had ever accused John of that.

106.    John already felt bad about having yelled at Sarah, and he now felt bad about having yelled at Jane, too.  He apologized for how he treated them but refused to admit to choking either of them—because he hadn't.  As Jane's texts to her non-Princeton friends would reveal, he insisted he had no memory whatsoever of having done anything like that, and he seemed sincere.

V.    <u>John's Texts With Jane in the Following Weeks</u>

107.    In the ensuing weeks, Jane repeatedly tried, unsuccessfully, to get John to admit to violently choking her.  As illustrated above, she sometimes used those claims as leverage to get John to do things she wanted him to do for her.  John knew he could not possibly have

choked Jane, but he still had no reason to doubt Jane's sincerity. He knew he'd been angry with her and thought he may have genuinely triggered some sort of reaction in her by something he'd said. So when she made these claims he repeatedly apologized to her, while consistently refusing to adopt her characterization of the event.

108. For example, on April 2 Jane tried to get John to admit that he had choked her. John responded as delicately and apologetically as he could without agreeing to something he knew hadn't happened: "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done last night." That refusal to agree to what she claimed, in a way that was consistent with the genuine sympathy he felt for how upset Jane was that night, characterized all of his responses to such accusations.

109. To take another example, on April 24 Jane again claimed that John had "literally choked [her] out," which even Jane knew wasn't true given that she never claimed to have lost consciousness. When John didn't agree that he'd choked her, Jane replied that he "d[id]n't even think [he] did anything that wrong." John responded, "I've acted wrong on many things," but again refused to concede he had choked her in any way. As he had told Jane on April 2 "I have no memory of that" and "I told everyone I didn't hurt you because I sincerely believed I didn't hurt you."

110. Even when Jane demanded that John go to therapy (or else she'd report him to Princeton), he agreed to go, *but still refused to agree he had done anything like choke her*. And when John stopped going to therapy, and Jane claimed he "violently choked [her] and then quit therapy," he *again* did not respond by agreeing he had choked her, but instead replied that the reason he quit is that he didn't think he was benefiting from it. *He then expressly told Jane* that he thought the purpose of therapy was "for the sake of becoming a better person" generally and

that **she was not the reason** he wanted to be better ("I don't want to be a better person for you necessarily.  I just want to be a better person.").  Jane responded by again relying on a characterization of her allegations that not even *she* believed, now telling him, preposterously, that he had "almost fucking murdered two women in cold blood."  John *still* did not agree that he had choked her.

111.    The closest Jane got to manufacturing an "admission" out of John was when she demanded, under threat of reporting him to the University, that he call his parents, tell them he'd choked her, record the call, and send it to her.  John felt he had no choice but to comply with this completely bizarre blackmail request.  ***Yet even then, John refused to adopt Jane's characterization of the event.***  He said in that recording that on the night in question he was "trying *to pull [Jane] in to talk to her* and, like, damaged her windpipe *ever so slightly*."  That description is at *complete odds* with Jane's own claim to Princeton that he grabbed her out of *anger*—not to talk to her—and literally lifted her off the ground by her neck for 5-6 seconds, rendering her virtually unable to talk the next day (never mind that she was able to scream and cry loudly for hours as soon as she collapsed to the ground).

112.    Yet Jane never claimed she told John, "That's wrong, do it again," or, "That's not good enough."  Even when Jane *proved* she could blackmail John into doing something as strange as calling his parents, randomly saying he did something wrong, and recording it, ***he still refused to admit to what she'd been claiming.***

113.    Instead, as described above in paragraphs 43-54, Jane in fact spent an *extensive* amount of time with John, both in groups and alone with him, through the end of the summer.  She sought his attention, affection, and care repeatedly.  Her actions spoke far louder than her words—words that John repeatedly, even under threat, refused to ratify.

## VI.    The Incidents are Reported and Investigated

114.    During the summer of 2023, when John and Jane were spending a lot of time together, John became friends with one of Jane's other male friends, Person A.  Towards the end of the summer, John and Person A commiserated about their tumultuous relationship with Jane and how they were both, for obvious reasons, a little scared of her.  Upon information and belief, this conversation got back to Jane and was the precipitating factor in Jane's reporting John to Princeton five months after he supposedly assaulted her.

115.    Sometime before September 12, Jane reported to Princeton that John had choked her on the night of April 1-2.  She claimed she had not reciprocated John's kiss, and that after she kissed Sarah, John became upset with her and choked her.  When interviewed in the ensuing investigation, Sarah reported that at the eating club party on March 3, John had choked her as well.  Despite the fact that they had sat on those allegations for several months, Princeton conducted a rushed investigation that showed it cared little for ensuring that John had a fair and adequate chance to defend himself.

### A.    Evidence Collection

116.    On September 26, 2023, Mr. Doe received an email from Jamie Sandman, the investigator assigned to the case, stating that the Office of the Dean of Undergraduate Students received a report about him and asking that Mr. Doe schedule an interview with her that very same day.  She did not attach a written notice of the allegations against him or give him any details regarding what this was about.  Mr. Doe responded that he would like to consult with a lawyer before the interview and requested a time for September 29. Ms. Sandman agreed to schedule the interview on the 29th and then informed Mr. Doe that while he could consult with a

lawyer, his lawyer could not attend the interview or participate in any part of the disciplinary process. John asked if he could instead have a parent present and was also told no.

117.    On September 29, Mr. Doe attended his interview, without knowing anything about the allegations. During the interview, Ms. Sandman informed him that a report had been made against him by two students for allegedly choking them on separate occasions months prior. The first was Jane, who claimed that Mr. Doe had choked her on April 1, 2023, almost six months prior to her report. The second accuser, Sarah, was a friend of John's who attended Princeton. Sarah claimed that Mr. Doe choked *her* almost seven months prior, on March 3, 2023. Mr. Doe heard these allegations for the first time during the interview and responded to them to the best of his ability.

118.    After his interview, on September 30, Mr. Doe emailed Ms. Sandman asking about the deadline to submit evidence to defend himself. Ms. Sandman responded the next day without providing a deadline and instead said that she wanted to "wrap up this investigation promptly" and Mr. Doe should provide any documentation "as soon as you can." Mr. Doe then prepared a written response and collected evidence, which he submitted the very next day on October 2, 2023. This evidence included, among other things, a letter from Student X's attorneys to Jane accusing her of defaming Student X by claiming he assaulted and threatened to choke her. Ms. Sandman responded that she would send the information to the Office of the Dean of Undergraduate Studies with the summary of Mr. Doe's interview.

119.    On October 7, 2023, Mr. Doe asked about the status of the investigation, and Ms. Sandman informed him that it was not yet closed because the Office of the Dean of Undergraduate Studies requested additional interviews from witnesses. She did not indicate which witnesses, if any, were being interviewed for a second time.

120.    On October 23, 2023—still without having been formally charged or provided any written notice of the allegations—Deputy Dean of Undergraduate Students Joyce Chen emailed Mr. Doe asking him to schedule a meeting with her to discuss how concerns are resolved by the Committee on Discipline. Mr. Doe met with her the next day, and she informed him that he would be receiving a packet of the evidence soon and that there would be a hearing on this matter just three days later, on Friday, October 27. The hearing would be held by the Faculty-Student Committee on Discipline, composed of two faculty members and three students, as well as Princeton Dean Deignan, who serves as the Chair of the Committee. Mr. Doe requested that the hearing be in person, rather by Zoom.

121.    After the meeting, Mr. Doe sent Dean Chen an email requesting that the hearing be scheduled a few days later so that he could have more than three days to review the evidence. Dean Chen agreed and scheduled the hearing for Wednesday, November 1.

122.    On October 25, Dean Chen sent Mr. Doe an email denying his request that the hearing be in person rather than by Zoom, stating that other recent hearings had been conducted over Zoom and it was difficult to orchestrate an in-person hearing. She also attached a packet of the evidence that had been collected.  She said that if Mr. Doe wanted any additional interviews to be conducted based on the information in the packet, he needed to let her know as soon as possible. She also sent Mr. Doe, *for the first time*, a formal written notice of the charges.

123.    According to the notice, Mr. Doe was charged with a violation of the University Policy on Personal Safety (specifically, assault) in that: in early April 2023 (on or about the evening of April 1 or early morning hours of April 2, 2023), possibly while intoxicated, Mr. Doe allegedly placed his hands around the neck of a non-student who was visiting from another University and applied pressured and/or choked her; and/or 2) on or about March 3, 2023 Mr.

Doe, possibly while intoxicated, allegedly placed his hand around the neck of another student and applied pressure and/or choked her. Pursuant to the notice, Mr. Doe was also charged with a violation of the University's Alcohol Policy based on his alleged hosting of a "pregame" in his room in early April 2023, where he allegedly served vodka, tequila, and mixers to individuals who were underage.

124.    After receiving the notice and evidence packet, Mr. Doe requested that the hearing be moved a few days to November 3 or November 6 due to the large amount of evidence that he needed to review, all while still doing his normal courseload. Given that he was not permitted to have an attorney or parent with him, he named another Princeton student as his advisor. Dean Chen did not respond to Mr. Doe's email.

125.    On October 31, Mr. Doe submitted a supplemental statement addressing the allegations and again asked if the hearing could be rescheduled to provide him with additional time to prepare. He also asked Dean Chen the following questions, including how to call Student X as a witness, given that Jane had also falsely accused Student X of choking and he was suing her for defamation:

- I was not permitted to have any attorney present when I was interviewed by Investigator Jamie Sandman, but may I have an attorney present for the hearing?
- Will there be an audio recording or transcript of the hearing that I can access at a later date?
- I would like to call ███████ (Student 4) and █████████████ (X) as witnesses at the hearing. Other than letting you know, is there anything else I need to do to request these witnesses' attendance?
- I understand that the COD may call additional witnesses at the hearing. Can you or the committee let me know at least 24 hours in advance of the hearing who those witnesses will be so that I can prepare questions for those witnesses?
- I understand that the circumstances of my probation are not before the COD at this time, but may be put before the committee if they must decide on a punishment for me – is that accurate?  If so, what information about my probation would be put before the COD at the punishment phase?
- What is Princeton's / COD's retention policy for records relating to this type of disciplinary proceeding?

126.     At 3:57 p.m. on the day before the scheduled hearing, Dean Chen—still without responding to either of Mr. Doe's requests that the hearing be postponed nor his list of questions—sent an updated version of the evidence packet to Mr. Doe, which contained 60 additional pages of evidence, including interview summaries of witnesses whom the accusers had requested be interviewed. She also updated the charge letter to indicate that Mr. Doe may have been intoxicated during one or both of the incidents for which he was charged. Finally, she indicated that Jane declined to attend the hearing, but that the hearing would nonetheless address Jane's accusations—even though neither Mr. Doe nor the hearing committee would have an opportunity to question her.

127.     Mr. Doe responded, asking if Dean Chen had received his statement or his request that the hearing be delayed. He asked to delay the hearing so he could respond to the 60 additional pages of evidence he had received.

128.     At 6:24 p.m., Dean Chen sent Mr. Doe another email, saying that she did not know if the hearing could be delayed but would let him know as soon as a determination was made. As to Mr. Doe's previous questions, she stated that he could not bring an attorney to the hearing, but could bring his Princeton student advisor. She said that there would be an audio recording made of the hearing that Mr. Doe could listen to if he needed to appeal the committee's decision. As to Mr. Doe's request that Student X be called as a witness, Dean Chen responded that because he was not interviewed, he could not be called as a witness. She suggested that Student X submit a written statement with any information he would like to share with the committee. Dean Chen refused to tell Mr. Doe which other witnesses would be called at the hearing and indicated that he did not need to ask questions of the witnesses, but he could prepare to ask questions of any individual who was interviewed. She noted that the hearing board

would *not* be informed about a prior disciplinary issue Mr. Doe faced unless he was found responsible, but did not explain what information concerning that disciplinary issue would be put before the COD in such event.

129.    At 6:47 p.m., Dean Chen sent Mr. Doe yet *another* updated evidence packet containing still more evidence. Mr. Doe responded and asked whether he would be permitted to submit an additional statement responding to the additional evidence.

130.    The next day, November 1, at 12:39 p.m.—just six hours before the hearing was scheduled to begin—Dean Chen emailed Mr. Doe stating that his request to delay the hearing was granted and the hearing would be on November 6 or 7 at 7:15 p.m.. She sent another email at 12:41 p.m., stating, "You had mentioned wanting to write another statement—again, you should not be repeating or reiterating information you have already submitted in your previous two statements." She stated that he could submit any additional statement by Friday November 3 at 9 a.m.—fewer than 48 hours away.

131.    Later on November 3, Dean Chen sent Mr. Doe yet *another* updated evidence packet containing his statement, as well as a new statement from Sarah. Despite her previous indication that the committee would not be informed of Mr. Doe's prior disciplinary issue, she stated, "The committee has a packet that has references to your prior disciplinary incident redacted but does contain names." Mr. Doe submitted his supplemental statement and materials related to Student X, and asked how his information would be submitted to the committee with redactions to which Dean Chen responded that the redacted evidence packet Mr. Doe received would be the same one provided to the committee.

132.    On November 4—two days before the newly scheduled hearing—Dean Chen sent *another* updated evidence packet to Mr. Doe containing 20 additional pages of evidence. She

stated that Mr. Doe had brought up certain points in his statement about the lack of evidence submitted by the accusers, so Dean Chen took it upon herself to relay those arguments to both women so they could address them in writing before the hearing. As such, Sarah submitted a 20-page response to the arguments Dean Chen relayed to her.

133.    On November 6, *just 45 minutes before the hearing*, Dean Chen emailed Mr. Doe that he was not permitted to use leading questions during the hearing. Mr. Doe asked which witnesses would be called, and Dean Chen did not inform him who would be called other than noting the witnesses who were on standby for the hearing. Then, just minutes before the hearing started, Dean Chen, unprompted, emailed Mr. Doe: "I wanted to mention that regarding the alcohol charge, our alcohol policy incorporates housing/dorm regulation policies that indicate that a student is responsible for violations that occur in their room. When a violation occurs in the room, the host is responsible, regardless of whether he purchases the alcohol."

### B.    The Evidence Packet

134.    The final evidence packet that the committee received reflects that **Ms. Sandman interviewed Jane and Sarah, the two female complainants, three separate times each, and provided them with the opportunity to respond to written and oral statements Mr. Doe had made. Mr. Doe was only interviewed one time by Ms. Sandman and was never asked to respond to the complainants' statements.** The first time he was provided access to their statements was in the evidence packets he received shortly before the various scheduled hearings.

135.    Moreover, the evidence packet reflects that Student 4, a male student who witnessed the alleged incident between Mr. Doe and Jane, was only interviewed once. On the other hand, a female student who was involved in Mr. Doe's prior unrelated disciplinary issue,

and had no eye-witness knowledge of the charged incidents with Jane and Sarah, was interviewed twice, despite Mr. Doe originally being told that his prior disciplinary issue would be brought to the attention of the committee only if he were found responsible.

136.    The evidence packet also demonstrates that Ms. Sandman interviewed five students identified by the female complainants (Students 6, 7, 8, 9, and 10) who had no first-hand knowledge of the alleged incidents. They did not interview Student X, the individual identified by Mr. Doe who brought a defamation lawsuit against Jane for falsely accusing him of choking her, or Mr. Doe's roommate, who interacted with Jane and Sarah in the days after the alleged incident with Jane.

137.    Moreover, the evidence packet demonstrates that none of the male witnesses who interacted with Jane after the alleged incident were asked about bruising on her neck, including Student 4, 6, and Mr. Doe, while female witnesses were asked about bruising on Jane's neck and provided conflicting reports.

138.    Furthermore, just before the hearing, Princeton had interviewed all of Sarah's roommates in order to rehabilitate Sarah's story after John had pointed out that she'd told none of them he'd supposedly assaulted her.  Dean Chen herself was even brought in to conduct some of those interviews, given how little time was left before the hearing.

139.    Yet Princeton did not similarly interview John's roommate, Student 5, on two critical points that Jane and Sarah had disputed: whether Jane slept in John's room the rest of the week after the incident, and whether she had any bruising on her neck.  Student 5 could have confirmed or denied that Jane slept there (as John's photo evidence effectively proved) and— since he therefore would have seen her—*whether Jane had any bruises on her neck*.  As it did

with the parties themselves, Princeton gave Jane's and Sarah's witnesses ample opportunity to rebut critical testimony, yet never sought to do the same with witnesses on John's side.

140.    Next, the evidence packet reflects that, while many redactions were made to information, prejudicial information about Mr. Doe was left unredacted. For instance, Jane's opinion that Mr. Doe had a relationship that "ended badly," was "inclined to violence towards women," was "big on boy culture," and "often made sexist or racist remarks" were left unredacted, despite the statements having nothing to do with whether Mr. Doe choked Jane or Sarah. Additionally, Sarah's opinion that Mr. Doe had a "superiority complex" and Student 7's opinion that Mr. Doe was "racist and sexist," had a "male savior complex," was "very opinionated and believed women were weak," made "pro-life comments," and made "a racist comment in Spanish class" were left unredacted.

141.    Finally, the evidence packet shows that Ms. Sandman did not probe inconsistencies in female witnesses' stories. For instance, Jane initially claimed to Mr. Doe that she "didn't remember anything" about what happened that night due to her intoxication, but that Student 3, who admitted she did not witness the incident, told her what happened. But later, Jane claimed that she remembered that Mr. Doe was trying to flirt with her and accidentally grabbed her too hard and let go quickly. On another occasion, she texted Mr. Doe that he almost "murdered two women in cold blood." And then, in her first interview with Ms. Sandman, Jane claimed that Mr. Doe was yelling at her, grabbed her by her throat, and *lifted her off the ground* as he choked her. Jane stated that she was straining on her tip toes to get the pressure off of her neck. Then, in her second interview, she claimed that she actually remembered that Mr. Doe was angry about Jane kissing Sarah and was expressing his anger physically. She said she initially did

not think he was being serious, but then, she recalled, it became clear he was furious as he choked her for 5-6 seconds.

142.     Ms. Sandman never asked Jane about any of those changes in her story.

143.     Additionally, Ms. Sandman never probed Jane about the fact that she said Sarah actually saw Mr. Doe choke her, but in a text message submitted into evidence, Jane said that Sarah did *not* see the incident.

144.     Moreover, Ms. Sandman never probed Sarah as to why she never mentioned to Mr. Doe that he had choked her, or why her text messages only reflected that she was angry with Mr. Doe on the night of the incident for having his friend "hover" over Sarah. Ms. Sandman did not ask Sarah about why she cropped the text messages she submitted to Ms. Sandman, cutting out her responses to Mr. Doe's questions.

145.     On the other hand, Ms. Sandman probed Mr. Doe about various potential inconsistencies, such as why there were text messages where Mr. Doe appeared to have admitted his culpability to Jane, why he texted Jane that he wasn't "actively violent," why he took "space" from Jane, as well why there was an audio recording that Jane submitted between Mr. Doe and his parents where he seemed to admit his culpability.

**C.     <u>The Evidence Overwhelmingly Undermines Jane's Allegations</u>**

146.     The final evidence packet presented to the panel showed that Jane had repeatedly changed her stories and was repeatedly contradicted by the evidence on points that were central to her story.  No reasonable, objective adjudicator could have found her testimony to be consistent or credible.

147.     For example, as to how John allegedly choked her, Jane said in her first interview that he "grabbed my throat and lifted me off the ground,"  such that she was literally  "straining

42

on her tip toes to get the pressure off her neck." Doing that would obviously require John to squeeze her neck on both sides. But after seeing the initial round of evidence, she said in her third interview that John "***did not*** squeeze the sides of her neck with his fingers" but instead just "press[ed] from the front as we were facing each other," making it impossible for him to have actually lifted her at all.

148.    As to what happened when John allegedly stopped choking her, Jane said in her second interview that John "released her ***and she fell to the ground*** screaming and crying." But in her third interview–after seeing John's and Student 4's testimony that she strangely fell backwards into his arms–she changed her testimony to say that after John released her, she instead "immediately tried to put some distance between herself and [John]" by "turn[ing] away from him," that John then "grabbed my torso," and that she only *then* "started screaming and fell to the ground."

149.    As to what Jane remembered after the alleged choking, she said in her second interview that she remembered "ask[ing] to be alone with [John]" in a common room to confront him about the choking. "It was very clear I was furious," she said in that interview. But in her third interview, she claimed that "because of the PTSD attack" that the choking immediately gave her, she "initially did not remember anything," not even "where I was when I first woke up" the next morning.

150.    The evidence also showed that Sarah fundamentally changed the testimony she offered in support of Jane's story. She expressly said in her first interview that she "did not see marks on [Jane]'s throat," which would surely have been present if John had literally lifted Jane off the ground. Undoubtedly after hearing Jane's specific story to the investigator, she then said in her second interview that she in fact "saw a slight bruise on the left side of [Jane]'s neck."

43

Not only did that squarely contradict her earlier testimony, it would also contradict Jane's own changed version of her story, in which she would claim John *did not squeeze the sides of her neck*. Indeed, John submitted two photos of Jane from that week in which her neck was entirely visible—and had no bruising whatsoever.

151.    The evidence undermined Jane's story in a host of other ways as well. First, it repeatedly showed—from witnesses adverse to John—that John expressed genuine shock and disbelief when Jane claimed he'd choked her. Jane told a friend in a *private* text that John "doesn't even remember" choking her. She texted still another friend that John "didn't believe [her]" the next day when she told him he'd choked her—not that he "pretended not to believe her," but that he "didn't." Sarah likewise admitted in her first interview that John genuinely "looked bewildered" when Jane collapsed and started crying and that he "did not believe he had choked" Jane. Sarah also admitted in her second interview that John "expressed shock" when later told that he'd supposedly choked Jane.

152.    Next, the evidence showed that not even Jane's own parents quite believed her when she first told them John had supposedly choked her. Her mother's first reaction was to say, "oh [John], what a weird thing to do to people," and later to ask Jane if she was "still thinking of leaving [Princeton] early or did you guys make up?" The response of Jane's father betrayed a similar skepticism, as evidenced by Jane's response to him that her "best friend choked [her] out, that should have gotten more than 'busy night' ☹". Jane's father further replied, "I think [John] is OK."

153.    The evidence also by the investigator confirmed that John and Jane kissed in a common room after the incident, just as John had testified. Sarah testified in her first interview that "[w]hile back in [her] dorm, [John] and [Jane] kissed briefly." Student 6, a friend of

Sarah's, also said in her interview that she recalled "making out" being mentioned as part of the interaction that night.  And Jane herself, when directly asked, said only that she "did not recall kissing [John]" in the common room—not "no way" or "absolutely not" or "there's no way I'd ever do that."  None of that is consistent with the idea that Jane was choked by John hours before and supposedly was afraid of him the rest of her time visiting Princeton.

154.    Indeed, the evidence also showed that Jane lied about where she slept during the rest of her time visiting Princeton that week.  She told the investigator that she spent every night in Sarah's room because she was afraid of John.  John, however, submitted photo evidence showing Jane had slept in his room two of those nights, and Sarah slept in his room one of those nights as well.

155.    The evidence further showed that Jane had lied about when and why she ended her friendship with John.  She said in her second interview that she "stopped talking [to John] after she learned he was no longer in therapy."  But John produced texts proving they stayed in communication for more than a month after she learned he was no longer in therapy, and that Jane continued to ask him to hang out with him and sought him out as a source of comfort.  He even produced a photograph showing that Jane and Sarah *stayed at his home for several nights in late August*—a full month after they learned he ceased therapy.  And finally, as noted above, he submitted evidence showing that, one week *after bringing her allegations* against John, Jane was still in contact with him, asking his advice about how to handle Student X.

156.    The evidence also repeatedly contradicted Jane about how she supposedly initially learned she had been choked.  As explained above, Jane initially claimed not to remember what happened between her and John due to a PTSD attack and her intoxication level, but only to have learned she was choked because people who had seen it had told her so.  As early as April 2,

however, she admitted to John—in text messages he submitted—that Sarah had not seen the alleged choking, but had only looked up after Jane had collapsed.  Yet in her first interview on September 20, Jane claimed that "[t]he only person who witnessed the choking was [Sarah]."  But in their interviews, both Sarah and Student 3 would make clear that neither of them had seen any kind of choking or physical interaction between John and Jane whatsoever.

157.   Finally, the evidence also revealed an alternative possibility for what might have triggered Jane's reaction, presuming her reaction was even genuine.  As Student 8 (Sarah's female roommate) testified, "Initially, [Sarah] told them that [John] mentioned a past boyfriend to Jane and it triggered her."  (That boyfriend, the investigation would elsewhere reveal, had choked Jane when they were dating.)  Student 8 testified that she then heard the same explanation from Jane herself: "In the morning, . . . [Jane] said, 'He said something that triggered me, and other stuff happened.'"  Student 4 went further: He testified that the following night Jane told him John "did not choke her, but he put his hand on her neck and it brought back the memory" of her prior assault.  It was no coincidence that Jane would admit this only to the sole eyewitness of the incident, who would know her story of being lifted off the ground was a lie.

D.   **The Evidence Also Undermines Sarah's Claims**

158.   The evidence packet also overwhelmingly undermined Sarah's testimony about her own alleged choking.  She claimed in her first interview that John "had his hand on her throat and was using that hand to hold her in place."  But her friends and roommates consistently testified that, despite telling them she'd been upset at John for yelling at her that night, had never claimed or suggested he'd assaulted her.  When she was reinterviewed, Sarah told a different story more consistent with that fact, claiming that John hadn't actually "meant to choke [her]" at

all.  She also said John did not actually "grasp" or "squeeze" her neck, but "was more pushing"—*a change in description virtually identical to the change Jane had made.*

159.    To make her claim more believable, Sarah claimed to the investigator that she spoke little with John the summer after the incidents.  John, however, submitted photo evidence showing that she and Jane spent several nights at his family home in August—which not only was over the summer but was *after* Sarah and Jane learned he had stopped going to therapy, and even required her to *fly* to his location.

160.    Sarah also claimed that the last time she spent time with John alone together after lawn parties was September 10.  John submitted text message evidence proving they spent time together as late as September 12 and September 18, of which, at least September 18 was time alone together.

161.    The evidence, in short, repeatedly showed that Sarah was not credible.

**VII.    The Hearing**

162.    On November 6 at 7:27PM, Mr. Doe's hearing began. At the hearing, the COD heard evidence on both accusations of Mr. Doe's alleged incidents of choking, even though the two incidents were completely unrelated to one another and occurred weeks apart. In fact, Jane had not even met Sarah at the time of her alleged incident, let alone witnessed it. Nevertheless, the two allegations were heard jointly before the same panel at the hearing. Additionally, Jane decided to not attend the hearing—yet the panel did not dismiss her complaint, and instead questioned Mr. Doe at length about her accusations.

163.    The panel's questioning at the hearing confirmed what the source involved in the panel's deliberative process would later convey: that it had prejudged the case.  It repeatedly attacked the testimony of John and Student 4, and just as repeatedly treated Sarah and the

witnesses supporting the complainants with kid gloves, if not total disinterest, as though nothing they could say could matter to the outcome.

164.    At the hearing, Mr. Doe was the first person to be questioned by the panel. His questioning lasted for over an hour and a half. The one-sided, demanding nature of the questions reflected that the panel presumed Mr. Doe to be responsible, especially when compared to the simpler questions the female witnesses received.  The panel repeatedly asked questions challenging Mr. Doe's account, but did not ask Sarah any similarly pressing questions—even though Mr. Doe had raised concerns about the many problems with her story.

165.    For instance, the first question at the hearing was asked solely to bolster the female witnesses' prior statements to the investigators that they did not see what happened between Jane and Mr. Doe, and to cast doubt on the one eyewitness who had told the investigators that he saw what happened and saw that Mr. Doe did not put his hands on Jane's neck. The very first question of the night was from Professor Harmon who asked, "This is in the dark, right? This is a nighttime event, right?"

166.    Members of the panel *repeatedly* demanded that John be able to persuasively explain Jane's and Sarah's motives, as though the burden of proof lay with John and as though their testimony would be deemed credible—despite all the contrary evidence—unless John could explain *why* they were lying.  One member asked him, for instance, "You think that the fact that Jane spent time with you means that she wasn't concerned about you as a danger, and how do you square that with her repeatedly demanding that you go to therapy, telling you that you have a serious problem, telling you that you need to tell your parents that you were violent with her?"

167.    Similarly, when John identified for the panel all the ways that Sarah's testimony had changed, a panel member shot back, "I guess, have you given any *reason* for [Sarah] to react

this way?"  It didn't matter to the panel member *that* Sarah had contradicted herself, unless *John* could explain *why*.

168.    John then noted for the panel that, despite Jane and Sarah *both* belatedly claiming that Jane had bruising on her neck, ***neither of them ever tried—or even claimed they'd tried—to show that bruising to him to prove he'd choked her***.  He then noted all of the ways that *Jane's* story had changed over time.  The panel's response, incredibly, was to ask whether pressing against the front of her neck wouldn't *also* be a serious assault—as though it didn't matter how dramatically Jane changed her story so long as each version of it amounted to a serious, even if completely contradictory, claim.

169.    This type of questioning continued, with COD members primarily asking questions hostile to Mr. Doe's account. And if Mr. Doe did not provide the answer the COD members were seeking, they would continue asking the same question in different ways. For instance, Professor Harman asked Mr. Doe what he was talking to Jane about in the moment after Jane and Sarah kissed. Mr. Doe stated he could not remember. Professor Harman asked again, "So you don't have any recollection of having said anything to her that would have upset or triggered any sort of reaction?" Mr. Doe again said he did not remember that moment. Professor Harman then pressed, "Yeah, I'm talking about in that moment." Mr. Doe insisted he did not remember but speculated that he may have used a word that triggered Jane due to her history of sexual abuse, but assured her that he did not do anything physical in the moment.

170.    Despite having just insisted on not remembering anything about the nature of the conversation, Professor Harman continued, "So do you assume that because you can't recall anything really about that conversation, that it was a conversation that was not angry or upsetting or disturbing in some way to her? Or that you weren't talking about anything that would have

stirred up a lot of emotion because you can't recall it? What I think I'm hearing you say, and you tell me, I don't want to put words in your mouth. You tell me if this is right, but it was such a benign conversation that you just have no memory of it at all." Pressured to answer differently, Mr. Doe said, "It's benign in contrast to the rest of that night."

171.    Still, Professor Harman continued, "What you're saying is that there was nothing about the—do you believe that if you had said something to her that was upsetting, that caused this reaction, you would've remembered it?" Mr. Doe said, "I'm not certain, I don't—what I'm saying is that there—" Professor Harman cut him off and said, "That's some word that you didn't have any idea what that conversation was about. And what you're saying is I don't remember anything about it. And I'm asking you if you think you would've remembered, had that conversation been angry or upsetting or where you were confronting her about something and then she falls on the ground. Do you think you would remember that?"

172.    Again, despite having just answered that he was not certain if he would remember, but then being pressured to answer it in a different way, Mr. Doe responded that it would be "more likely" to remember a conversation that was emotionally charged, but that given the alleged incident occurred a long time ago and the entire night was emotionally charged, he still didn't remember. He again insisted the reaction was not caused by something physical he did. Professor Harman then said that no witness offered any explanation about what was discussed beforehand and why Sarah collapsed, and Mr. Doe again insisted, "Right. I don't have an explanation to this moment."

173.    Professor Harman later asked Mr. Doe about why three women stopped to ask if he and Sarah were okay when they were talking at the party. She asked, "What was it about that situation that caused those three women to stop and ask her if she was okay?" Mr. Doe explained

that Princeton is a very conscientious community and it was not uncommon for someone to stop and check in when they saw a six foot one man leaning over and arguing with a five foot two woman. He also explained that there was a safety officer in the room who could have checked in and didn't, which further showed that the people who stopped were just being conscientious.

174.    That did not satisfy Professor Harman, who then said "there was obviously something more to this encounter that caused these three women to stop and ask Sarah if she were okay," as though an argument could never be enough to make passerby care.

175.    Another board member then tried to turn Mr. Doe's comment about a safety officer being present against him, by saying, "So Mr. Doe, it's true that Student 3 had had a prior incident at an eating club that caused you to be concerned about her safety right? And I just wanted to bring to your attention that what you're arguing right now is that even with the safety officer present and with people coming to speak to you and Sarah, when you were having this argument, you were still concerned about Student 3's safety when she was in the same sort of situation. There was a safety officer for her, and yet you still felt the need to have someone look after her. Is that correct?"  That panel member gave no explanation why John's concern for Student 3's safety was somehow an indicator that he was a violent person.

176.    Later, when the COD was questioning Student 4 about whether Jane had a coat on the night of the incident—in an attempt to establish that her bruising could not have been visible—Mr. Doe showed the COD a picture of Jane and himself from that night, demonstrating that she was not wearing a coat. Professor Harman stated, "I was actually seeking to understand whether or not people had coats because it was early April." Mr. Doe clarified that the picture was taken that night and that she was wearing exactly what was in the picture. Professor Harman

then argued with him, pressing him to make a different statement, by saying, "It was 11 o'clock. It's early April."

177.    The COD also asked Mr. Doe questions that were completely irrelevant to the issues, and were solely focused on whether or not he had good character—despite explicitly telling Mr. Doe that character witnesses were not permitted at the hearing because it would focus only on the incidents at hand, and after telling him that Student X could not testify because he did not have firsthand knowledge of the incident and only knew about the character of Jane. One COD member asked Mr. Doe, "You've referred a couple times to the fact that you were concerned about Student 3. Is that right? Who you wanted people to look out for? And I think what you're saying is 'Look at me. I'm a good guy. I was concerned about Student 3.' And I just wanted to ask you if you could address a sort of different way of seeing this, which is that it's intrusive for you to decide to make sure that Student 3's okay by having people follow her. And indeed, she was followed by the one guy following her who you asked to follow her, that's intrusive and controlling potentially. And then also that you are getting mad at someone for kissing Jane is also, you are taking yourself to have a say in how these other women in your life behave in an intrusive and controlling manner. Can you just see something if someone had that reaction to the stories that are being told?"

178.    Mr. Doe responded asking for clarification: "I guess I'm trying to understand the question. So the idea is that because I was trying to look out for Student 3 and someone could think that looking out for Student 3 is actually an intrusion, and so I'm the kind of person who makes intrusions, and so I'm the kind of person who would be upset about a kiss enough to attack someone. Is that the question?" The COD member responded, "I just wanted you to agree to say something to the perspective that someone might react by saying this is intrusive and

controlling. You think you have a say and an entitlement to tell these women, friends of yours, how they should behave, what should be happening to them." Whether or not Mr. Doe asking a friend to watch Student 3 at a party was intrusive and controlling is completely irrelevant to whether Mr. Doe choked Sarah at this party, yet he was forced to defend his character at the hearing.

179.    In a similar vein, another member stated, "Just a simple question, Mr. Doe, and I think I can probably foresee how you'll respond. I just thought that it was pertinent to bring up the fact that [Jane] and [Sarah] both characterize you as sort of the controlling person in the friendship, and they've both alleged that at one time or another you threatened to commit suicide if they didn't do what you wanted them to do. Can you for the record tell us whether you have ever threatened that?" John denied it, but whether he had ever spoken about suicide or was a controlling friend was irrelevant to whether he choked Jane or Sarah; that question shows yet again how biased the COD was against him.

180.    This line of questioning continued as a member asked, "Do you have any reason besides what we've been over previously to believe that it is more likely that Jane would be the controlling person in the friendship than you would be since it's sort of like a they said this, you and maybe [Student 4] both said this type of situation." Again, whether either Mr. Doe or Jane, or both of them, were controlling has no bearing on whether the alleged incidents occurred. And indeed, Mr. Doe responded that he was unaware that he would be asked about this topic of who was the more controlling friend and offered to show text messages that exhibited Jane's character in that regard. The COD member simply stated that they "don't think we can enter things into the record this late" and asked "whether there are any additional details about whether we should consider Jane the controlling person in the friendship."

181.    The questioning of Mr. Doe ended after almost an hour and a half.  Then Student

6, who during his interviewhad said that Sarah and Jane told him Mr. Doe had been "aggressive"

the night of the incident with Jane, testified. Only when asked if choking was mentioned, Student

6 had said he thought it was. Student 6 was not pressed on this at the hearing. And, unlike the

repeated questioning of Mr. Doe when he said he did not remember something, when Student 6

said he could not remember what Jane was wearing the day after the incident, a COD member

stated "that's fair" and moved on. And when Student 6 claimed that Jane had a raspy voice when

he saw her after the incident, the COD member responded, "Awesome." He was questioned for a

total of ten minutes.

182.    Student 4 was the next witness. In his previous interview, he had said that he

actually saw the alleged incident between Jane and Mr. Doe. He said that Mr. Doe did not touch

Jane and that Jane just randomly collapsed into Mr. Doe. Like Mr. Doe, he was pressed hard on

potential inconsistencies and asked to explain why other witnesses might be incorrect. For

instance, he was told that Student 3—with whom he had been walking—said she did not see

what happened between Mr. Doe and Jane. The COD member said, "She was a little surprised

that you were in a position to see that. So that's why I'm asking about relation to where you were

at that time to where Student 3 was."  (The COD member did not ask Student 3 why her account

differed from Student 4.)

183.    A COD member then confronted Student 4 with a statement the investigator wrote

about his interview: "He did not see any physical altercation between Mr. Doe and Jane, but it

could have happened." It continued: "Perhaps it happened if she is saying it and it triggered a

memory in her head. I don't think it's that bad. I don't think [John] choked her really really hard.

I think it is being portrayed a lot worse than it was." Student 4 testified ***unequivocally*** that he

54

had not said this during his interview and was misquoted. When he tried to explain what he had actually said and meant, Professor Harman interrupted him and said, "Can I ask a question about time? Its 10:03. I don't know that we need to share [the written interview summary] on the screen. We've heard it read out. We've heard his response. I'm just concerned about time. I actually don't know what the plan is with time for this event." The questioning continued for a bit, with COD members prefacing their questions by saying "sorry" and "two quick things." Finally Student 4 was able to explain that he thought he believed he had been misquoted by the investigator—yet continued to be challenged on that point by members of the panel.

184.    In total, Student 4 was questioned for 40 minutes—far longer than any witness who testified in support of Jane and Sarah.

185.    Before the next witness was called, a COD member said, "Procedural question. Professor Harman was bringing this up earlier. I don't see us getting through all these witnesses in like 20 minutes." Professor Harman responded, indicating that her mind was already made up even before Sarah herself had been questioned: "Yeah, I'm confused about the time. I should say we have received a ton of information. We've received a huge amount of written information. We've had a long conversation already…What is the longest that we'll go? I should say my strong preference is that we do complete tonight. I understand that I'm not in charge. If we wanted to complete tonight how long are we giving ourselves that we are going to be together?" The COD Chair responded that they would discuss privately. As the final witnesses were called, the COD asked substantially fewer questions than they had of Mr. Doe and Student 4.

186.    Next, Student 7 testified for 11 minutes about Sarah telling her some details about the alleged incident with Mr. Doe, but she could not recall if Sarah mentioned Mr. Doe putting a hand on her throat or choking the first time she spoke to her about the incident. At the end of her

testimony, she said she actually did remember that Sarah told her that information (which contradicted Sarah's own testimony that she had not told anyone that John choked her in the immediate aftermath of the alleged incident).

187.    Then, the investigator was called for 5 minutes simply to rebut Student 4's testimony that the investigator had misquoted him. The investigator did not show her notes on screen during the hearing, but merely confirmed that her notes said what was in her report in the hearing packet.

188.    The last witness to be called was Sarah. At the beginning of her testimony, a COD member apologized to her for the late hour and that the hearing was taking longer than expected. Later in her testimony, the COD Chair said, "I also want to encourage everyone to try to focus questions on the charges that are before us" and asked Sarah to "keep her answers as concise as possible" because of the late hour. Another member prefaced a question by saying, "I'll keep my question brief and I think it has a brief answer." Another member prefaced a question by saying, "Two questions. One I think is also pretty simple." In total, her examination did not even last 30 minutes.

189.    **In contrast to Professor Harman's intense and prolonged questioning of Mr. Doe, she did not ask Sarah even a single question. Sarah's testimony mattered so little to her prejudged view of the case that she actually fell asleep during it:**



190.    And the questions that were asked of Sarah had almost nothing to do with her account of the incident or the inconsistencies in her story; instead, they focused heavily on Mr. Doe and his character. She was asked about what Mr. Doe was normally like when he was intoxicated, whether Mr. Doe was drunk during the incident with Jane, whether Jane thought requiring Mr. Doe to stop drinking was important, whether Mr. Doe ever violated the condition that he stop drinking, and whether Jane slept in her room the remainder of the week she was visiting.

191.    Unlike with John, the COD members did not press Sarah on challenging topics. Not a single one asked her, for example, about her dramatic change from saying Jane had *no* bruises on her neck to saying she supposedly did.  The most confrontational question they asked her was whether she "ever felt pressured by Jane to have certain views?" Sarah literally gave a one-word answer—"No"—and the panel member simply responded with, "Okay.  Yeah, that's my question."  One member even teed up questions for Sarah by telling her what she had previously said and assuring her she was being consistent: "You mentioned you were on the ground when this is going on. I know you've been consistent about that, and you said in one of your last statements you were about 10 feet away. Does that sound right?"  No such leading and

favorable questions were ever asked of John or his witnesses.  Indeed, John had been told 45 minutes before the hearing he was not allowed to ask any leading questions of witnesses.

192.    Following Sarah's testimony and Mr. Doe's closing statement, the hearing ultimately concluded shortly after 11:30 p.m. Given the short timeframe, the panel's own statements that they needed to move quickly and wanted to complete deliberations that night, and the fact that a source who was involved in the panel's deliberative process said the panel had prejudged guilt, their deliberations were, upon information and belief, extremely limited and were indeed completed that night.

193.    At no point did the COD seek expert evidence or testimony on PTSD or whether Jane's purported reaction and memories were consistent in any way with a genuine PTSD reaction.

**VIII.   <u>The Panel's Decision and Sanction</u>**

194.    At 10:00 a.m. the next morning—just 10-11 hours after the hearing ended—Dean Chen emailed John to set up a Zoom call to tell him the COD's decision.  On that Zoom call she told John that the COD had found him responsible for the charges against him.

195.    The COD then issued its formal decision letter and rationale on November 8, 2023.  It found John responsible for assaulting Jane, responsible for assaulting Sarah, and responsible for violating the alcohol policy by hosting the pregame event in April where adults under 21 were present.  Its almost nonexistent rationale, and the speed with which it was issued, confirmed all the more that the panel, as confirmed by the source involved in the panel's deliberative process, had prejudged the case, and that the actual evidence received at the hearing didn't matter.

196.    The decision stated in boilerplate fashion that the COD had considered all of the information obtained in the investigation and presented at the hearing, but its actual analysis of that evidence was almost nonexistent.  Its rationale that there was "clear and persuasive evidence" of John's guilt consisted of just two things: "the women's continued and consistent descriptions of the incidents in communications and conversations with others" and "the admissions and acknowledgements you made in text messages."  It stated, without explanation, that it "did not find persuasive" his claim that he made those admissions "only because you were being blackmailed," even though *Jane had never even been questioned* about that claim.

197.    That was the sum total of the COD's attempt to explain its analysis of the evidence.  It said *literally nothing* about the way Jane's story had repeatedly changed, in dramatic ways, or how it could credibly state that her story had been "consistent" despite those changes.  It said *literally nothing* about the way Sarah's story had also changed.  It also said *literally nothing* about Student 4's eyewitness testimony, or *any* of the other evidence it purportedly considered.  Its entire rationale consisted in the two conclusory sentences described above.

198.    In perhaps the clearest sign that its "rationale" was anything but, **the COD never even said *which* version of Jane's or Sarah's story it found there to be "clear and conclusive evidence" of.**  It did not state whether John was being found responsible for choking Jane in a way she could not remember and which no one witnessed (her first version of events); whether he was being found responsible for literally lifting her off the ground by her throat (her second version); or whether he was being found responsible for having applied pressure to the front of her neck in a way that made the *aftermath* the thing that really upset Jane (her third version).

Likewise for Sarah, the COD's decision letter said nothing about which version of Sarah's story it found "clear and persuasive evidence" of John having done.

199.    The rationale, in short, implicitly acknowledged that Jane's story had changed in dramatic and irreconcilable ways and that the evidence did not support one version over the other.

200.    Nor did the panel identify for John which of his "text messages" contained the "admissions and acknowledgements" that he had choked her.

201.    As explained in detail above, John repeatedly refused to agree that he had choked Jane, even when Jane threatened him in various ways.  He apologized for how he had mistreated her but repeatedly stated, diplomatically, that he had no memory of having choked her.  That the panel was unable to identify any specific text message where John "admitted" or "acknowledged" choking her only underscores that point.

202.    Notably, the panel did *not* state that the audio recording of John's phone call with his parents was an "admission" or "acknowledgment" in that regard—it expressly limited those purported admissions to "text messages."

203.    The decision letter said it was suspending John "for two years," meaning he would not be eligible to return "until the fall of 2025."  That is an unprecedented sanction at Princeton for the charges John was found responsible for.

204.    The decision letter's rationale for handing down that sanction was that, in addition to the two undefined assaults it found John responsible for, it said he had also had a "prior disciplinary infraction in June 2023 stemming from an assault in March 2023 (which resulted in probation)."  The decision letter did not quote any document, or otherwise explain, why it

believed it could characterize that prior disciplinary infraction an "assault." Nor did it say anything at all about the actual nature of that other incident.

205.    Indeed, the "assault" was nothing of the sort: It stemmed from an incident in which John and Student 3—who often practiced Muay Thai together—were rough-housing. Student 3 expressly told Princeton, when it investigated that incident, that *everything that happened between her and John in that incident was done with* "my informed and continuous consent." Princeton—which, as shown above, finds almost everyone guilty for everything— nevertheless found John responsible for "endangering a student" for that incident. But the COD wrongly and unfairly characterized it as an "assault" in reaching John's sentence on Jane's and Sarah's charges.

## IX.    **The Appeal**

206.    Mr. Doe's deadline to appeal was November 20.

207.    Given that he intended to argue on appeal, among other things, that one of the COD members fell asleep during the hearing, he asked Dean Chen if he could review the video footage of the hearing. Dean Chen informed him that he could only review the audio of the hearing "as that captures the content of the hearing." He was instructed to schedule a time to listen to the audio in a room on Princeton's campus, as he was not permitted to keep a copy of the audio.

208.    Mr. Doe asked why he could not view the video, and if he could use technology to create a transcript of the hearing. Dean Chen informed him that the policy is to allow the student to listen to the audio "since it contains all the content they would need for the appeal." She instructed that he was not permitted to record or use a service to transcribe the audio hearing, but that he could manually transcribe the hearing by writing it out himself. Mr. Doe also asked if he

could bring an individual not affiliated with Princeton (i.e., an attorney) to listen to the hearing with him, and Dean Chen instructed him that he could not.

209.    On November 20, Mr. Doe submitted his appeal, raising various arguments. Mr. Doe argued that Ms. Sandman treated male and female witnesses differently during the investigation as she interviewed the female complaints three times each, but interviewed him only once. Additionally, he argued that he was never offered any follow-up interviews to respond to the statements the complainants had made in their interviews, while the female complainants were provided additional interview opportunities to respond to his written statements. He stated that Student 4, a male witness, was only interviewed once, while Student 3, a female witness, was interviewed twice.

210.    He argued that Ms. Sandman and Dean Chen interviewed numerous additional witnesses suggested by the female complainants but ignored Mr. Doe's request to interview a male exculpatory witness. Additionally, he raised the fact that Sarah and Student 3 provided conflicting testimony in their initial interviews about whether Jane had bruising on her neck, but none of the male witnesses were even asked about bruising.

211.    Moreover, he argued that the committee was presented with prejudicial information about others' opinions that he was racist, sexist, and pro-life, and that the investigator failed to probe the inconsistent stories of female witnesses.

212.    On November 20, Christine Gage confirmed receipt of Mr. Doe's appeal and stated that the review panel would convene on November 29. She stated that she was hopeful to have a decision by December 1. On November 29, Ms. Gage emailed Mr. Doe that the panel was assessing his appeal.

213.    On December 4, despite the University Rights, Rules, and Responsibilities not contemplating inquiries from the appeal panel, Ms. Gage emailed Mr. Doe a series of questions implying that the appeal panel had spoken with members of the COD and/or Dean Chen—an *ex parte* communication not contemplated by the policy—and implying that Mr. Doe's appeal would be denied due to his allegedly not having made certain requests during the investigative and hearing process. For instance, Ms. Gage asked "You claim that it was unfair that you were interviewed by the investigator only once. Can you let us know whether you requested to meet with the investigator more than once and were denied that request?" But at the time, Mr. Doe had no reason to request an additional interview—because he had not yet learned that, unlike him, the complainants had been interviewed multiple times.

214.    As to the argument that the hearing was rushed, Ms. Gage asked, "Can you let us know whether you informed the COD of this concern, and whether you requested that the COD allot additional time to hear the case?" This question, too, made no sense: Mr. Doe could not, in the middle of the hearing, be reasonably expected to have complained to the COD, which would decide his liability and his sanction, that it was rushing through the case too quickly.

215.    And because Mr. Doe had argued that he was restricted 45 minutes before the hearing from asking leading questions, Ms. Gage asked, "Can you let us know whether there were any questions that you tried to ask witnesses that the COD did not permit you to ask?" But this also made no sense: Mr. Doe had been told he couldn't ask leading questions, so he didn't.

216.    Mr. Doe responded to the inquiries to the best of his ability on December 6.

217.    On December 20, the appeal panel denied Mr. Doe's appeal. It stated that no procedural irregularity existed in Mr. Doe's hearing. As to Mr. Doe's argument that the investigator did not interview Student X who had sued Jane for defamation for falsely accusing

him of choking her, the panel stated that Mr. Doe was provided with the opportunity for Student X to submit a written statement, and that character witnesses and other witnesses without direct knowledge of the incident are not interviewed—even though the investigator interviewed Students 6-10, who also did not have direct knowledge of the incidents.

218.    As to Mr. Doe's argument that he was only interviewed once while the complainants were interviewed multiple times, the panel found that Mr. Doe submitted written materials four days after his interview, which ended up contradicting some of the information provided by the complainants. It stated it "understood" that the investigator then asked additional questions to the complainants based on the information Mr. Doe submitted, and that Mr. Doe did not request an additional interview but rather submitted supplemental written materials.

219.    As to Mr. Doe's argument that he was given restrictions about asking leading questions just 45 minutes prior to the hearing, the panel stated that the COD's practice is to not allow questions eliciting information already in evidence. The panel further stated that it learned John had met with the Secretary of the COD on October 24, 2023, to review the hearing procedures and that Mr. Doe did not object to the procedures at that meeting. Despite clearly having spoken with Dean Chen about this meeting, the panel did not provide John an opportunity to inform them about what did or did not take place at that meeting.

220.    Finally, as to Mr. Doe's argument that the penalty of a two-year suspension fell outside of the range of penalties for similar conduct and that in the last two years, the COD hasn't imposed a two-year suspension for *any* offense, the panel stated that the COD considered precedents not just from the last two years but from prior years. It noted that Mr. Doe was found responsible for assaulting two different students and had been found responsible for an additional

assault earlier in the year. As it was a pattern of concerning behavior, the COD issued a two-year suspension which was appropriate according to the panel.

221.    The panel did not address many of Mr. Doe's arguments raised in his appeal. It did not address Mr. Doe's concern that a male eyewitness was interviewed just once, while a female witness who did not witness the evidence was interviewed twice. Nor did it address Mr. Doe's argument that female witnesses were asked about whether the complainant had bruising after the alleged incident, and provided conflicting accounts, while no male witness was asked about bruising. It also did not address the argument that the interview reports contained irrelevant and prejudicial opinions about Mr. Doe's character.

222.    Tellingly, the panel also did not address his argument that the investigator failed to probe the dramatic inconsistencies of the female witnesses, while probing male witnesses on supposed inconsistencies.

223.    The panel did not address Mr. Doe's argument that his manner of questioning was restricted even though the Rights, Rules, and Responsibilities did not allow for such a restriction. The panel merely stated that Mr. Doe did not object to the restriction.

224.    The panel did not address Mr. Doe's argument that it was unfairly prejudicial for the COD to hear both of the allegations against him related to choking in the same hearing in front of the same COD members, or his analogy that in the criminal justice system, charges would be tried separately when there is a significant risk that a joint adjudication of the charges would inhibit the factfinder's ability to make reliable findings.

225.    The panel did not address Mr. Doe's argument that the COD found him responsible based on the fact that two women accused him of assault as opposed to actually weighing the evidence of each assault to determine whether there was sufficient evidence.

226.     The panel did not address Mr. Doe's argument that the COD rushed his hearing due to the late hour and that one of the COD members fell asleep during the hearing.

227.     The panel did not address Mr. Doe's argument that he was questioned for over an hour by the COD at the beginning of the hearing, but the COD only examined Sarah for half an hour at 10:50 p.m., or that the COD rushed their deliberations after the hearing ended at midnight.

228.     The panel did not address Mr. Doe's argument that the COD misapplied the applicable standard of "clear and persuasive" evidence, that it the cited the complainants' testimony as consistent when the evidence showed the contrary, and that it ignored the testimony of a male eyewitness who testified that Mr. Doe did not choke Jane.

229.     Finally, the panel did not address the argument that the COD took into account Mr. Doe's prior probation for "assault" when Mr. Doe was only found responsible for "endangering a student," or that the process was infected by gender bias.

## CAUSES OF ACTION

### Count I – Breach of Contract

230.     Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

231.     At all times relevant hereto, a contractual relationship existed between the University and Mr. Doe.  The University's Code was a part of that contract.  Under that contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, in the process of sanctioning students, and in resolving appeals.

232.     The University breached this contract with Mr. Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

**A.     Failure to Apply the "Clear and Persuasive" Evidence Standard**

233.     The Code promises that the University will not find a student responsible for misconduct unless "the evidence presented constitutes a clear and persuasive case in support of the charges against the student."

234.     As stated above, the University was aware of a large amount of evidence that called Jane's and Sarah's credibility into question and undermined their claims.  It was further aware that they repeatedly changed their stories.  It was also aware that John had testified consistently and was supported by the only third-party witness to the incident between himself and Jane.  And it knew it was required to appropriately discount Jane's testimony since she never showed for the hearing and therefore could not be challenged on the many ways her story had changed.

235.     Despite that, it still found against Doe, based on a rationale that was almost entirely conclusory, which falsely stated that Jane's and Sarah's stories had remained consistent, which refused to identify (because it couldn't) which of Jane's stories was more credible, and which refused to identify any actual texts in which John admitted or acknowledged having choked Jane (because it couldn't).

236.     The finding against Mr. Doe and its rationale were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor of Jane and Sarah.

237.     In all of those ways, and the ways described in more detail above, Princeton failed to apply the "clear and persuasive" evidence standard.

### B.     Denial of Mr. Doe's Appeal

238.     The Code also promises that disciplinary decisions may be appealed on three grounds, including that "[t]he procedures" used to investigate and resolve the complaint "have not been fair and reasonable," and that "[t]he imposed penalty does not fall within the range of penalties imposed for similar misconduct."

239.     As explained above, Mr. Doe's appeal documented several ways in which the procedures used to investigate and resolve Jane's and Sarah's complaints were neither fair nor reasonable.  Among other things, the COD failed to pursue relevant testimony, evidenced gender bias in the collection of evidence and conduct at the hearing, treated the parties disparately, refused to call relevant witnesses, refused to allow Mr. Doe to submit relevant text message evidence, and conducted the hearing at an unreasonable hour, causing at least one panel member to fall asleep.

240.     Mr. Doe's appeal also explained why his sanction was not "within the range of penalties imposed for similar misconduct."

241.     As a direct result of the University's breaches of its contract with Mr. Doe, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a woman-abuser which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

### <u>Count II – Breach of the Covenant of Good Faith and Fair Dealing</u>

242.     Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

243.    Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.  It required the University to implement the contract in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

244.    For all of the reasons stated in Count I, the University breached the covenant of good faith and fair dealing.

245.    Princeton breached the covenant in several additional ways as well.

### A.    Failure to Conduct a Fair Investigation

246.    First, the Code promises that Princeton will "investigate alleged infractions" of the Code.  Princeton was required by the covenant to conduct that investigation in a way that did not deny Mr. Doe the fruits of the contract.  As described above, however, its investigation was remarkably deficient in a number of ways.  Among other things, and as described more fully above, Princeton:

- Conducted a joint investigation despite the lack of factual overlap on Sarah's claim.

- Failed to interview relevant witnesses.

- Gave Jane and Sarah multiple interview opportunities to respond to testimony before the hearing without doing the same for John.

- Failed to press Jane and Sarah as firmly as it did John.

- Failed to redact highly prejudicial and irrelevant testimony.

- Conducted a rushed investigation—despite Jane's and Sarah's delayed reporting—that devoted more resources to obtaining evidence for Jane and Sarah than for John.

- Evidenced gender bias through the witnesses who were pursued and what they were (and were not) asked.

69

### B.      Failure to Conduct a Fair Hearing

247.    Second, the Code also states that disciplinary charges will be resolved by being "presented to . . . the Committee on Discipline" at a hearing.  The hearing that Princeton conducted breached the covenant for several significant reasons.  Among other things, and as described more fully above, Princeton:

- Conducted a combined hearing despite the lack of factual overlap on Sarah's claim.

- Prejudge the outcome of Mr. Doe's hearing before it even started, as stated by the source with knowledge of the panel's deliberations.

- Engaged in unbalanced questioning of the witnesses.

- Repeatedly treated John as though the burden of proof were his by demanding he explain *why* Jane and Sarah had acted as they had, even when the evidence proved they'd contradicted themselves.

- Refused to call relevant witnesses.

- Refused to accept relevant text message evidence.

- Conduced the hearing at an unreasonable hour that caused it to be rushed and led to at least one panel member falling asleep.

### C.      Failure to Provide a Meaningful Rationale

248.    Third, the Code states that the committee must "inform[] the student promptly of the decision" and, "[i]f a penalty is imposed," make a "special effort . . . to ensure that the student fully understands why the penalty was imposed[.]"  Princeton's decision letter, however, offered almost no rationale for its decision.  It stated just two things: that the complainants had purportedly offered "continued and consistent descriptions of the incidents," and that Mr. Doe had made "admissions and acknowledgements . . . in text messages."  It said literally *nothing* about the many ways the complainants' stories provably had *not* been consistent, nor offered any explanation at all in support of its conclusion about their consistency.  And as to Mr. Doe's

"admissions," it stated simply that it did not believe they had been made because he was "being blackmailed," again with zero further elaboration. That was the sum total of the panel's explanation for why it found Mr. Doe responsible. It based its decision on a rationale that was almost entirely conclusory, which falsely stated that Jane's and Sarah's stories had remained consistent, which refused to identify (because it couldn't) which of Jane's stories was more credible, and which refused to identify any actual texts in which John admitted or acknowledged having choked Jane (because it couldn't). The decision failed to offer any kind of meaningful explanation of the panel's decision.

249.    The finding against Mr. Doe and its rationale were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor of Jane and Sarah.

250.    As a direct result of the University's violation of the covenant of good faith and fair dealing, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

251.    Accordingly, the University is liable to Mr. Doe for violation of the covenant of good faith and fair dealing and for all damages arising out of that violation.

## Count III – Violation of Title IX (20 U.S.C. § 1681)

252.    John Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

253.    The University receives federal funding, including in the form of federal student loans given to students, and therefore is subject to the requirements of Title IX.

254.    Title IX prohibits gender discrimination in the educational setting.

255.    Unlawful discrimination exists when gender bias is a motivating factor in a student's discipline, which in turn occurs when gender bias motivates an outcome or sanction at least in part.

256.    The finding and sanction against John Doe were the product of gender bias at least in part, as exhibited by all of the following things, among others:

- Extreme pressure upon Princeton by the federal government to give deferential treatment to claims of assault brought by women against men, exhibited both by nationwide enforcement of the Dear Colleague Letter and the resolution agreement Princeton entered into in 2014;

- Extreme pressure from Princeton's student body and alumni to enforce a gendered view of claims of violence brought by women against men (particularly in the wake of rescission of the Dear Colleague Letter) and to identify things like "toxic masculinity" as the root cause of the problem;

- The University's responsiveness to that gender-biased pressure, including:

    o   actions taken in the wake of on-campus protests and publications;

    o   Princeton's pledge to adhere as closely as possible to the DCL's gender-biased regime;

    o   Princeton's adoption of a complicated two-track system for resolving claims of sexual misconduct designed to limit the reach of the 2020 regulations;

- The statements and actions of a biased investigator and hearing panel which, among other things:

    o   Repeatedly questioned John much more pointedly and confrontationally than it did Jane and Sarah, despite the glaring contradictions and inconsistencies they told;

- o Found that Jane and Sarah had told "consistent" stories despite the many changes to their stories, including on the most central parts of their allegations;

- o Refused to pursue exculpatory witnesses, even when requested by John;

- o Pursued female witnesses on behalf of Jane and Sarah but not similarly situated male witnesses on behalf of John;

- o Asked female witnesses, but not similarly-situated male witnesses, questions about whether Jane had any bruising;

- A conclusory and unsupported rationale that calls the decision against John into grave doubt, and failed to address significant exculpatory evidence. as explained above.

- A permanent, disclosable sanction that will gravely impact John's future and which is disproportionate to the violation he was (wrongly) found to have committed.

257.    As a direct result of the University's violation of Title IX, and as a direct and proximate cause thereof, Mr. Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

258.    Accordingly, Princeton is liable to Mr. Doe for violations of Title IX and for all damages arising out of that violation.

## Count IV – Gross Negligence

259.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

260.    In conducting its investigation and adjudication of Jane's and Sarah's claims, the University owed a common law duty to Mr. Doe to exercise reasonable care, with due regard for

the truth and to apply procedures evenhandedly, with due consideration of the important and irreversible consequences of its actions, as well as John's various liberty and property rights and interests generally.

261.    Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of Mr. Doe.

262.    In particular, the University has negligently hired, trained and supervised the people it employs to investigate and adjudicate disciplinary claims or otherwise implement its policies and procedures, as described above.

263.    By way of further example, and upon information and belief, those individuals are trained (1) to implement the goal of combating "toxic masculinity" and "rape culture," a chief element of which is to not express any doubt about the sincerity of claims of assault brought by women against men; and (2) to otherwise credit the testimony of claimants unless there is clear and convincing evidence, or something akin to that, of its falsity, in contravention of the requirement that all facts be determined by a preponderance of the evidence.

264.    As a direct result of the University's negligence, and as a direct and proximate cause thereof, Mr. Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

265.     Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against the University, and order relief against Defendant as follows:

a.     That this Court issue permanent injunctive relief: (1) ordering the University to vacate and expunge its finding of responsibility as to Doe; (2) restraining the University from reflecting, in any manner whatsoever, in John Doe's records or elsewhere, the findings or sanctions imposed upon Doe based on its adjudication of Jane Roe's and Sarah Smith's complaints; (3) restraining the University from maintaining any records related to that sanction, as it was the product of the University's erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and (4) ordering that Mr. Doe be immediately readmitted to Princeton.

b.     That the University be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by its misconduct; and

c.     That the University be ordered to pay punitive damages; and

d.     That this Court award John Doe his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: June 20, 2024

/s/ Justin Dillon
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (D.C. Bar No. 987116)
Kimberly Blasey (D.C. Bar. No. 90003791)
DILLON PLLC
1717 K Street, Suite 900
Washington, DC 20005
T: (202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Applications for admission* pro hac vice *forthcoming*

/s/ Jamie Hoxie Solano
Jamie Hoxie Solano (NJ Bar No. 426422024)
Bryan W. McCracken (NJ Bar No. 416362022)
FORD O'BRIEN LANDY LLP
275 Madison Ave., Fl. 24
New York, NY 10016
T: (212) 858-0040
jsolano@fordobrien.com
bmccracken@fordobrien.com

*Attorneys for Plaintiff John Doe*

## Certification Pursuant to L. Civ. R. 11.2

We hereby certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, as contemplated by 28 U.S.C. § 1746:  that the matter in controversy here is not the subject of any other action pending in any court, or of a pending arbitration proceeding; that no other action or arbitration proceeding is contemplated; and that we know of no other parties who should be joined in this action at this time.

Executed on June 20, 2024

/s/ Justin Dillon
Justin Dillon

/s/ Jamie Hoxie Solano
Jamie H. Solano

## Certification Pursuant to L. Civ. R. 201.1(d)(1)

This matter does not fall within the compulsory arbitration requirement set forth in L. Civ. R. 201.1(d)(1) because John Doe seeks injunctive relief in addition to money damages.