**SAUL EWING LLP**
James Keller, Esq. (NJ Bar ID No. 020991996)
Amy L. Piccola, Esq. (NJ Bar ID No. 012682008)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-8405 (Piccola) / (215) 972-1964 (Keller)
Email: Amy.Piccola@saul.com / James.Keller@saul.com
*Attorneys for Defendant the Trustees of Princeton University*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, | Case No. 24-CV-7125 |
| Plaintiff, | |
| v. | Motion Day: October 7, 2024 |
| THE TRUSTEES OF PRINCETON UNIVERSITY, | |
| Defendant. | |

### MEMORANDUM OF LAW OF DEFENDANT
### THE TRUSTEES OF PRINCETON UNIVERSITY IN SUPPORT OF ITS
### MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................1

Alleged Facts and Procedural Background.................................................................1

    A.   Multiple Misconduct Complaints against Doe and the University's Investigation. .................................................................................................1

    B.   Hearing, Adjudication, and Appeal of the Misconduct Complaints against Doe. ......................................................................................................5

Argument..................................................................................................................7

    A.   Standard of Review. ...................................................................................7

    B.   Doe's Breach of Contract Claim (Count I) against the University Must Be Dismissed. Doe has not Plausibly Alleged that the University Substantially Violated the RRR's terms in Conducting its Disciplinary Process. ......................9

        1.   The Investigation and Hearing.................................................................10

        2.   Doe's Appeal....................................................................................12

    C.   Doe's Breach of Good Faith and Fair Dealing Claim (Count II) also Fails as a Matter of Law because Doe has not Plausibly Alleged that the University Acted in Bad Faith. .............................................................................................17

    D.   Doe's Title IX Claim (Count III) Fails as a Matter of Law because the Complaint does not support a Plausible Inference that the University Discriminated against Doe on the Basis of his Sex, Nor Otherwise Demonstrate that Sex was a Motivating Factor in the University's Decision to Impose Discipline. ..............................................................................................21

        1.   The University Conducted a Thorough Investigation and Hearing, and the Outcome of the Process was Supported by Clear and Convincing Evidence....................................................................................................22

        2.   Doe has not plausibly alleged that the University was Motivated by External Pressure to Discriminate against Men. ...........................................27

    E.   Doe fails to State a Gross Negligence Claim (Count IV) against the University...................................................................................................29

Conclusion. .............................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................7, 8

*Behne v. Union Cnty. Coll.*, No. CV146929, 2018 WL 566207 (D.N.J. Jan. 26, 2018) ...........................................................................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................8

*Byers v. Intuit, Inc.*, 600 F.3d 286 (3d Cir. 2010) ...................................................1, 8

*Christian v. Lannett Co., Inc.,* No. CV 16-963, 2018 WL 1532849 (E.D. Pa. Mar. 29, 2018) ........................................................................................................8

*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) ..................................................2

*Doe v. Princeton Univ.*, 790 F. App'x 379 (3d Cir. 2019).............................9, 16, 26

*Doe v. Princeton Univ.*, No. 17-CV-1614 (PGS), 2018 WL 2396685 (D.N.J. May 24, 2018), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) ....................................2, 15, 17

*Doe v. Princeton Univ.*, No. CV 22-5887, 2023 WL 8755232 (D.N.J. Dec. 19, 2023) ...............................................................................................21, 26, 29

*Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225 (D.N.J. Jan. 17, 2018) ...............................................................................................21, 28

*Doe v. St. Joseph's Univ.*, 832 F. App'x 770 (3d Cir. 2020)....................................25

*Donohue v. Capella Univ., LLC*, No. CV 22-5634, 2023 WL 5425503 (D.N.J. Aug. 22, 2023) ......................................................................................................29

*Gendia v. Drexel Univ.*, No. 20-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020) ...................................................................................................................26

*Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002)................................8

*Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159 (3d Cir. 2010).8

*Saravanan v. Drexel Univ.*, No. CV 17-3409, 2017 WL 4532243 (E.D. Pa. Oct. 10, 2017) ...............................................................................................................26

*Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL 4482457 (3d Cir. Sept. 27, 2022) ............................................................................................. passim

*Wysocki v. Wardlaw-Hartridge Sch.*, No. 2:21-CV-14132, 2022 WL 2168212 (D.N.J. June 16, 2022) ..................................................................................... 19

*Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464 (D.N.J. Oct. 16, 2009) ........................................................................ 17

**STATE CASES**

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210 (2005) ..................................................................................................... 17

*Mittra v. Univ. of Med. & Dentistry of New Jersey*, 316 N.J. Super. 83, 719 A.2d 693 (App. Div. 1998) ............................................................................................. 9

*R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132 (N.J. 2001) ......................................................................................................... 18

*Sons of Thunder, Inc. v. Borden*, 690 A.2d 575 (N.J. 1997) ................................... 17

*Wade v. Kessler Inst.*, 778 A.2d 580 (N.J. Super. Ct. App. Div. 2001) ...... 17, 18, 19

**STATE STATUTES**

Rule 12(b)(6) ....................................................................................................... 7, 9

Rule 15(a) ................................................................................................................ 8

**OTHER AUTHORITIES**

RRR, Alcohol Policy ................................................................................................ 3

RRR, Personal Safety ..................................................................................... 1, 3, 20

University's *Rights, Rules, and Responsibilities* ..................................................... 2

## **INTRODUCTION**

Plaintiff John Doe ("Plaintiff" or "Doe") is a student at Defendant the Trustees of Princeton University ("Princeton" or the "University"). In September 2023, two different individuals came forward (one a University student and one a non-University student) and alleged that, on separate occasions on campus, Doe had placed his hands around their necks and choked them.  Consistent with its policies, Princeton handled these allegations of choking in accordance with its published student discipline procedures.  Following an investigation, an in-person hearing before the University's Faculty-Student Discipline Committee, and an appeal to senior University officials, Doe was found responsible for violating the University's <u>Personal Safety</u> policy and suspended for two years. While Doe acknowledged his misconduct, he is unhappy with this outcome.

Doe's unhappiness does not support a federal lawsuit. His Complaint should be dismissed with prejudice.

## **ALLEGED FACTS[1] AND PROCEDURAL BACKGROUND**

### A.    **Multiple misconduct complaints against Doe and the University's investigation.**

In September 2023, two individuals, identified in Doe's Complaint as Roe and Smith, came forward to the University and accused Doe of physically assaulting

---

[1] The University accepts as true the allegations in Doe's Complaint, as required at this stage of the case. *Byers v. Intuit, Inc.*, 600 F.3d 286, 297 (3d Cir. 2010) ("[A]s a general rule we must accept as true the allegations contained in a complaint

them during social interactions. Roe, who did not attend Princeton, reported that Doe choked her on the night of April 1-2, 2023 on the University's campus. (Complaint ¶ 115). During the investigation into Roe's complaint, Smith, a Princeton undergraduate student, separately reported to the University that Doe had also choked her on the University campus in March 2023. (*Id.*) Doe also was accused of having served alcohol to underage individuals in his dorm room. (*Id.* ¶ 123).

The University's Faculty-Student Committee on Discipline (the "Committee") adjudicated these complaints against Doe pursuant to the University's *Rights, Rules, and Responsibilities* policy (the "RRR"). The relevant sections of the RRR are excerpted as "**Exhibit A**."[2] The RRR provides the Committee with jurisdiction to delegate an investigator to look into "any potentially serious alleged infraction (except allegations of sex discrimination or sexual misconduct; see section 1.3) involving undergraduate students for which the penalty might interrupt the

---

attacked by a 12(b)(6) motion to dismiss . . . .").  To be clear, the University disputes most of the allegations in Doe's Complaint.

[2] The Court may consider the relevant excerpts of the RRR, which are integral to Doe's Complaint, when deciding the instant Motion to Dismiss. *Doe v. Princeton Univ.* ("*Princeton III*"), 30 F.4th 335, 345–46 (3d Cir. 2022) ("Because the Panel Report was 'integral to' and 'explicitly relied upon in the complaint,' consideration is appropriate."); *Doe v. Princeton Univ.*, No. 17-CV-1614 (PGS), 2018 WL 2396685, at *2 n.1 (D.N.J. May 24, 2018) ("*Princeton I*") (considering panel report and letter when dismissing Title IX claims because they are "undisputedly authentic documents upon which the Complaint's claims are based"), *aff'd*, 790 F. App'x 379 (3d Cir. 2019) ("*Princeton II*").

student's academic career." (Ex. A, Subsection 2.5.1). Doe was investigated for potential violations of Subsection 1.2.5(5) of the RRR, <u>Personal Safety</u>, which relates to "[a]ny physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results."[3] (*Id*.). Doe was further investigated pursuant to Subsection 2.2.9(2)(d) of the RRR, <u>Alcohol Policy</u>, which explains that a violation of the policy occurs "when alcohol is served, provided, or made available by or to persons under the age of 21. Violations involving juveniles, such as high school applicants or visitors to the University, will be deemed particularly serious." (*Id*., Subsection 2.2.9). The University classifies the "serving, providing, or making available of hard alcohol (in any quantity)" as a higher risk violation. (*Id*.)

The RRR specifically provides that a Dean or University investigator will investigate alleged infractions. (*Id*., Subsection 2.5.2). Following the investigation, the student has the following rights:

- The student may obtain from the Committee's secretary all documents pertaining to reports of the alleged misconduct and the names of the members of the committee;
- The student has the option of submitting any additional written materials that may assist the Committee in reaching a decision.

---

[3] Subsection 1.2.5 Personal Safety also explains that "[a]ctions that threaten or endanger in any way the personal safety or security of others will be regarded as serious offenses."

(*Id.*)

Once the investigation is concluded, the RRR mandates that "[m]atters shall be presented to the committee with all reasonable promptness." (*Id.*) In all cases referred to the Committee, the student involved will be informed in writing of the charge(s) and of the specific day and time when the student is to appear before the Committee. (*Id.*) The RRR outlines the hearing procedures as follows:

- The student may be accompanied at the committee hearing by an adviser, who must be a current member of the resident University community, and who may participate in the hearing in accordance with instructions issued by the chair;
- At the hearing, any person with information about the matter before the committee may be requested to appear by the student, the dean of undergraduate students, or the committee, subject to reasonable limits agreed on by the committee;
- In an opening statement the student has an opportunity to explain the circumstances from a personal point of view and may also question individuals who have provided information and may in turn be questioned by the committee members;
- The student may make a closing statement.

(*Id.*) In order to determine that a student has violated a University rule, a majority of the voting committee members present must conclude that the evidence presented "constitutes a clear and persuasive case in support of the charges against the student." (*Id.*)

In compliance with the RRR, the University initiated an investigation into the complaints against Doe and, specifically, into whether he violated the RRR's above-

referenced policies on personal safety and alcohol use. (*Id*. ¶¶ 116, 120). The Committee appointed an investigator who conducted a comprehensive investigation, which included: (1) interviewing Doe, (2) interviewing both complainants, (3) interviewing five witnesses, and (4) collecting information, including numerous text messages, and two written statements from Doe. (*Id*. ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180). Following the investigation, the Committee scheduled a disciplinary hearing, and in advance of that hearing, Doe was provided all of the information that was also provided to the Committee. (*Id*. ¶ 122).

### B. Hearing, adjudication, and appeal of the misconduct complaints against Doe.

On November 6, 2023, a panel of the Committee—composed of two faculty members and three students, as well as the then-Dean of Students, Kathleen Deignan, who served as the Chair of the Committee—held the hearing. (*Id*. ¶ 120). Doe was present. Doe was accompanied by an adviser, he had the ability to present information to the Committee and offer testimony, and he had the ability to call and ask questions of witnesses. As permitted by the RRR, Doe also submitted a written account of the events. (*Id*. ¶ 120). Doe also offered evidence pertaining to a student identified as Student X, whom Doe identified as having information related to Roe's credibility. (*Id*. ¶ 118). As the investigation progressed, Doe submitted additional materials related to Student X and two supplemental written statements. (*Id*. ¶¶ 118,

128, 131). Doe also submitted to the Committee numerous text messages between and among the involved parties. (*Id.* ¶¶ 77, 156, 160, 180).

After reviewing all evidence presented, including Doe's submissions, and conducting a four-hour hearing, the Committee found Doe responsible for three violations of the RRR: two violations of subsection 1.2.5, <u>Personal Safety</u>, and one violation of subsection 2.2.9, <u>Alcohol Policy</u>.[4] Notably, Doe's own Complaint concedes that he violated the <u>Alcohol Policy</u>.[5] As a result of these multiple, serious violations of the RRR, Doe was sanctioned with a two-year suspension from the University. (*Id.* ¶¶ 1, 16, 162, 192).

The RRR states that a student found to have violated University policy has the right to appeal the decision. (Ex. A, Subsection 2.5.2). The appellate panel is comprised of neutral, senior University officials. (*Id.*) There are only three grounds for appeal, namely:

- The procedures have not been fair and reasonable. The period of time under review starts when a student is formally charged with a violation and ends when the

---

[4] The RRR classifies violations of subsection 1.2.5 as "serious offenses." (Ex. A, Subsection 1.2.5) Similarly, violations of subsection 2.2.9 for providing alcohol to minors where visitors to the University are involved, such as Roe, are "deemed particularly serious." (*Id.*, Subsection 2.2.9). Further, violations involving hard alcohol are classified as "higher risk." (*Id.*).

[5] Doe's Complaint states that on Roe's second night visiting him at the University, the two of them "had drinks" with other students in Doe's dorm room. (Compl. ¶ 94). As Doe concedes this violation of the RRR, the University does not address it further.

> committee issues a final decision. Neither the choice of
> venue nor the nature of the investigation is grounds for
> appeal;
>
> - There exists substantial relevant information that was
>   not presented, and reasonably could not have been
>   presented to the committee;
> - The imposed penalty does not fall within the range of
>   penalties imposed for similar misconduct.

(*Id.*) The RRR makes clear that the purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. (*Id.*) The appellate panel may decide to uphold the original decision of the Committee; to reduce the imposed penalty; or to return the case to the original hearing body for additional proceedings. (*Id.*)

Doe submitted an appeal. (Compl. ¶¶ 209, 212, 217). The appeal panel, after seeking and receiving requested clarifications from Doe, upheld the outcome and the sanction. (*Id.*).  Doe then filed this lawsuit.

## **ARGUMENT**

### A.    **Standard of Review.**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citation omitted). While the complaint must be construed in the "light most favorable to the plaintiff," *Byers*, 600 F.3d at 291 (citation and internal quotations omitted), "'labels and conclusions' [and] . . . 'naked assertion[s]' devoid of 'further factual enhancement'" are not entitled to the presumption of truthfulness. *Iqbal*, 556 U.S. at 678 (citations omitted). Ultimately, if the factual allegations fail "to raise a right to relief above the speculative level," the reviewing court must dismiss the claim. *Twombly*, 550 U.S. at 555 (citation omitted).

Although a plaintiff whose complaint is dismissed for failure to state a claim may be granted leave to amend his complaint, if amendment would be futile, the claims should be dismissed with prejudice and without leave to amend. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 111 (3d Cir. 2002). Stated differently, where a claim as originally pled is legally insufficient, and no amendment will cure the insufficiency, the claim should be dismissed with prejudice. *See Christian v. Lannett Co.*, *Inc.,* No. CV 16-963, 2018 WL 1532849, at *7 (E.D. Pa. Mar. 29, 2018); *see also Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) ("Under Rule 15(a), futility of amendment is a sufficient basis to deny leave to amend.").

Doe has not stated a claim under Rule 12(b)(6) and the deficiencies of his Complaint cannot be cured by amendment. His Complaint against the University should be dismissed in its entirety, with prejudice.

**B.    Doe's Breach of Contract Claim (Count I) against the University Must Be Dismissed. Doe has not Plausibly Alleged that the University Substantially Violated the RRR's terms in Conducting its Disciplinary Process.**

Under New Jersey law,[6] "the relationship between a private university and its students should not be analyzed in purely contractual terms." *Mittra v. Univ. of Med. & Dentistry of New Jersey*, 316 N.J. Super. 83, 85, 719 A.2d 693, 694 (App. Div. 1998); *Princeton III*, 30 F.4th at 345–46. New Jersey courts have consistently rejected rigid application of contractual principles in university-student disputes. *Mittra*, 719 A.2d at 697; *Behne v. Union Cnty. Coll.*, No. CV146929, 2018 WL 566207, at *7 (D.N.J. Jan. 26, 2018). Instead, the focus is on whether the university substantially complied with its established procedures. *Id.*

As applied to the RRR, the Third Circuit has held that New Jersey law requires a plaintiff-student to show "the institution violate[d] in some substantial way its rules and regulations." *Princeton II*, 790 F. App'x at 385 (emphasis added) (*quoting Mittra*, 719 A.2d at 698); *see also Princeton III*, 30 F.4th at 346–47 (discussing the RRR and holding, "New Jersey law requires at least that the school follow its own

---

[6] There is no dispute that New Jersey law applies in this case.

established procedures and that those procedures be fundamentally fair."). A plaintiff "may not prevail where the evidence is closely balanced or inconclusive." *Id*. at 347.

Here, Doe alleges that the University failed to follow the RRR in investigating and resolving the charges against him and thereby breached its "contract" with him by failing to: (1) apply the "clear and persuasive" evidence standard mandated by the RRR, and (2) grant his appeal. However, the allegations of Doe's own Complaint confirm that the University "follow[ed] its own established procedures." *Id*. at 346.

### 1.    *The Investigation and Hearing*

The RRR requires the University to (1) "investigate alleged infractions," (2) resolve charges through the Committee at a hearing, and (3) apply the "clear and persuasive evidence" standard. (Compl. ¶¶ 28, 233, 237, 247; *see also* Ex. A, Subsection 2.5.2). The University did all of these things.

*First*, the University conducted an extensive investigation, which included: (1) interviewing Doe, (2) interviewing both complainants, (3) interviewing five witnesses, and (4) collecting information, including numerous text messages, and three written statements from Doe. (*Id*. ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180). Doe suggests that the University could have done something more, or different. Doe's suggestion is of no moment. The University's obligation, on the face of the

RRR, is to "investigate." It did so. Neither Doe nor any student (or other individual) controls the nature, extent, or duration of that investigation.

**Second**, the Committee adjudicated the charges against Doe at a hearing that afforded Doe the process prescribed by the RRR. (*Id*. ¶¶ 1, 16, 162, 192). Doe was allowed to submit written statements and evidence prior to the hearing, to identify and question witnesses, and to have an adviser present. (*Id*.). He did all of these things.

**Third**, the Committee determined Doe's responsibility for the alleged policy violations using the clear and persuasive evidence standard. Doe cites to no factual evidence to the contrary; he simply disagrees with the outcome, and therefore contends that the evidence could not have been clear and persuasive. That Doe believes this does not make it so. Most salient to the pending motion to dismiss, there are facts pled in ***Doe's own Complaint*** that support the Committee's determination by clear and persuasive evidence. For example, Doe acknowledged his responsibility for misconduct toward Ms. Roe (1) in a text message where he stated, "it's probably that it hasn't fully soaked in yet cause I haven't processed what I must have done last night," (*Id*. ¶ 108), and (2) in a phone call to his parents, when he admitted that he "damaged [Roe's] windpipe ever so slightly." (*Id*. ¶ 111). Doe suggests that he was somehow effectively blackmailed into writing that text and making those statements to his own parents; the Committee did not find those suggestions credible.

Further, a neutral witness at the hearing corroborated key facts, testifying that one of the impacted individuals (Roe) "had a raspy voice when he saw her after the incident." (*Id*. ¶ 181). Based on all of the evidence presented, including the corroborating evidence just cited and acknowledged in Doe's own Complaint, the Committee credited Ms. Roe's account of events.

As for Ms. Smith, Doe admitted that he "confronted [Smith] in ***actions* he would come to regret**." (*Id*. ¶ 89) (emphases added). Doe also admitted that "[h]e spoke closely and loudly with [Smith], in part out of anger," and acknowledged that three bystanders who witnessed his confrontation felt it necessary to intervene on Smith's behalf. (*Id*.) The Committee ultimately credited Smith's account of events after hearing her testimony at the hearing and considering these admissions from Doe.

The Committee applied the "clear and persuasive evidence" standard. (*Id*.) Doe cites to no plausible evidence to the contrary. The fact that the University did not reach the conclusion that Doe desired does not mean that the Committee deviated from the required standard. And that Doe does not like the outcome certainly does not support a claim for breach of contract.

### 2.    *Doe's Appeal*

Doe next alleges that the University somehow breached a "contract" by not granting his appeal, because "[t]he procedures" used to resolve the complaint[s]

"have not been fair and reasonable." (*Id.* ¶ 238; *see also* Ex. A, Subsection 2.5.2).

As a reminder, the grounds for appeal (RRR, Section 2.5.2) are:

- The procedures have not been fair and reasonable. The period of time under review starts when a student is formally charged with a violation and ends when the committee issues a final decision. Neither the choice of venue nor the nature of the investigation is grounds for appeal;
- There exists substantial relevant information that was not presented, and reasonably could not have been presented to the committee;
- The imposed penalty does not fall within the range of penalties imposed for similar misconduct.

In support of his claim, Doe alleges that the Committee "failed to pursue relevant testimony, evidenced gender bias" during the investigation and hearing, "treated the parties disparately, refused to call relevant witnesses, refused to allow Mr. Doe to submit relevant text message evidence, and conducted the hearing at an unreasonable hour." (*Id.* ¶ 239). "Failing to pursue" testimony and the time of day of a hearing, as an initial matter, are not stated grounds for an appeal.

More fundamentally, there is no cognizable breach of contract claim stated here. Doe believes the Committee should have granted his appeal for the reasons he notes. The Committee did not grant his appeal. Doe nowhere explains why his disagreement with the Committee's appeal decision somehow constitutes a breach of contract, or why this Court should second-guess the decision making of the Committee. Additionally, Doe's allegations are simply wrong. As detailed above

and in his own Complaint, Doe had a full chance to present evidence during the investigation and at the hearing. He plainly thought he had presented enough evidence to prevail. Doe's after-the-fact rationalization that more or different evidence should have been considered is too late, and does not support any breach of contract claim.

To the extent the Court deems it necessary to evaluate the underlying claims of Doe's internal appeal, they can similarly be dismissed. Doe first alleges that the Committee failed to pursue relevant testimony because neither the investigator nor the Committee interviewed Student X, an individual identified by Doe who brought a defamation lawsuit against Roe, nor Doe's roommate, who interacted with Roe and Smith in the days after the incident with Roe. (*Id*. ¶ 136). Doe's own Complaint concedes, however, that after the investigation was concluded he was provided with the evidence packet and informed "that he had the option to request additional interviews be conducted based on the information in the packet." (*Id*. ¶ 122). Doe did not request that Student X or his roommate be interviewed. Doe's Complaint further concedes that the students who *were* interviewed were "identified by the female complainants." (*Id*. ¶ 136). In other words, Roe and Smith identified witnesses, and they were interviewed. Doe did not. This was Doe's choice. Doe's failure to take advantage of the process available to him does not support a breach of contract claim.

To support his allegation of gender bias (stated here as a breach of contract claim, not a Title IX claim), Doe alleges that a male student who witnessed the alleged incident between Doe and Roe was interviewed once, while a female student who was involved in a prior disciplinary issue pertaining to Doe was interviewed twice. The appellate body did not find this conclusory allegation of "gender bias" to support Doe's appeal. There is no basis for this federal court to second-guess the University's decision in this regard. *See Princeton I*, 2018 WL 2396685, at *4 (a court must "weed out the conclusory statements" and "exclude[] the[m] . . . from its analysis").

Doe also alleges that the Committee somehow acted improperly because it "refused to call relevant witnesses." (*Id.* ¶ 239). In fact, the Committee refused to compel a single witness, Student X, to appear at the hearing (*Id.* ¶¶ 177, 239), and Doe himself acknowledges that Student X had no knowledge of the incidents being adjudicated. (*Id.*). The refusal of the Committee to mandate testimony from a student witness with no knowledge of the incidents at issue is consistent with the RRR's requirement that those persons "***with information about the matter before the committee***" may testify. (*Id.* ¶ 29; RRR, Section 2.5.2) (emphasis added). And even without Student X testifying, Doe was permitted to submit written materials pertaining to Student X to the Committee for consideration on two separate occasions. (*Id.* ¶ 118, 131).

15

Doe next alleges that his appeal should have been granted because he was precluded from submitting additional, previously undisclosed text messages during the hearing. As Doe acknowledges, however, he was allowed to (and did) submit text messages *prior* to the hearing, during the factfinding investigation. (*Id*. ¶¶ 77, 156, 160, 180). His attempt to submit new text messages at the hearing was contrary to the RRR's established procedures, as a student "has the option of submitting any additional written materials that may assist the committee in reaching a decision" following the investigation, but before the hearing– not at the hearing itself. (Ex. A, Subsection 2.5.2).

Doe finally alleges that the hearing was conducted at an "unreasonable hour," but that is also a post-hoc rationalization from Doe. As the Committee is made up of professors and students, the hearing was reasonably scheduled at 7:27 PM, after the conclusion of the school-day. (*Id*. ¶ 162). More importantly, Doe nowhere suggests, nor could he, that there is a contractual obligation for a conduct hearing to take place at a particular time of day.

In sum, Doe has not alleged facts showing that Princeton substantially violated the RRR's terms in conducting its disciplinary process or in considering Doe's appeal. Rather, Doe's own allegations show that Princeton adhered to "its own rules" and followed "fundamentally fair" procedures. *Princeton II*, 790 F. App'x at 385. Because the University followed its procedures as outlined in the RRR, Doe's

breach of contract claim must be dismissed. *Princeton I*, 2018 WL 2396685, at *8 (dismissing contract claim alleging violations of the RRR where the University followed its procedures as outlined in the RRR).

### C.    Doe's Breach of Good Faith and Fair Dealing Claim (Count II) also Fails as a Matter of Law because Doe has not Plausibly Alleged that the University Acted in Bad Faith.

Every contract in New Jersey "contains an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 778 A.2d 580, 584 (N.J. Super. Ct. App. Div. 2001), aff'd as modified, 798 A.2d 1251 (N.J. 2002); *Sons of Thunder, Inc. v. Borden*, 690 A.2d 575, 587 (N.J. 1997) (same). While there is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, "two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009). Further, a plaintiff "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005) (quotation omitted).

17

The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith had engaged in some conduct that denied the benefit of the bargain originally intended by the parties. *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132 (N.J. 2001). Proof of bad motive or intention is vital to an action for breach of the covenant of good faith and fair dealing. *Id*. Bad faith allegations "should not be permitted to be advanced in the abstract and absent an improper motive." *Wade*, 798 A.2d at 1260. Doe's allegations do not plausibly indicate that the University acted in bad faith.

Doe alleges that the University breached the covenant of good faith and fair dealing by: (1) failing to conduct a fair investigation, (2) failing to conduct a fair hearing, and (3) failing to provide a meaningful rationale. (Compl. ¶¶ 245-251). As an initial matter, and as detailed above, Doe fails to adequately plead exactly what the "contract" is in this case.  Even if Doe has adequately pled the existence of a contract, he fails to adequately allege any "bad faith conduct" or "malicious motive" on behalf of the University. This Count II is just a repackaging of Doe's breach of contract claim. Doe disagrees with the outcome of the disciplinary process, but other than saying so in conclusory fashion, he provides no plausible factual allegations to contradict the following: there was a thorough investigation, an investigation packet was provided for his review, the Committee conducted a hearing at which Doe was

permitted to testify, and Doe had an opportunity to appeal the outcome, which he did. (*See, e.g,* Compl. ¶¶ 77, 85, 86, 122, 130, 136, 156, 160, 180). Doe's subjective suggestion that he would have done something differently, or that he wished the Committee did something differently, are of no moment to his breach of contract claim.  (Compl. ¶¶ 246-247).

Doe's final "bad faith" allegation is that the University failed to provide a meaningful rationale for its disciplinary decision. (*Id.* ¶ 248). Yet, in the same exact paragraph of his Complaint, Doe actually cites the precise rationale that the University shared, and the basis for same. That Doe (not surprisingly) disagrees with the University's rationale does not render it deficient.

Allegations of bad faith "should not be permitted to be advanced in the abstract and absent an improper motive." *Wade*, 798 A.2d at 1260. The "bad faith" advanced by Doe is all speculation; there are no plausible allegations of malice on the University's behalf. *See Wysocki v. Wardlaw-Hartridge Sch.*, No. 2:21-CV-14132, 2022 WL 2168212, at *3 (D.N.J. June 16, 2022) (dismissing claim where "[t]he Court cannot discern coherent factual allegations supporting Plaintiffs' bare assertion that [the defendant school] violated and breached the implied covenant of good faith and fair dealing").

Doe almost surely will attempt to analogize this case to a Title IX lawsuit involving the University (*Princeton III*), where, after an appeal to the Third Circuit,

a breach of the covenant of good faith and fair dealing claim survived a motion to dismiss. The present case is unlike *Princeton III* for several reasons. First, here Doe was found to have violated the University's <u>Personal Safety</u> policy, not the University's Title IX policy. Second, Doe has not alleged plausible facts showing that the University "[s]ubject[ed] [Doe] to a discriminatory disciplinary process," "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe]," "constru[ed] all discrepancies and inconsistencies in [Roe's] favor," and "ignor[ed] evidence corroborative of [Doe's] counter claims." *Princeton III*, 30 F.4th at 348.

As an initial matter, *Princeton III* involved complaints by a male student against his female girlfriend, and vice versa. The crux of the Plaintiff's breach of contract arguments in *Princeton III*, which the Third Circuit ultimately determined were sufficient to survive a motion to dismiss, was that Doe sufficiently alleged that the Committee "disregard[ed] evidence that tended to inculpate Roe and exculpate Doe." 30 F. 4th at 347. Here, by contrast, there were not cross-claims by Doe against Roe (or Smith). The Committee here did not and could not have disregarded ***incriminating*** evidence against Roe or Smith, because Doe did not file any complaints against either of them. Further, the Committee could not have "ignored Doe's counterclaims," because he did not file any. Finally, as detailed above, the Committee here did not disregard "exculpatory" evidence that Doe sought to

introduce; rather, Doe failed to timely present this "evidence," and the evidence, in any event, was from a witness (Student X) who had no information about Roe and Smith's allegations at all. Doe has not adequately pled a claim for the Breach of Good Faith and Fair Dealing, and Count II should be dismissed with prejudice.

> **D.    Doe's Title IX Claim (Count III) Fails as a Matter of Law because the Complaint does not support a Plausible Inference that the University Discriminated against Doe on the Basis of his Sex, Nor Otherwise Demonstrate that Sex was a Motivating Factor in the University's Decision to Impose Discipline.**

In Count III, Doe alleges that the University discriminated against him on the basis of sex in violation of Title IX when it investigated and found him responsible for violations of the RRR.[7] (Compl. ¶ 123). To state a Title IX claim, Doe must allege facts supporting a plausible inference that the University discriminated against him on the basis of sex, and that sex was "a motivating factor in the decision to discipline." *Doe v. Princeton Univ.*, No. CV 22-5887, 2023 WL 8755232, at *6 (D.N.J. Dec. 19, 2023) (*quoting Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020)); *See also Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-DEA, 2018 WL 466225, at *9 (D.N.J. Jan. 17, 2018) (holding that, because Title IX liability requires an allegation that the defendant's conduct was motivated by gender bias, "the Court

---

[7] Doe was not investigated for alleged violations of the University's Title IX Sexual Harassment Policy, nor its Sexual Misconduct Policy. He was investigated for student conduct violations. In this way, too, Doe's case is distinct from other cases upon which he seems to have patterned his Complaint.

need not probe into the theory-specific requirements necessary to state a claim" if the plaintiff fails to sufficiently allege that the defendant's conduct was motivated by gender bias). "Allegations that may support gender bias include 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL 4482457, at *4 (3d Cir. Sept. 27, 2022) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Doe's pleading fails to support a plausible inference that the University discriminated against him on the basis of his sex and fails to demonstrate that his sex was the motivating factor in the disciplinary outcome.

### 1.    *The University conducted a thorough investigation and hearing, and the outcome of the process was supported by clear and convincing evidence.*

Doe alleges that the investigator and Committee were biased because: (1) Doe was questioned "more pointedly and confrontationally" than the complainants, (2) the complainants were found to have told "consistent" stories despite "changes to their stories," (3) the Committee refused to pursue exculpatory witnesses on behalf of Doe, (4) female witnesses were pursued on behalf of the complainants, but not similarly situated male witnesses on behalf of Doe, and (5) male witnesses were not questioned as to whether Roe had any bruising on her neck, but female witnesses were. (Compl. ¶ 256).

As to the first allegation, even if Doe is right that he was questioned more "pointedly and confrontationally" than Roe or Smith, (*Id.* ¶ 256), he fails to plausibly plead how that treatment was tied to his status as a male, rather than to his status as the respondent/alleged assailant. *See, e.g., Verdu*, 2022 WL 4482457, at *3 (stating that "the purported differences in how Princeton treated [the respondent] and [his victim] are too conclusory to support a plausible claim for relief.").

Regarding the second allegation, Doe is essentially challenging the decision-making process of the Committee. He contends that the Committee "got it wrong" and should have found that the complainants (Roe and Smith) provided inconsistent testimony, not consistent testimony. Doe no doubt currently believes this. But that subjective belief does not mean the Committee actually got it wrong, and Doe provides zero plausible facts indicating that, even if the Committee did "get it wrong," it did so *because Doe is a man*.

Doe next contends that the University "pursued" female witnesses on behalf of complainants, but no male witnesses on behalf of Doe. There are no plausible allegations to suggest that the investigator did anything other than investigate those witnesses identified as having actual information about the events at issue, regardless of their sex. Doe's own Complaint concedes that he was interviewed by the investigator, was provided the list of witnesses interviewed during the fact-finding process, and was informed "that he had the option to request additional interviews

be conducted." (*Id*. ¶ 122). Doe did not request a follow-up interview and did not request that the investigator interview *any* additional witnesses on his behalf, regardless of sex. By contrast, Doe's own Complaint concedes that many of the students interviewed were "***identified*** by the female complainants." (*Id*. ¶ 136). Doe cannot credibly complain that he was somehow subject to gender discrimination because the University interviewed witnesses who happened to be identified by female parties, but did not clairvoyantly decide to interview male witnesses never identified by Doe.

Doe also alleges that male witnesses were not questioned at the hearing about whether Roe had any bruising on her neck. (*Id*. ¶ 137). Specifically, Doe alleges that "Student 4, 6, and [Doe]" were not asked about bruising on Roe's neck. (*Id*.). This is contradicted within Doe's own Complaint, where he acknowledges that the Committee <u>did</u> question Student 4 about bruising at the hearing "in an attempt to establish that [Roe's] bruising could not have been visible." (*Id*. ¶ 176). Doe could have questioned Student 4 on this point at the hearing as well. Doe also could have questioned Student 6, who was present at the hearing, about bruising. (*Id*. ¶ 181). Doe did not do so – almost surely because Student 6 had already testified that Roe "had a raspy voice when he saw her after the incident." (*Id*.). Further, as Doe confirms he gave a statement at the hearing, absolutely nothing was stopping him

from testifying himself about Roe's bruising if he thought it was helpful to his position. (*Id*. ¶ 192).

Finally, Doe alleges that his male roommate, Student 5, was not questioned during the investigation about whether Roe had any bruising on her neck. However, Doe **never identified** Student 5 as a witness – not at the outset of the investigation, and not after being provided the witness list and being informed "that he had the option to request additional interviews be conducted." (*Id*. ¶ 122). Therefore, the investigator could not have questioned Student 5 at all, let alone about any bruising on Roe's neck, because of Doe's failure to identify him as a witness. Doe's failure to meaningfully participate in his own defense cannot support his allegations of gender bias.

In short, even if Doe disagrees with the process and the outcome of his case, he has presented no credible, plausible allegations of gender bias to support a claim under Title IX. *See Verdu*, 2020 WL 1502849, at *4-5 (plaintiff failed to show Title IX violation where he admitted to violation of University's policies and "failed to allege that he received different treatment by Princeton than a similarly situated female"); *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774–75 (3d Cir. 2020) (noting panel's investigation, which failed to question Roe's credibility or memory, may have been "shoddy," but did not give rise to gender bias where "allegations" did not "relate to bias on account of sex") (*quoting Doe v. Columbia Univ.*, 831 F.3d 46, 57

25

(2d Cir. 2016)); *Doe v. Princeton Univ.* ("Princeton II"), 790 F. App'x 379, 384 (3d Cir. 2019) (affirming dismissal of Title IX claim where plaintiff pled conclusory statements that Princeton would have treated him differently if he were a female, failed to plead facts "reflecting that the disciplinary process and results for female victims are different from men," and found his "many grievances about how the process was conducted and how he was treated" did not show "unfavorable treatment due to his sex"); *Gendia v. Drexel Univ.*, No. 20-1104, 2020 WL 5258315, at *3 (E.D. Pa. Sept. 2, 2020) (no Title IX allegations where investigator "assumed Roe's truthfulness" and made evidentiary determinations that favored Roe over plaintiff); *Saravanan v. Drexel Univ.*, No. CV 17-3409, 2017 WL 4532243, at *4 (E.D. Pa. Oct. 10, 2017) (holding that plaintiff's complaint did not demonstrate Title IX claim where plaintiff alleged "an adverse and erroneous outcome" and "blanket allegations of discrimination" (citations omitted)). At most, Doe has suggested that Princeton had a bias in favor of the complaining parties, Roe and Smith. Without further plausible allegations specifically tying that favoritism to gender, those suggestions fail to adequately state a Title IX claim. *Doe v. Princeton Univ.,* No. CV 22-5887 (RK) (DEA), 2023 WL 8755232, at *8 (D.N.J. Dec. 19, 2023), reconsideration denied, No. CV 22-5887 (RK) (JTQ), 2024 WL 3580747 (D.N.J. July 29, 2024).

Doe's Title IX claim (Count III) should be dismissed with prejudice.

### 2. *Doe has not plausibly alleged that the University was motivated by external pressure to discriminate against men.*

As an alternative method to try to support his Title IX claim, Doe contends that the University faced internal and external pressure to respond aggressively to allegations made by female complainants against male respondents. (Compl. ¶¶ 37-74). As an initial matter, this extensive discussion in Doe's Complaint entirely relates to claims of sexual assault and the related internal Title IX processes at the University. This case, by contrast, is not a sexual assault case. Princeton's Title IX processes were not involved.

In any event, allegations about "pressure" are too abstract and conclusory to sufficiently allege that gender bias specifically impacted Doe's case. Courts have held that similar allegations are insufficient to survive a motion to dismiss. "[E]xternal pressure alone is not enough. Rather, '[i]n the cases where public pressure was found to support claims of erroneous outcome [under Title IX], that public pressure targeted the *specific* disciplinary action being challenged.'" *Verdu*, 2020 WL 1502849, at *5 (quoting *Doe v. Univ. of Cincinnati*, No. 1:16CV987, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018) (collecting cases holding same). In *Verdu*, for example, the court held that the plaintiff failed to allege that gender bias affected the relevant proceedings because he failed to "point to any public pressure directed at any single individual involved in his specific case," and instead cited to federal investigations by Office of Civil Rights into the University's broad handling

of sexual assault accusations and general criticisms of an unrelated academic department. *Verdu*, 2020 WL 1502849, at *5 ("Without any allegations specifically connecting the external pressure on the University to Plaintiff's specific case, there is simply no basis to plausibly infer that the outcome of the [investigation] was motivated by his gender."); *see also Rider Univ.*, 2018 WL 466225 at *12 (allegation that pressure from 2011 Dear Colleague Letter resulted in gender bias was conclusory and insufficient on its own to carry Title IX claim).

Finally, the now-rescinded 2011 Dear Colleague Letter was issued over 12 years ago, with two intervening presidential administrations and a significant overhaul of Title IX regulations occurring since then. It is implausible that the Dear Colleague Letter, which was rescinded in 2017, had any impact on the University's conduct, and Doe alleges no facts to the contrary. The Third Circuit has confirmed that resting a Title IX discrimination claim on the Dear Colleague Letter is insufficient: "'pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination,' it factors into the total mix of information supporting a plausible Title IX discrimination claim." *Princeton III*, 30 F.4th at 345 (quoting *Univ. of Scis.*, 961 F.3d at 210).

In sum, Doe fails to allege any plausible facts to support his claim that the University's conduct was motivated by gender bias. For this reason, too, Plaintiff's Title IX claim (Count III) should be dismissed, with prejudice.

### E.    Doe fails to State a Gross Negligence Claim (Count IV) against the University.

New Jersey courts have held that universities owe no duty of care to students when carrying out disciplinary procedures. *Donohue v. Capella Univ., LLC*, No. CV 22-5634, 2023 WL 5425503, at *7 (D.N.J. Aug. 22, 2023) (holding that there is no "authority indicating that a private university or its employees owe a certain duty of care to its students under New Jersey law when carrying out disciplinary procedures."); *Doe*, 2023 WL 8755232, at *13 ("Because the University owes Plaintiff no duty of care under New Jersey law, his gross negligence claim must fail."). Doe's gross negligence claim (Count IV) must be dismissed with prejudice.

## CONCLUSION.

For the foregoing reasons, Doe's Complaint against the University should be dismissed in its entirety, with prejudice.

# Exhibit A

Rights, Rules, Responsibilities

# 1.2 University-Wide Conduct Regulations

## 1.2.1 Respect for Others

Respect for the rights, privileges, and sensibilities of each other is essential in preserving the spirit of community at Princeton. Actions which make the atmosphere objectively intimidating, threatening, or hostile to individuals are therefore regarded as serious offenses. Abusive or harassing behavior, verbal or physical, which demeans, intimidates, threatens, or injures another and is sufficiently severe and/or pervasive to have the effect of unreasonably interfering with an individual's educational experience, working conditions, or living conditions is subject to University disciplinary sanctions. Making tolerance of such behavior or submission to it a condition of employment, evaluation, compensation, or advancement is an especially serious offense. Procedures for resolving complaints or grievances regarding abusive, harassing, or disrespectful conduct are discussed under Rights, Rules, Responsibilities section **1.2.2** (/2023/university-wide-regulations/12-university-wide-conduct-regulations#comp122) (Discrimination or Harassment (Based on a Protected Characteristic)), section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct) (Title IX Sexual Harassment and University Sexual Misconduct) and section **2.2.5** (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life#comp225) (Disorderly and Disrespectful Conduct), as well as Human Resources policy **1.1.3** ⧉ (https://hr.princeton.edu/myhr/policies/responsibilities-employees) (Responsibilities of Employees).

Princeton University strives to be an intellectual and residential community in which all members can participate fully and equally, in an atmosphere free from all manifestations of bias and from all forms of discrimination, harassment, exploitation, or intimidation. As an intellectual community, it attaches great value to freedom of expression and vigorous debate, but it also attaches great importance to mutual respect, and it deplores expressions of hatred directed against any individual or group. The University seeks to promote the full inclusion of all members and groups in every aspect of University life.

Mutual respect requires special sensitivity to issues of bias. Expressions of bias directed at individuals or groups undermine the civility and sense of community on which the well-being of the University depends. They devalue the distinctive contributions of the individuals affected and impair their ability to contribute their views and talents to the community and to benefit fully from participating in it. By alienating those individuals, they harm the whole community. The University calls on all its members to display the appropriate sensitivity and to challenge expressions of bias whenever they encounter them.

## 1.2.2 Discrimination or Harassment (Based on a Protected Characteristic)

Princeton University is committed to creating and maintaining an educational, working, and living environment free from discrimination and harassment based on a protected characteristic. Princeton University's Policy on Discrimination and/or Harassment prohibits such discrimination and harassment and applies to all members of the University community.

When the University becomes aware of a complaint that a member of the University community may have been subjected to or affected by discriminatory and/or harassing behavior based on a protected characteristic, the University will take prompt action. The vice provost for institutional equity and diversity in the Office of the Provost will conduct an initial assessment of the information provided in the complaint to consider whether the alleged conduct, if substantiated by a preponderance of the evidence, could constitute prohibited conduct under the University's Policy on Discrimination and/or Harassment. If so, the vice provost for institutional equity and diversity may determine that the complaint may proceed to investigation. Complaints against undergraduate students only or graduate students only would be referred to the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School, respectively, for investigation. If the alleged conduct involves faculty members or staff, the matter would be referred to the University's Investigations Unit for investigation. If it is determined after investigation that a violation of University policy has occurred, appropriate action will be taken to stop the discrimination and/or harassment. The action taken by the University, including any remedial measures, will depend on the particular facts and circumstances involved.

**Protected characteristics** are those personal traits, characteristics, and/or beliefs that are defined by applicable law as protected from discrimination and/or harassment. They include race, creed, color, sex, gender identity or expression, pregnancy and related conditions, age, national origin, ancestry, religion, physical or mental disability, genetic information, veteran status, marital or domestic partnership status, affectional or sexual orientation, and/or other characteristics protected by applicable law.

**Discrimination** is adverse treatment of an individual based on a protected characteristic, rather than individual merit. Examples of conduct that can constitute discrimination if based on an individual's protected characteristic include but are not limited to:

Singling out or targeting an individual for different or less favorable treatment (e.g., more severe discipline, lower salary increase) because of their protected characteristic.

Failing or refusing to hire or admit an individual because of their protected characteristic.

Terminating an individual from employment or an educational program based on their protected characteristic.

**Harassment** is unwelcome verbal or physical behavior which is directed at a person based on a protected characteristic, when these behaviors are sufficiently severe and/or pervasive to have the effect of unreasonably interfering with an individual's educational experience, working conditions or living conditions by creating an intimidating, hostile, or offensive environment. Examples of conduct that can constitute harassment if based on an individual's protected characteristic include but are not limited to:

Unwelcome jokes or comments about a legally protected characteristic (e.g., racial or ethnic jokes).

Disparaging remarks to a person about a legally protected characteristic (e.g., negative or offensive remarks or jokes about a person's religion or religious garments).

Displaying negative or offensive posters or pictures about a legally protected characteristic.

All communications, including those conveyed electronically, such as by email, telephone or voicemail, text messaging, social media or other internet use, that violate this policy.

**Retaliation** is prohibited against any individual or group of individuals involved in filing a report, complaint or grievance under the Policy on Discrimination and/or Harassment (or with an external entity), opposing in a reasonable manner an action believed to constitute a violation of University policy, participating in a University investigation, compliance review, or disciplinary proceeding, or filing a request for an accommodation under a University policy. (For purposes of this policy, "retaliatory action" Is defined as intimidation, threat, coercion, discrimination, or adverse educational or employment action; acts of politeness and the like typically do not qualify.)

Depending on the circumstances referenced above, retaliatory acts may include (but are not limited to): adverse employment action; adverse action relating to participation in an educational program; unreasonably interfering with the academic or professional career of another individual; engaging in conduct which constitutes stalking, harassment, or assault; engaging in efforts to have others engage in retaliatory actions on one's behalf.

The full text of the Policy on Discrimination and/or Harassment, including examples of prohibited conduct, resources, and options for addressing concerns, can be viewed online at: **https://inclusive.princeton.edu/addressing-concerns/policies/policy-discrimination-andor-harassment** (https://inclusive.princeton.edu/addressing-concerns/policies/policy-discrimination-andor-harassment) in an accompanying set of Frequently Asked Questions: **http://inclusive.princeton.edu/addressing-concerns/faqs** (http://inclusive.princeton.edu/addressing-concerns/faqs). Members of the University community are expected to be familiar with and adhere to the regulations set forth in the policy.

## 1.2.3 Peaceful Dissent, Protests, and Demonstrations

Free speech and peaceable assembly are basic requirements of the University as a center for free inquiry and the search for knowledge and insight. These rights involve a concurrent obligation on the part of all members of the University, guests, and visitors to maintain on the campus an atmosphere conducive to scholarly pursuits and to respect the rights of all individuals.

In view of Princeton's obligation to promote the free expression of all views, the campus is open to any speaker whom students or members of the faculty have invited and for whom official arrangements to speak have been made with the University. The right of free speech in a university also includes the right to acts of peaceful dissent, protests in peaceable assembly, and orderly demonstrations which include picketing and the distribution of leaflets. These are permitted on the Princeton campus, subject to approval as to schedule and location, unless, or until, they disrupt regular and essential operations of the University or significantly infringe on the rights of others, particularly the right to listen to a speech or lecture.

All individuals and groups planning to engage in activities of the sort described in the previous paragraph should seek approval from the Office of the Dean of Undergraduate Students. Locations generally approved for these activities include the following:

The area adjacent to Chancellor Green Center (on the Firestone Library side).

The area in front of Frist Campus Center on the north side, by the Frist "gateway."

The areas to the west and south of Alexander Hall, and to the east of Alexander Hall, between Stanhope Hall and Morrison Hall.

The area in the vicinity of the east entrance to the University Store.

The area between Whig and Clio halls.

The cobblestone area between Firestone Library and Washington Road.

The area in the vicinity of the arch near the entrance to McCosh Hall, Room 50.

Scudder Plaza at Robertson Hall.

The area adjacent to Shapiro Walk between the Department of Computer Science and Mudd Manuscript Library.

The walkway in front of Nassau Hall.

The area in the vicinity of the north entrance to Jadwin Gymnasium.

In asking groups and individuals to seek prior approval for schedule and location, the University's goal is not to restrict free speech or peaceable assembly. Rather, it is to give the University the opportunity to provide space that accommodates the reasonable needs of both the University community and those engaged in acts of speech or protest. The University reserves the right to determine the time, place, and manner of all such activities.

Whenever appropriate, the Office of the Dean of Undergraduate Students, with assistance from and in consultation with the Department of Public Safety, will designate clearly marked areas for protests and demonstrations from among the list that appears above. In addition to those on this list, other locations may be designated because of particular circumstances associated with a protest or demonstration (for example, to schedule a protest in the vicinity of a campus public lecture held in a location not near those on the list). To the extent practicable, the marked areas will be within reasonable sight and sound of the speaker's and the audience's ingress to and egress from the location of the event. The University reserves the right to refuse permission to use a particular area for protests or demonstrations, including those on the designated area list. When such a decision is reached, the University will provide reasons when asked.

It is a violation of these policies whenever any individual prevents, or willfully attempts to prevent, the orderly conduct of a University function or activity, such as lectures, meetings, interviews, ceremonies, and public events; or blocks, or willfully attempts to block, the legitimate activities of any person on the campus or in any University building or facility.

Whenever a member of the University community, that is a member of the faculty, staff, or student body, violates these policies, that individual may be subject to University-imposed sanctions, including being barred from campus and/or arrested. Whenever a nonmember of the University community violates these policies, that individual may be barred from campus and/or arrested. Decisions to invoke University disciplinary action or arrest in the course of a protest or demonstration will be made after due warning and, wherever possible, such decisions will be made by officers of the University (see the Bylaws of the Board of Trustees).

All members of the press and media, both those affiliated with the University and those with no affiliation to the University, are fully subject to these provisions unless special arrangements for press coverage have been authorized by the University's Office of Communications. Ordinarily, arrangements of some kind to permit press coverage will be made when circumstances allow, and will be administered by the Office of Communications.

More detailed information about University policies and practices pertaining to Peaceful Dissent, Protests, and Demonstrations can be found on the website **https://odus.princeton.edu/protests** ↗ (https://odus.princeton.edu/protests).

## 1.2.4 Distribution of Written Materials by Members of the University Community

Free inquiry, free expression, and civility within this academic community are indispensable to the University's objectives. Inclusion of the name, telephone number, and/or email address of the University sponsoring organization or individual member of the University community on material resembling petitions, posters, leaflets distributed on campus, including materials disseminated using campus information technology resources or University internet access is encouraged, since such attribution promotes and facilitates civility as well as vigorous debate in the academic community. Anonymous public postings without sponsorship of a registered University organization or individual shall be removed or deleted if a complaint by a member of the University is lodged with the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School.

### Posting of Notices

Posters or notices of any kind may be affixed only to bulletin boards in dormitory entryways, food service units, academic and administration buildings, and outdoor kiosks, lampposts, and bulletin boards. Individuals are encouraged to remove outdated material from kiosks and bulletin boards rather than postering over existing notices.

## 1.2.5 Personal Safety

Actions that threaten or endanger in any way the personal safety or security of others will be regarded as serious offenses.

The following offenses will be regarded as extremely serious:

1. Deliberate participation in a riot or general disturbance that threatens the safety, or seriously threatens the property, of either University members or members of the local community.
2. Intimidation by violence, by a threat of violence, or by property damage, which seeks to interfere with the free expression of ideas, or attempts to punish such free expression.

3. The possession, storing, or use on campus (including in any University housing) of (a) firearms (including antique firearms and imitation firearms); (b) any guns that shoot projectiles (including paintball, BB, air); (c) ammunition for any firearm; or (d) any explosive or incendiary device (including firecrackers and other fireworks). The use of prop guns in theatrical productions and the like requires advance written permission from the Office of the Dean of Undergraduate Students. (Easily identifiable toys, such as brightly colored or clear water guns, are not covered by this provision.)

4. The possession of weapons or the use or threatened use of weapons or objects capable of being used as weapons. (Students may possess small pocket-knives or kitchen implements and may use them for their intended purposes only.)

5. Any physical assault committed in the course of any University function or activity, or on the premises of the University or in the local vicinity, especially when unprovoked and/or when injury results.

6. Any other act that seriously endangers human life, or threatens serious physical or psychological injury.

## 1.2.6 Programs Involving Minors

The University is dedicated to the welfare and safety of all individuals who participate in its programs and activities, with particular concern for minors, who are defined as individuals who are under the age of 18 years old and are not a matriculated college student at Princeton University or elsewhere. Members of the University community who interact with minors are expected to be acquainted with and abide by the University's Policy for Programs Involving Minors. For more information about this policy, see the following website: **https://minorsoncampus.princeton.edu** ⬀ (https://minorsoncampus.princeton.edu/).

## 1.2.7 Quiet

Activities that take place in the vicinity of University residences, classrooms, the library, the chapel, and similar facilities must be conducted in such a way as to respect the necessity for maintaining a reasonable degree of quiet in such areas. (See "Noise" under section **2.2.1** (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life) for more information.)

## 1.2.8 TigerCards (ID Cards) and Other Identification

TigerCards are issued to eligible members of the University community and are intended for campus use only. Members of the community are asked to carry their cards while on campus. TigerCards are nontransferable and must be presented on request to authorized University representatives. TigerCards should not be lent or given to others even for short periods of time.

Possession, manufacture, sale, use, or transfer of false identification of any sort is a violation of the law and of University policy.

Rights, Rules, Responsibilities

# 2.2 Regulations Concerning Specific Aspects of Student Life

## 2.2.1 Dormitory Regulations

A student resident in a University dormitory agrees to the terms and conditions outlined in the University room contract. In general, dormitory residents themselves have authority to make their own social rules, so long as those rules conform to the general guidelines defined in the following paragraphs, as well as to the University's general conduct regulations. Note: there are a companion set of regulations available for graduate student apartments.

Undergraduate students who choose gender inclusive housing may be assigned to the same room regardless of gender. In graduate dormitory housing, students of different genders generally may not share the same room or suite, but they may share the same bathroom. However, specifically designated rooms, bathrooms, or suites in graduate dormitories may be made available for shared occupancy or use as gender-neutral housing.

Space in University dormitories is made available to regularly enrolled students of Princeton for their personal use, and use of such space cannot be transferred to any other individual. While students are permitted to have guests (including Princeton students staying in a room for which they do not have a housing contract) for short periods of time, extended visits are not permitted. Where applicable, the privilege of having overnight guests is subject to the approval of all roommates.

Students are responsible for ensuring that they and their guests abide by all University conduct regulations within their assigned room or suite. Generally, students will be subject to disciplinary action for any violation of University policy that takes place within their assigned room or suite, unless they neither knew about nor consented to the behavior or activity in question, or could not reasonably have been expected to foresee that a violation would ensue. Members of the dormitory community are expected to act with a considerate regard for the rights, privileges, and sensibilities of others. Dormitory residents should respect the desire of all members of the community for a reasonable degree of privacy.

It is expected that residents will show consideration for the property of their peers and of the University. The student is responsible for loss or damage to University property (including the furniture, life safety and security devices, and the accommodations) provided for the use of the student. In the event of loss or damage, the student using the accommodations will be charged for necessary repairs or replacements. In addition, students who damage private property or University property will be subject to University disciplinary action. Students may be held liable for all losses or damages resulting from negligent and/or purposeful acts and may also be liable for any loss or damage incurred by their guests who are non-University members.

Students may not appropriate University furniture from common spaces for use in a dorm room, nor remove from a dorm room the University furniture assigned to that room except as noted on the Housing and Real Estate Services website. Additionally, students may not remove furniture from furnished apartments.

Failure to fully vacate a dormitory room by the date required in the dormitory contract is considered an unauthorized occupancy of a residential unit (see section **1.4.7** (/2023/university-wide-regulations/14-university-law-and-property-rights#comp147)).

The faculty retains general oversight of undergraduate dormitories. The University Student Life Committee is responsible for making policy recommendations to the vice president for campus life and the executive director of housing. Violations of dormitory regulations are adjudicated by the Office of the Dean of Undergraduate Students, the Faculty-Student Committee on Discipline, the Residential College Disciplinary Board, the Office of the Dean of the Graduate School, or the Housing and Real Estate Services Office. Housing policies, regulations, and services are outlined on the Housing and Real Estate Services website.

Undergraduate students and graduate students living in the undergraduate dormitories, Graduate College and Annexes or in University rentals should consult: **https://hres.princeton.edu/policies** ⧉ (https://hres.princeton.edu/policies)

## Noise

Every Princeton student residing on campus has the right to a reasonably quiet environment in which to study and to pursue other interests. The University expects all students to respect this right and to be aware of the impact of their activities on their neighbors. Audio speakers, for example, should be placed in such a way as not to interfere with the activities of others. Normally, audio equipment should be placed away from doors and open windows. While social gatherings are an essential part of campus life, students responsible for hosting parties are urged to be considerate of their neighbors. Throughout the academic year, including reading period and exam times, if the Department of Public Safety receives complaints about a loud party or other noisemaking activity prior to midnight on weeknights or 2 a.m. on weekends (Friday–Saturday and Saturday–Sunday nights only), the public safety officers will ask the hosts to reduce the noise level. After the curfew hour, or at any time after a second call for a noise violation at the same location, the public safety officers are authorized to end the activity in question. Dormitory residents

concerned about excessive noise should feel free, at any time, to call the public safety officers for assistance. All noise complaints are noted by the Department of Public Safety. Violations of this noise policy may result in disciplinary action by the Office of the Dean of the Graduate School or the Office of the Dean of Undergraduate Students.

## Animals in Housing

The only pets that may be kept in dormitory rooms are fish contained in tanks that do not exceed 10 gallons. Students requesting an assistance animal due to a documented disability may do so at any time, but should plan to submit a request by July 1st for requests to bring the assistance animal to campus at the start of the academic year. Any student wishing to bring an assistance animal to campus must submit a request for accommodation to the Office of Disability Services. Information on the University's Service and Assistance Animals policy can be found at: **https://inclusive.princeton.edu/addressing-concerns/policies/service-and-assistance-animals-policy** (https://inclusive.princeton.edu/addressing-concerns/policies/service-and-assistance-animals-policy). Requests for Assistance Animals will be considered on a case-by-case basis. Students seeking to have a service or guide dog in housing should contact the Office of Disability Services.

## Smoking

Princeton University is committed to providing a healthy, smoke-free living environment for all its students. Further, New Jersey law prohibits smoking in all dormitories/annexes, including private student rooms and common areas. In accordance with the University's smoking policy, smoking is not permitted anywhere within Princeton University dormitories/annexes or graduate student apartment buildings or units. More information on the University's smoking policy can be found at: **https://ehs.princeton.edu/health-safety-the-campus-community/smoking-campus** (https://ehs.princeton.edu/health-safety-the-campus-community/smoking-campus).

## Fire Safety Policy

Students are required to comply with all policies governing fire safety. These policies are intended to create a safe environment for members of the University community and to minimize potential fire and life safety hazards. Students are expected to evacuate dormitories and all other University buildings when a fire alarm activates or when instructed to do so by public safety or other University staff. For more information, students should consult the Fire Safety Policies on the Housing and Real Estate Services website at: **https://hres.princeton.edu/policies/fire-safety** (https://hres.princeton.edu/policies/fire-safety).

## Candle/Flammable Liquid/Incense/Fireworks Policy

The University candle/incense ban is a total ban in all dormitories and annexes. Candles/incense do not have to show signs of use and/or be out of manufacturer's wrapping. All candles/incense will be confiscated and immediately disposed of. A $100 fine will be issued along with possible disciplinary action by the dean's office for lit or unlit candles/incense. If damage occurs to a room due to candles/incense, the student will be held liable for charges to restore the room to its original condition. Fireworks are also prohibited in University dormitories. See section **1.2.5** (/2023/university-wide-regulations/12-university-wide-conduct-regulations#comp125).

## Storage

Storage space is extremely limited in the dormitories. During the academic year, therefore, students may store their possessions only in their suites or in designated storage areas. Possessions found in other areas will be treated as abandoned goods, and will be disposed of by the University at its sole discretion. During the summer vacation, all personal possessions must be removed from dormitory rooms.

## Lofts

Lofts which conform to University standards and that incorporate the bed frames and mattress are permitted in dormitory rooms. Please consult the Housing Office for information regarding appropriate specifications.

## Privacy and Right of Re-entry

The University respects the privacy of the student but reserves the right to re-enter and take possession of the accommodations upon breach of any term of this agreement. The University may enter the accommodations during reasonable hours to provide efficient service and maintenance. The University may enter the accommodations without notice for the purposes of emergency service, safety and room condition inspections, or if there is reason to believe that any term or condition of this agreement or any University policy is being violated. When entering accommodations, the University may be accompanied by an outside party, such as a municipal fire inspector.

## Search of Dormitory Rooms

An administrative search of dormitory rooms (excluding safety inspections) will be carried out only with adequate cause, and with the explicit authorization of the dean of undergraduate students, the dean of the Graduate School, or some other senior administrative officer. Such a search may be conducted, for example, where there is reason to believe that the health and safety of

an individual (or the campus community) is at stake or a term or condition of this agreement or a University policy is being violated. Should such a search be necessary, every effort will be made to have the resident present at the time of the search. If it is impossible to arrange to have the resident present, the resident will be informed of the action as soon as possible following the search.

## 2.2.2 Other Building Policies

### Posting of Notices

Posters or notices of any kind may be affixed only to bulletin boards in dormitory entryways, food service units, academic and administration buildings, and outdoor kiosks, lampposts, and bulletin boards. Individuals are encouraged to remove outdated material from kiosks and bulletin boards rather than postering over existing notices. (See also section **1.2.4** (/2023/university-wide-regulations/12-university-wide-conduct-regulations#comp124).)

### Safety Regulations

Entering mechanical areas (rooms, steam, and utility tunnels, etc.), construction sites, or other restricted areas is prohibited. Entering upon exterior elevated surfaces of campus buildings (roofs, fire escapes, terraces, balconies, parapets, or ledges above the first floor) is prohibited except in emergencies or in the circumstances described below:

1. Authorized persons may, for purposes of research, enter upon the following elevated areas constructed especially for such research: the roof of Jadwin Laboratory, the terrace of the Engineering Research Laboratory, the Butler College rooftop garden, Sherrerd Hall rooftop, and the Andlinger Center for Energy and the Environment rooftop garden and Lewis Center for the Arts rooftop terrace. Prox access is required. Entrance upon these areas may be authorized at the discretion of the responsible administrators or faculty departmental chairs.
2. The New College West and Yeh rooftop spaces are available to students with residential college approval only. Prox access is required. Entrance to these areas is authorized at the discretion of the residential colleges.
3. In addition, members of the faculty and staff may, for purposes of research, request authorization to enter upon elevated surfaces other than those specified above. Such requests will be reviewed by the Office of Environmental Health and Safety in conjunction with the Department of Facilities. Student requests must be sponsored by a faculty or staff member.
4. Any persons may enter upon the following terraces and on-grade plazas clearly designed for foot traffic and gatherings: Jadwin Plaza, New College West and Yeh College plaza, Simpson International Building balcony, and the Lewis Center for the Arts plaza.
5. University employees or contractor personnel are authorized to enter upon any elevated surfaces in the performance of official functions.

These regulations are intended to prevent injuries to members of the University community, and to prevent physical damage to surfaces, areas, or equipment not designed for traffic or public use.

This policy specifically prohibits buildering on any elevated surface on the campus. The policy also prohibits entering upon any dormitory exterior areas above the first floor. (While some exterior elevated areas of the dormitories may appear to have been designed for foot traffic or gatherings, all such spaces are to be used only as a second means of egress in case of fire.)

No items, including antennas and wire, lights, flags, banners, etc., may be placed on or affixed to the outside of any building. No items may be placed on fire escapes at any time, under any circumstances.

Because of the seriousness of the regulations regarding fire safety and use of steam and utility tunnels and exterior elevated surfaces of campus buildings, the University will take disciplinary action on a first offense. Such action may include the imposition of a fine by the Housing Office. Undergraduate students and graduate students should refer to the applicable fire safety policies on the Housing and Real Estate Services website for specific information regarding such fines at: **https://hres.princeton.edu/policies/fire-safety-policies** ⊡ (https://hres.princeton.edu/policies/fire-safety-policies). Graduate students and undergraduate students living in rental units should consult: **https://hres.princeton.edu/policies/apartment-living** ⊡ (https://hres.princeton.edu/policies/apartment-living).

The University has the right, moreover, to require students who have violated these safety rules (or any other dormitory regulations) to vacate their accommodations with no financial credit for the remainder of the semester.

In order to ensure the safety of students engaged in certain academic, research, and extracurricular activities, the University has established policies governing safety practices in research facilities and machine shops. These regulations are explained during safety training required of all participants and students are expected to adhere to all regulations and lab and shop safety postings. Failure to do so may result in disciplinary action.

For clarification of the above safety regulations, please consult the Housing Office, Office of Environmental Health and Safety, the University Fire Marshal's Office, or the Office of the Dean of Undergraduate Students.

### 2.2.3 Campus Dining Regulations

All first-year and sophomores are required to sign a Campus Dining meal contract for the unlimited plan. Juniors and seniors have the option of the unlimited plan, Block 105 or no Campus Dining meal plan. Students requesting accommodations for medical reasons should contact the Office of Disability Services. Detailed terms of dining contracts are available at **https://dining.princeton.edu/meal-plans** ⧉ (https://dining.princeton.edu/meal-plans).

## 2.2.4 Health Regulations

Health Services offerings and services are outlined on the University Health Services website at **uhs.princeton.edu** ⧉ (https://uhs.princeton.edu/). University Health Services has policies and procedures governing the confidentiality of student health records and the extent to which information may or may not be released consistent with state and federal law. Specific immunizations are required for enrolled students by the University and the state of New Jersey. An up-to-date list of immunizations that are required can be found at **uhs.princeton.edu/medical-services/immunizations-allergy-shots/required-recommended-immunizations** ⧉ (https://uhs.princeton.edu/medical-services/immunizations-allergy-shots/required-recommended-immunizations). For further information, contact University Health Services.

## 2.2.5 Disorderly and Disrespectful Conduct

Students are expected to conduct themselves in accordance with the law and commonly accepted standards of behavior. Unauthorized entry into restricted spaces, combative or disruptive conduct with local or University medical, law enforcement, fire, emergency or other personnel, excessive noise, public nudity, public urination, disrespect for spaces that requires cleanup by University staff members, or other behaviors that clearly disrupt and disrespect the working and/or living conditions of others, may be met with disciplinary sanctions.

## 2.2.6 University Ban on the Nude Olympics

For a number of years undergraduates, predominantly members of the sophomore class, gathered as a group in Holder Courtyard on the night of the first snowfall, virtually naked, and in an environment that included student alcohol abuse, underage drinking, lack of concern for the welfare of fellow students, and risk of harm to themselves, to other people, and to property. This gathering came to be known as the "Nude Olympics."

In the spring of 1999, the president of the University and the Board of Trustees accepted the recommendation of the Committee on the Nude Olympics that this activity be banned, effective immediately, because of the severe health and safety risks posed by the event. The undergraduate student body is advised that they may not attempt to organize or engage in any activity that is perceived to perpetuate gatherings or events that contain or encourage some or all of the behaviors that have been associated with past Nude Olympics. These prohibitions apply to the campus, as well as to public and private property in the surrounding communities.

Any undergraduate engaging in activity that, in the judgment of the dean of undergraduate students or a designee, could reasonably appear to others to perpetuate gatherings or events that contain or encourage such behaviors is subject to suspension from the University for a period of at least one year. The penalty will be increased for aggravating behaviors, such as committing acts of vandalism, harassment, or avoiding apprehension by campus public safety officers or municipal police. Normal disciplinary procedures will apply, except that (1) the dean of undergraduate students, or a designee, will hear the case and assign the penalty, and (2) appeals will be brought to a subcommittee of the Faculty-Student Committee on Discipline.

The president and board ask members of the University community to report information they have regarding possible violations of this policy to the Department of Public Safety or the Office of the Dean of Undergraduate Students.

## 2.2.7 Hazing

Hazing can be a violation of New Jersey law as well as a violation of University policy. A student may be found responsible for violating University policy even if not charged or found guilty of a crime under New Jersey law.

### New Jersey Law

Included below is a summary of New Jersey's hazing law; for a complete copy of the law, consult N.J.S.A. Title 2C, Sections 40-3 through 40-5. Under New Jersey law:

a) A person is guilty of hazing, if, in connection with initiation of applicants to or members of a student or fraternal organization, whose membership is primarily students or alumni of the organization or an institution of higher education, the person knowingly or recklessly:

    1. causes, coerces, or otherwise induces another person to commit an act that violates federal or State criminal law;

2. causes, coerces, or otherwise induces another person to consume any food, liquid, alcoholic liquid, drug or other substance which subjects the person to a risk of emotional or physical harm or is otherwise deleterious to the person's health;

3. subjects another person to abuse, mistreatment, harassment, or degradation of a physical nature, including, but not limited to, whipping, beating, branding, excessive calisthenics, or exposure to the elements;

4. subjects another person to abuse, mistreatment, harassment, or degradation of a mental or emotional nature, including, but not limited to, activity adversely affecting the mental or emotional health or dignity of the individual, sleep deprivation, exclusion from social contact, or conduct that could result in extreme embarrassment;

5. subjects another person to abuse, mistreatment, harassment, or degradation of a sexual nature; or

6. subjects another person to any other activity that creates a reasonable likelihood of bodily injury to the person.

Hazing shall not include any reasonable and customary athletic, law enforcement, or military training; contests; competitions; or events.

b) Hazing is a crime of the third degree if an actor commits an act of hazing which results in death or serious bodily injury to another person and is a crime of the fourth degree if the actor commits an act of hazing which results in bodily injury to another person. Otherwise, hazing is a disorderly persons offense.

c) In addition to any other sanctions or penalties that may be imposed under law, knowingly or recklessly promoting or facilitating a person to commit an act of hazing shall be subject to a fine under law of not less than $1,000 or more than $5,000 for an initial violation, and a fine of not less than $5,000 or more than $15,000 for each subsequent violation.

d) A person, student or fraternal organization, or institution of higher education, and another person acting in concert with the person, organization, or institution, shall be immune from prosecution under this section if the person, or an employee, officer, or other agent acting on behalf of the organization or institution, as the case may be.

1. called 9-1-1, or otherwise contacted campus security, police, or emergency services, and reported that a person was in need of medical assistance due to an act of hazing as described in this section;

2. the caller provided the caller's name and, if applicable, the name of the person acting in concert with the caller to the 9-1-1 operator or other recipient of the emergency contact;

3. the caller was the first to make the 9-1-1 report or other emergency report; and the caller and, if applicable, the person acting in concert with the caller remained on the scene with the person in need of medical assistance until assistance arrived and cooperated with the emergency services on the scene.

Consent shall not be available as a defense to a prosecution under law, and it shall not be an affirmative defense to a prosecution under law that the conduct in which the actor engaged was sanctioned or approved.

Conduct constituting an offense under the law may be prosecuted under any applicable provision of the New Jersey Code of Criminal Justice.

## University Policy Prohibiting Hazing

All students shall have the right to be free of all activities which might constitute hazing, while attempting to become a member of, or maintain membership in, a fraternity, sorority, athletic team, student organization, eating club, or other organization. Organizations, their members, and their prospective members are prohibited from engaging in or encouraging others to engage in activities that are defined as hazing.

Hazing encompasses a broad range of behaviors that (a) may place another person in danger of bodily injury, or (b) that demonstrates indifference or disregard for another person's dignity or well-being.

Examples of hazing include but are not limited to the following:

- Ingestion of alcohol, food, drugs, or any undesirable substance.
- Participation in sexual rituals or assaults.
- Emotionally or psychologically abusive or demeaning behavior.
- Acts that could result in physical, psychological, or emotional deprivation or harm.
- Physical abuse, e.g., whipping, paddling, beating, tattooing, branding, and exposure to the elements, or the threat of such behaviors.
- Participation in illegal activities or activities prohibited by University policy.
- Requiring nudity.
- Requiring the completion of errands.

Where an activity amounts to hazing, a person's consent to the activity is not a defense. In order to encourage students who may hesitate to report incidents of hazing for fear of revealing other policy violations, the University may offer leniency to a reporting student with respect to the behavior reported, depending on the circumstances involved.

See also section **1.4 (/2023/university-wide-regulations/14-university-law-and-property-rights)**, providing that members of the University community are expected to act in accordance with applicable law.

## Acceptable Behavior

Any new member initiation process should be conducted in a manner that respects the dignity of new members and protects their mental and physical well-being. Examples of acceptable behavior include the promotion of scholarship or service, the development of leadership or social skills or of career goals, involvement with alumni, building an awareness of organizational history, development of a sense of solidarity with other organization members, or activities that otherwise promote the mission of the organization or of the University.

For additional information, see **https://odus.princeton.edu/community-standards/hazing** ⧉ **(https://odus.princeton.edu/community-standards/hazing)**.

## 2.2.8 Fraternities and Sororities

The University does not recognize fraternities and sororities because, in general, they do not add in positive ways to the overall residential experience on the campus. These organizations can contribute to a sense of social exclusiveness and often place an excessive emphasis on alcohol. Students are discouraged from participating in these organizations.

Sororities and fraternities are not permitted to use any University resources or participate in University-sponsored events (e.g., Student Activities Fair, Princeton Preview Program, etc.).

### Prohibited Activities

First-year students may not affiliate with a fraternity or sorority. Affiliation includes but is not limited to: membership; "pledging" (i.e., participating in new member programming); participating in "rush" (i.e., formal recruitment); attending or participating in any activity sponsored by a fraternity or sorority; or contributing funds to a fraternity or sorority.

Students may not solicit the participation of any first-year students in a fraternity or sorority, including by electronic means. Solicitation includes but is not limited to: conferring membership on a first-year student; inviting a first-year student to pledge or participate in new member programming; including a first-year student in rush or formal recruitment; inviting a first-year student to attend or participate in any activity sponsored by a fraternity or sorority; organizing a sponsored event to which first-year students are invited; or soliciting or accepting funds from a first-year student on behalf of a fraternity or sorority.

Indications that an activity is "sponsored" by a fraternity or sorority may include but are not limited to: an invitation to participants on behalf of a fraternity or sorority; the use of fraternity or sorority funds to support the activity; or an announcement or other explicit identification of fraternity or sorority sponsorship. The presence of individuals who are members of the fraternity or sorority is not, alone, evidence of sponsorship.

This policy applies to activities that occur both on and off campus.

### Students Covered by This Policy

A student will only be held responsible for actions which a reasonable person in that student's position would have known were contrary to this policy. A student who is not a member of a fraternity or sorority will not be held responsible for solicitation unless there is clear and persuasive evidence that the student acted on behalf of or actively and intentionally enabled members of a fraternity/sorority in violating the policy. For the purposes of this policy, Bridge Year Program participants and students who have been admitted to Princeton but who have not yet matriculated are considered first-year students. Students are considered first-year students until the end of the final examination period of their second semester at Princeton.

### Definition of a Fraternity or Sorority

For the purposes of this policy, a fraternity or sorority

- is a student organization (i.e., an entity with a leadership or financial structure that has or intends to have a persisting identity over time),
- is not recognized by the University, and
- either has Greek letters in its name and an affiliation with a national organization or has a primarily social purpose and an exclusive membership.

This policy does not apply to the eating clubs or to any organization whose membership is not open to any Princeton student.

### Consequences

Any violation of this policy will be regarded as a serious matter. A student who engages in solicitation, as defined above, should expect to be suspended. A first-year student who joins, pledges, or rushes a fraternity or sorority should expect to be suspended. A first-year student who attends or participates in any other activity or event sponsored by a fraternity or sorority may be subject to a lesser penalty (e.g., disciplinary probation). All relevant facts and circumstances will be taken into account in determining the appropriate penalty.

The University may offer leniency to a student who has been extraordinarily forthcoming during an investigation under this policy where that student might otherwise have been implicated in an infraction.

## 2.2.9 Alcohol Policy

Students at Princeton University are responsible for knowing and abiding by both state and University regulations regarding the consumption of alcohol. The University provides educational programs and information on alcohol and drug abuse as well as counseling services related to alcohol and other drug use. Students are expected and encouraged to be aware of the social, physiological, and psychological consequences and personal risks of excessive drinking in order to make responsible and informed decisions about the serving and consumption of alcohol. Students who take prescription drugs, over-the-counter medications, or herbal or other supplements are expected to be aware of the consequences of drinking alcohol in combination with those medications.

The University alcoholic beverage policy is consistent with the laws of the state of New Jersey that, in general, prohibit the consumption and serving of alcoholic beverages by and to persons under 21 years of age. Students will be deemed to have served alcohol when they have made alcohol available to others, regardless of whether any alcohol is actually consumed. Students' responsibility for violations of University policy that take place within their assigned room or suite is described in section **2.2.1 (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life)**. Students are responsible for their behavior, whether or not they are under the influence of alcohol. The consumption of alcohol does not constitute a mitigating circumstance when it contributes to the violation of University regulations. The policy affirms the need for mutual respect and personal responsibility within a diverse community.

The University respects the right to privacy, and its representatives will not enter dormitory rooms without substantive cause (e.g., without reasonable suspicion that University policies or regulations have been violated, or that someone's safety is in jeopardy). However, those whose behavior infringes on the rights of others have, in essence, forfeited that privacy.

## What Are the Responsibilities of Princeton University Students?

Alcoholic beverages normally will not be provided at events where persons under the legal drinking age for consumption of alcoholic beverages are present, including those sponsored by the University, the residential colleges, the University centers, the Undergraduate Student Government, and the classes.

Availability of alcoholic beverages shall not be the primary focus of advertising for campus social events. Those given approval to serve alcoholic beverages are responsible for ensuring that only those of legal drinking age are served, that alcohol is consumed—if at all—in a legal, healthy, and responsible way, and that no intoxicated individuals are served.

It is the immediate obligation of those in the presence of a severely intoxicated person to contact appropriate University or local medical or safety personnel (such as the Department of Public Safety, University Health Services (UHS) staff, local hospital staff, or local police or members of the rescue squad). Neither intoxication nor admission to UHS for intoxication will be grounds for disciplinary action. Contacting the Department of Public Safety for assistance in transporting a student in need of medical attention will not, in itself, lead to disciplinary action. Disciplinary action will occur only if other circumstances indicating a violation of University policy are observed. In such an instance, failure to call for assistance will be considered an especially serious violation of policy. In order to encourage calls for assistance, the University may offer leniency with respect to other violations which may come to light as a result of such calls, depending on the circumstances involved.

## When Will the Department of Public Safety or Other University Administrators Intervene?

Public Safety (or another University administrator) may enter a room whenever there is reasonable cause to believe that someone's safety may be in jeopardy or that a violation of the alcohol policy is taking place.

Public Safety will investigate possible alcohol violations when indicators of alcohol provision are observed. Such indicators may include—but are not limited to—kegs, bottles, cans, spilled alcohol, an individual leaving a room in possession of alcohol, or intoxicated behavior.

In the event of a noise complaint, Public Safety will go to the room and knock on the door. If no one answers, Public Safety may enter the room and instruct the residents of the room to control the noise. Regardless, Public Safety may enter the room where there is cause to investigate further, as described above.

## When Are Princeton University Students in Violation of the Alcohol Policy?

1. On campus and in the local vicinity, students are in violation of the University alcohol policy under any or all of the following circumstances, and alcohol, kegs, and/or taps used in violation of the below regulations may be confiscated:
   a. When participating in or organizing an activity that encourages excessive drinking (e.g., drinking games, pre-gaming with hard alcohol, initiation activities, hazing), as these acts can endanger the individual being served. These are especially serious violations.
   b. When the serving or consumption of alcohol contributes to behavior that (i) intimidates or harasses others; (ii) injures or threatens to injure others (e.g., driving under the influence of alcohol, assault); (iii) leads to the destruction of property;

of (iv) infringes on the peace and privacy of others. These are especially serious violations. In keeping with state law, when a student has been detained by Public Safety or local law enforcement officials on suspicion of driving under the influence of alcohol, the refusal to submit to the taking of breath samples for the purpose of determining blood alcohol content will be taken as conclusive evidence that the student was driving under the influence of alcohol.

    c. Violations of local ordinances or state laws by students may also be grounds for University disciplinary action, regardless of where such violations occur, if they clearly violate University standards of conduct. Additional state and federal laws can be found at **https://odus.princeton.edu/community-standards** (https://odus.princeton.edu/community-standards).

    d. When they fail to immediately contact appropriate University or local medical or safety personnel (such as the Department of Public Safety, University Health Services (UHS) staff, local hospital staff, or local police or members of the local rescue squad) on behalf of a severely intoxicated person.

2. On campus, students are in violation of the University alcohol policy under any or all of the following circumstances, and alcohol, kegs, and/or taps used in violation of the below regulations will be confiscated:

    a. When carrying or possessing an open container of alcohol (defined as any container not sealed by the manufacturer) in or across common spaces (lounges, game rooms, courtyards, dining areas, hallways, etc.).

    b. When in possession of a keg and/or tap or other evidence of intent to serve alcohol, including alcohol delivered in large quantities to the University Mailroom (unless permission has been granted by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School).

    c. When, under the age of 21, in possession of any container of alcohol in common spaces of the University, including alcohol delivered to the University Mailroom.

    d. When alcohol is served, provided, or made available by or to persons under the age of 21. Violations involving juveniles, such as high school applicants or visitors to the University, will be deemed particularly serious.

    e. When procuring alcohol for persons under the age of 21 or by using false identification or falsifying identification.

## What Are the Consequences of Violating the Alcohol Policy?

Students who are in violation of the alcohol policy are subject to a range of University sanctions: Warning, Reprimand, Disciplinary Probation (including housing, and/or campus service sanctions), Withholding of Degree, Suspension (Not Served), Suspension, Suspension with Conditions, Expulsion, and Censure. In keeping with the University's particular concern about high-risk alcohol use, the consequences for violations of the alcohol policy will reflect the level of risk represented by the behavior as well as the impact of the behavior upon the community.

In general, first instance lower-risk violations will result in a dean's warning or reprimand; subsequent violations will result in, at a minimum, disciplinary probation. Examples of lower-risk alcohol violations include, but are not necessarily limited to, situations where:

- Only low-proof alcohol (under 30 proof) is present;
- A modest amount of alcohol is available, appropriate to the number of persons present;
- No high-risk drinking, including drinking games, is occurring;
- No "common sources" of alcohol, such as kegs or alcoholic punch, are present;
- Neither the serving nor the consumption of alcohol has contributed to behavior that infringes on the peace and privacy of others (e.g., disorderly conduct, harassment, vandalism or property damage, injuring or threatening to injure others, or driving under the influence of alcohol).

The University regards higher-risk violations of the alcohol policy as more serious than lower-risk violations. In general, a student who commits a first higher-risk alcohol violation is placed on disciplinary probation. Discipline for a second higher-risk offense will be more serious and may involve a long term of disciplinary probation, campus service, and/or revocation of on-campus residential privileges. Students should expect to be suspended for a third higher-risk alcohol or alcohol-related offense or for any particularly egregious first or second offense. Higher-risk alcohol violations include, but are not necessarily limited to, the following:

- The serving, providing, or making available of hard alcohol (in any quantity);
- The possession of hard alcohol by underage persons in common spaces of the University;
- The possession of kegs or other common sources of alcohol;
- Drinking games, including those where some participants are playing with nonalcoholic beverages;
- The possession of any large quantity of alcohol (of any kind) relative to the number of people present;
- Violations that result from intoxication, such as assault, harassment, disorderly conduct, vandalism, or property damage;
- Failing to immediately contact appropriate University or local medical or safety personnel on behalf of a severely intoxicated person.

Deans may notify a student's parents following any significant incident of drug/alcohol-related misconduct. Alcohol, kegs, and/or taps used in violation of the above regulations will be confiscated.

Students who violate the University's alcohol or drug policies are encouraged to avail themselves of the services of the Alcohol and Other Drug Program offered by the University Office of Counseling and Psychological Services. When appropriate, deans may require an alcohol/drug evaluation by University Health Services staff (UHS).

## 2.2.10 Drug Policy

Princeton University does not condone the possession, use, manufacture, or distribution of controlled substances, marijuana, cannabis, or drug paraphernalia of any kind in any amount, or the possession, use, manufacture, or distribution of prescription drugs without a prescription. This prohibition applies on-campus and to participation in University activities off-campus, including but not limited to work-study programs, off-campus events, and off-campus research projects. Students in violation of this policy may be jeopardizing their own well-being as well as the well-being of the University community.

In general, a student who violates this policy for the first time will be issued a reprimand or placed on probation, depending on the substance and the circumstances. Discipline for a second offense will be more serious and may involve lengthening the probation, campus service, and/or revocation of on-campus residential privileges. Students should expect to be suspended for a third offense. Students involved in such cases, when their conduct is in violation of the law, cannot be guaranteed immunity from either arrest or prosecution.

Among those violations considered to be most serious are the manufacture, sale, or distribution of controlled substances or prescription drugs without a prescription; any involvement in controlled substance use or traffic with minors, particularly from the local area; and possession or use of the more dangerous or highly addictive drugs. Students engaged in activities described in this paragraph should expect a lengthy separation or expulsion from the University upon a first offense.

Students possessing, using, selling, or manufacturing controlled substances may also be subject to mandatory penalties prescribed by the state.

It is the immediate obligation of those in the presence of a person suffering adverse consequences of using drugs to contact appropriate University or local medical or safety personnel (such as the Department of Public Safety, University Health Services staff (UHS), local hospital staff, or local police or members of the rescue squad). In order to encourage calls for assistance, the University may offer leniency with respect to violations which may come to light as a result of such calls, depending on the circumstances involved.

The Department of Public Safety (or another University administrator) may enter a room whenever there is reasonable cause to believe that someone's safety may be in jeopardy or that a violation of the drug policy is taking place, unless otherwise prohibited by law.

## 2.2.11 Conduct at Prospect Avenue Clubs

Standards of behavior by University students in the independent Prospect Avenue clubs are to conform with established standards in the University as a whole. In particular, club members are to act with considerate regard for the rights, privileges, and sensibilities of others. It is expected that they will show due consideration for the property of their fellow members and guests, as well as for the property of the club itself. Physical violence, intimidation of others, or offensive and disorderly behavior will not be tolerated in any club or on the walks and streets outside clubs. It is also the immediate obligation of those in the presence of a severely intoxicated person or a person suffering from adverse consequences from using drugs to contact appropriate University or local medical or safety personnel (see section **2.2.9 (/2023/students-and-university/22-regulations-concerning-specific-aspects-student-life#comp229)**). University policy in cases in which misconduct is alleged to have taken place in the clubs is governed by the provisions set forth concerning off-campus activities (see section **1.4.2 (/2023/university-wide-regulations/14-university-law-and-property-rights#comp142)**).

## 2.2.12 Transportation and Parking Services

### Undergraduate Student Parking Policy

All students must be familiar with the Princeton University parking regulations since students are responsible for their own and their guests' vehicles. Frequent violations of the parking rules and regulations will result in the revocation of parking privileges and/or may result in disciplinary action.

Detailed regulations and campus maps are available online at **https://transportation.princeton.edu** (https://transportation.princeton.edu/).

### Undergraduate Student Parking

Princeton University is a pedestrian campus; students are expected to walk, bike, or ride TigerTransit to classes, eating clubs, and athletic practices and events. Undergraduate students are generally not permitted to bring a vehicle to campus. For alternate transportation options, please visit **https://transportation.princeton.edu** (https://transportation.princeton.edu/).

Transportation and Parking Services (TPS) has an exemption process available to those undergraduates with a compelling need for a parking permit. A compelling need will be defined as a need that cannot be reasonably accommodated by University, commercial, regional transit or transportation options, and would therefore cause a hardship.

Requests for exemptions, together with supporting documentation, should be submitted to Transportation and Parking Services through the process outlined on the TPS website at **https://transportation.princeton.edu** ⧉ (https://transportation.princeton.edu/). The Parking Committee will review all requests. Medical exemption requests must have supporting documentation from a physician and will be reviewed by University Health Services. The committee, at its discretion, may request additional information. Students will be notified in a timely manner. If approved, students will need to register their vehicles and pay a fee in order to obtain a permit for campus parking.

A current state-issued vehicle registration card and a valid TigerCard is necessary to obtain a parking permit. With a valid Princeton University parking permit, students are permitted day and overnight parking in designated lots as determined by TPS. Repeated violations of the parking policy will result in the revocation of the parking permit. Any student who seeks to register a vehicle on behalf of another student, nonstudent, or student who is not currently enrolled, will be reported for disciplinary action.

Public parking in University parking lots and garages is permitted only after 4 p.m. and on weekend. Students parking in any University lot or garage during the weekday hours of 7 a.m.  to 4 p.m. without a permit will result in a citation, boot, or tow.

Parking in areas next to buildings (e.g., Bloomberg, Scully, Frist, etc.) is restricted at all times. Parking in these areas will result in towing without prior warning or citation. Students who continuously violate the parking rules and regulations will be reported for disciplinary action and revocation of future parking privileges.

## Guests

Parking arrangements for guests are the responsibility of the inviting party. To avoid citations and possible towing of a vehicle, students must make parking arrangements through the Service Point for their guests. For a fee, temporary parking permits will be issued to guests who require parking from Monday, 7 a.m., through Friday, 4 p.m. On weekends, from Friday, 4 p.m., through Monday, 7 a.m., guests may park for free in designated lots as listed on the TPS website at **https://transportation.princeton.edu** ⧉ (https://transportation.princeton.edu).

## 2.2.13 Legal Assistance

The Office of the Dean of Undergraduate Students and the Office of the Dean of the Graduate School are authorized to provide specific kinds of aid to students who have been charged with violations of the law or who are actually under arrest. In such cases, University officials may:

1. Provide the student with the names of a few local attorneys; the student may or may not choose to consult with persons from this list.
2. Help to arrange bail, if the student or parents cannot provide immediate funds for bail. In special circumstances, the University may make a loan for the amount of bail (or of a bondsman's fee) if the student and/or parent so authorizes.

In all instances, the cost of bail, as well as the cost of legal counsel, are the full responsibility of the student and the student's family. The University's actions in such cases are undertaken in an effort to ensure the protection of the student's rights and safety, and are not to be construed as efforts to afford the student special treatment in respect to the law.

## 2.2.14 Financial Regulations

Students are responsible for satisfying all student account obligations by the due date on the student bill. A student who fails to meet all financial obligations may be subject to one or more of the following: (a) prohibited from course selection and/or course changes, (b) placed on leave of absence until all financial obligations are met, (c) prohibited from enrolling or being readmitted to the University, (d) denied a diploma document at graduation, and (e) payment of all reasonable collection agency fees, attorney charges, and legal fees necessary for the collection of outstanding indebtedness. If a balance remains due after graduation or separation from the University, the student's account will be considered in default and may be immediately assigned to an external party for collections. Additional financial information regarding tuition and terms of payment is available online at **www.princeton.edu/studentaccounts** ⧉ (http://www.princeton.edu/studentaccounts).

Payments in excess of the balance should not be made to a student's account unless they are associated with estimated costs, as reflected in the student budget determined by the Financial Aid Office. In all cases Princeton reserves the right to return any overpayment.

## 2.2.15 Use of University Monies (Including Student Fees)

University funds, including fees collected by the University from all students (or their parents) as a condition of enrollment in the University, can be used only for purposes integrally related to student activities at the University. Such funds should not be used to make grants to organizations outside the University, thus rendering the University, in effect, a conduit for the transfer of funds. An annual fee is assessed to all enrolled graduate students in residence in order to fund activities of the Graduate Student Government, and at the discretion of the Graduate Student Government, to support other organizations and events. Undergraduate activity monies can be allocated through the Undergraduate Student Government for the support of the on-campus activities of campus groups, including provision of funds to assist in fund-raising efforts, in educational and informational

campaigns, and the like. University policy stipulates, however, that each of the many causes that compete for student attention should make its own case to potential sources of funds on campus and should solicit from individuals voluntary contributions specifically for the particular purposes of that organization.

Rights, Rules, Responsibilities

# 2.5 University Discipline

## 2.5.1 Jurisdiction

The Faculty-Student Committee on Discipline, comprising students, faculty members, and administrators, is responsible for the administration of the stated rules and regulations governing undergraduate student conduct, for assessing reported violations, and, when necessary, for assigning appropriate penalties.

### Cases Involving Undergraduates

All alleged academic violations involving undergraduates that do not implicate the honor system (section **2.3** (/2023/students-and-university/23-undergraduate-honor-system)) fall under the jurisdiction of the Faculty-Student Committee on Discipline. The Faculty-Student Committee on Discipline also adjudicates any other potentially serious alleged infraction (except allegations of sex discrimination or sexual misconduct; see section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)) involving undergraduate students for which the penalty might interrupt the student's academic career. Where an undergraduate student is alleged to have committed a behavioral infraction and for which the penalty will not interrupt the student's academic career, the Faculty-Student Committee on Discipline delegates jurisdiction to the Residential College Disciplinary Board. (See section **2.5.3** (/2023/students-and-university/25-university-discipline#comp253) regarding the resolution of infractions that do not result in separation.)

Under no circumstances will a student whose disciplinary matter is pending be permitted to receive a degree.

### Cases Involving Graduate Students

Alleged violations of academic and nonacademic rules and regulations (except allegations of sex discrimination or sexual misconduct; see section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)) involving graduate students are discussed in section **2.6.7** (/2023/students-and-university/26-graduate-school#comp267).

### Cases Involving Both Undergraduates and Graduate Students

In the event that one or more undergraduate students and one or more graduate students are alleged to have violated University policy, where the facts and circumstances of the case are inextricably intertwined, special procedures apply. See section **2.5.7** (/2023/students-and-university/25-university-discipline#comp257).

### Sexual Harassment and Sexual Misconduct

The Title IX coordinator, in consultation with appropriate University officials, may direct a Title IX panel to investigate and adjudicate charges normally handled by the Faculty-Student Committee on Discipline or by other judicial authorities described in section **2.5.3** (/2023/students-and-university/25-university-discipline#comp253) and section **2.6.7** (/2023/students-and-university/26-graduate-school#comp267), when those charges are raised in connection with an investigation under the policies on Title IX Sexual Harassment and University Sexual Misconduct (section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)).

## 2.5.2 The Faculty-Student Committee on Discipline

### Membership

The committee consists of the following voting members: at least six members of the faculty (no more than four of whom may be present during any hearing); a dean from the Office of the Dean of the College; and eight undergraduate students (no more than five of whom may be present during any hearing). The dean of undergraduate students serves as chair and votes only in the event of a tie as set forth below, and a dean from the office of the dean of undergraduate students serves as secretary without vote. A quorum consists of at least three student members and at least two faculty members. The representative from the Office of the Dean of the College shall have the duties and powers of the dean of undergraduate students in the dean's absence.

### Investigation of Alleged Infractions

A dean or University investigator will normally investigate alleged infractions under the jurisdiction of the Faculty-Student Committee on Discipline. Other representatives of the Office of the Dean of Undergraduate Students (including investigators retained for this purpose) may assist in the investigation of such matters.

Following the investigation, the student may obtain from the committee's secretary all documents pertaining to reports of the alleged misconduct and the names of the members of the committee. The student has the option of submitting any additional written materials that may assist the committee in reaching a decision.

Other than complaints related to sexual misconduct, where the alleged behaviors are those of a student, complaints of discrimination or harassment, including both complaints regarding discrimination or harassment based on a protected characteristic and complaints regarding harassment that does not involve a protected characteristic, are normally investigated and resolved through the student disciplinary process, administered by the Office of the Dean of Undergraduate Students as described in this section.

For complaints of discrimination and/or harassment based on a protected characteristic, an initial assessment will be made by the Office of the Vice Provost for Institutional Equity and Diversity. (Information relating to the University's Policy on Discrimination and/or Harassment, including available resources and how to file a complaint under the policy, can be found at **https://inclusive.princeton.edu/addressing-concerns/bias-discrimination-harassment** ⧉ (https://inclusive.princeton.edu/addressing-concerns/bias-discrimination-harassment)). If that office makes a determination that the complaint should proceed to an investigation, it will be forwarded to the dean responsible for disciplinary matters in the Office of the Dean of Undergraduate Students.

All disciplinary cases involving allegations of sexual  harassment and sexual misconduct are investigated and adjudicated in accordance with the procedures outlined in section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct).

## Notice and Convening of Hearings

Matters shall be presented to the committee with all reasonable promptness. In all cases referred to the Committee on Discipline, the student involved will be informed in writing of the charge(s) and of the specific day and time when the student is to appear before the committee. Where a matter is first presented to the Office of the Dean of Undergraduate Students within one week of the end of an academic term, it may be held for consideration until the following term.

In certain circumstances, an undergraduate student whose case falls under the jurisdiction of the Faculty-Student Committee on Discipline may request that the dean of undergraduate students adjudicate the matter, waiving the right to a hearing by the committee. If the dean or their designee agrees to hear the case, the student retains the right to appeal the decision except on procedural grounds. There are no procedural appeals in such cases.

## Enrollment and Residence Status

Normally, pending action on the charges by the committee or pending an appeal, the student will be permitted to remain in residence on campus, attend classes, and make use of some or all University facilities, except for circumstances relating to the physical or emotional safety or well-being of a member (or members) of the University community, or the ability of the University to carry out its essential functions.

The student should understand that if the committee's decision proves adverse, or if an appeal proves unsuccessful, the decision of the committee will normally be considered effective as of the date of the original decision. In cases adjudicated prior to the last day of classes, if the final decision is a separation from the University (i.e., suspension, suspension with conditions, or expulsion), the student will normally not earn credit for the semester in which the infraction occurred. If the case is adjudicated during reading period obtaining credit for the semester will be at the discretion of the committee. If the case is adjudicated during exam period and the final decision is a separation from the University the student must complete the term and the committee's penalty will take effect immediately thereafter.

Pending a hearing or the student's decision about whether to appeal a separation from the University or the withholding of the degree, and/or while an appeal is in process, an administrative hold will be placed on the student's University transcript. Should the student decide not to appeal a separation or the withholding of the degree, or should an appeal not result in an alteration of the committee's decision to dismiss the student or withhold the degree, the registrar will record the fact of the penalty on the student's transcript.

## Conduct of Hearings

The student may be accompanied at the committee hearing by an adviser, who must be a current member of the resident University community, and who may participate in the hearing in accordance with instructions issued by the chair.

At the hearing, any person with information about the matter before the committee may be requested to appear by the student, the dean of undergraduate students, or the committee, subject to reasonable limits agreed on by the committee. In an opening statement the student has an opportunity to explain the circumstances from a personal point of view and may also question individuals who have provided information and may in turn be questioned by the committee members. At the chair's discretion, an individual who has brought forward a charge may also ask questions.

The student may make a closing statement and is then excused while the committee deliberates in closed session.

There may be some occasions in which, because of external legal proceedings, the student believes that there are compelling reasons for refusing to speak or to answer questions. In the event that (1) legal proceedings—including but not limited to arrest, summons, and indictment—have been instituted against a student in state or federal courts as a result of alleged involvement in the matters that the committee is considering and (2) the alleged misconduct is more serious than a disorderly person offense, the student will be granted permission not to speak or to answer questions without prejudicing the committee's decision. In the case of other external proceedings, the dean will consider the student's reasons for declining to speak, and if these reasons are deemed legitimate, will excuse the student from giving information without prejudice to the disposition of the case. In instances as set forth above, when a student has chosen not to speak and when in the dean's judgment the committee does not have enough information to come to a conclusion without the student's testimony, at the dean's discretion the hearing may be postponed until more complete information is available. In such instances, when the dean believes that circumstances are present that seriously affect the health or well-being of any person, or where physical safety is seriously threatened, or where the ability of the University to carry out its essential operations is seriously threatened or impaired, the dean normally will bar the student from campus, pending disposition of the legal proceedings and recommencement of the hearing. This decision will be subject to review in accordance with section **1.1.8 (/2023/university-wide-regulations/11-university-principles-general-conduct-and-regulations#comp118)**, and without prejudice to the committee's eventual consideration of the charges. If a hearing proceeds before external legal matters are resolved, the chair of the committee must explain to the student the risks either of speaking freely or of not speaking at all.

## Deliberations and Findings

In order to determine that a student has violated a University rule, a majority of the voting committee members present must conclude that the evidence presented constitutes a clear and persuasive case in support of the charges against the student. If the student is found responsible for one or more of the violations charged, the committee will consult applicable rules and precedents to determine the proper penalty. If the student is found to have misled the committee during the hearing, the committee may take that fact into account in reaching a conclusion and assigning a penalty.

If the voting members are evenly divided on a particular case, the case must be reconsidered at the next meeting of the committee. If at the second meeting at which the case is considered the regular voting members are still evenly divided, the dean of undergraduate students votes to break the tie.

The chair or the secretary of the committee informs the student promptly of the decision. If a penalty is imposed, special effort is made in this discussion to ensure that the student fully understands why the penalty was imposed and its nature and consequences. The student has the right to receive a summary report of the proceedings upon request.

## Appeals in Behavioral Cases

If a student is found by the Committee on Discipline to have violated University policy, the student found responsible (sometimes referred to as the "respondent") has the right to appeal the decision.

The appellate body has the following five members: the dean of the college, the dean of the Graduate School, the vice president for campus life, the chair of the Judicial Committee of the Council of the Princeton University Community, and another faculty member appointed by the president. The members will be impartial and unbiased. One member will be appointed by the president to serve as its chair.

Each appeal will be heard by three members of the appellate body (i.e., appeal panel). The chair will assign the appeal panel for each case. All decisions shall be made by a majority of the appeal panel.

Grounds for appeal are:

1. The procedures have not been fair and reasonable. The period of time under review starts when a student is formally charged with a violation and ends when the committee issues a final decision. Neither the choice of venue nor the nature of the investigation is grounds for appeal.
2. There exists substantial relevant information that was not presented, and reasonably could not have been presented to the committee.
3. The imposed penalty does not fall within the range of penalties imposed for similar misconduct.

The purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. The appeal panel may decide to uphold the original decision of the committee; to reduce the imposed penalty; or to return the case to the original hearing body for additional proceedings, a rehearing or other action. If a student requests a review of a penalty, it cannot be increased on appeal.

The deadline for filing an appeal in a behavioral case is one week from the date of decision by the Faculty-Student Committee on Discipline.

## Appeals in Academic Cases

A student wishing to appeal a decision of the Committee on Discipline in a case involving an academic infraction may appeal to the dean of the college, seeking a review of a decision or penalty on the grounds that (1) there exists substantial relevant information that was not presented, and reasonably could not have been presented, to the Faculty-Student Committee on Discipline, or (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct. The purpose of such an appeal is not to initiate a review of substantive issues of fact, or a new determination of whether a violation of rules has occurred. If the dean concludes after such a review that additional proceedings or a rehearing is warranted, the original hearing body will normally perform these functions. Also, if the dean determines that a penalty of the Faculty-Student Committee on Discipline (or the dean of undergraduate students) should be altered, the dean will make a recommendation to the president, describing the reasons for the proposed modification, and the president will decide whether or not to implement the recommendation. If a student requests a review of a penalty, it cannot be increased on appeal.

A student has the right to appeal questions of procedural unfairness only to the Judicial Committee of the Council of the Princeton University Community, in accordance with the appeal procedures defined by the Judicial Committee (see section **1.9.4** (/2023/university-wide-regulations/19-judicial-committee-council-princeton-university-community#comp194)).

The associate secretary of the University will serve as secretary for all appeals of decisions by the Committee on Discipline and will have primary responsibility for interactions with the parties and for the gathering of information needed for the appeal.

The deadline for filing an appeal in an academic case is one week from the date the decision is communicated to the student by the Faculty-Student Committee on Discipline.

## 2.5.3 Adjudication of Infractions That Do Not Result in Separation (Undergraduate)

### General Procedures

Normally, if a student is alleged to have committed a behavioral infraction, other than sex discrimination or sexual misconduct, for which precedents are available and for which the penalty will not interrupt the student's academic career, the matter will be resolved by the Residential College Disciplinary Board (RCDB), comprising of deputy, associate, and assistant deans of undergraduate students responsible for discipline and the seven assistant deans for student life. General procedures are as follows:

The student will first be asked to meet with the appropriate dean or a University investigator. All complaints will be investigated promptly. Before the case is adjudicated, the student may read all statements, reports, or other information relevant to the allegation. The facts of the case will be discussed and the student given ample opportunity to present the student's own account of the incident in question, including a written account, witnesses, or other relevant information, or to request clarification of any relevant information submitted by other parties. The student will be notified of the specific violation the student is alleged to have committed before the case is considered by RCDB.

The assistant dean for student life will then bring the case, with a recommendation regarding the student's responsibility for the alleged infraction, to the RCDB. The RCDB will consider the case and determine the appropriate action, up to and including disciplinary probation (including housing and/or campus service sanctions or other restrictions on access to space, resources, or activities).

Other representatives of the Office of the Dean of Undergraduate Students (including investigators retained for this purpose) may assist in the investigation and/or resolution of infractions under the jurisdiction of the RCDB.

### Appeals

A student has the right to appeal to the dean of undergraduate students or their designee any disciplinary decision of the Residential College Disciplinary Board. The appeal should be submitted in writing. The purpose of the appeal is to seek a review of a decision or penalty on the grounds that (1) there exists substantial relevant information that was not presented, and reasonably could not have been presented, to the dean or the RCDB; (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct; or (3) a procedural irregularity occurred in the adjudication of the incident in question. The purpose of such an appeal is not to initiate a review of substantive issues of fact, or a new determination of whether a violation of rules has occurred. The deadline for filing such an appeal is one week from the date the student was informed in writing of the penalty. The decision of the dean of undergraduate students or their designee shall be final.

## 2.5.4 Records of Proceedings (Undergraduate)

Confidential records of all disciplinary proceedings involving undergraduate students are maintained by the Office of the Dean of Undergraduate Students. The use of these documents is restricted according to the rules and procedures concerning the confidential nature of student records.

Disciplinary procedures normally involve only the student and the University. Generally, the student's family is not informed while disciplinary procedures are underway. When, however, in the judgment of the University the welfare of the student or the community warrants communication, family members may be contacted during the disciplinary process. All disciplinary decisions resulting in serious penalties (especially, but not exclusively, withholding of degree, suspension, suspension with conditions, and expulsion) will be communicated to the student's family or other legal guardian, unless the student has before the commencement of the term in question filed a statement certifying that the student is not financially dependent as defined by the federal income tax laws.

## 2.5.5 Penalties

Penalties that may be applied by all University disciplinary bodies are set forth under section **1.1** (/2023/university-wide-regulations/11-university-principles-general-conduct-and-regulations) "University Principles of General Conduct and Regulations."

## 2.5.6 Grievance Procedures

Students are also afforded certain protections under federal and state laws and, in addition to or in the alternative of filing an internal complaint, may elect to file a harassment or discrimination complaint with a federal or state agency authorized to investigate such complaints. The appropriate agency will depend on the nature of the complaint and the status of the parties involved. One such agency is the United States Department of Education, Office for Civil Rights.

Information concerning grievance procedures is available under section **1.7** (/2023/university-wide-regulations/17-resolution-complaints-against-members-university-community).

## 2.5.7 Special Procedures in Cases Involving Both Undergraduate and Graduate Students

In the event that one or more undergraduate students and one or more graduate students are alleged to have violated University policy, where the facts and circumstances of the case are inextricably intertwined, the following special procedures apply.

In such situations, an ad hoc joint committee comprising representatives from the Faculty-Student Committee on Discipline and the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School will adjudicate all alleged academic infractions that do not implicate the honor system (see section **2.3** (/2023/students-and-university/23-undergraduate-honor-system)) and all other potentially serious alleged infractions (except allegations of sex discrimination or other sexual misconduct; see section **1.3** (/2023/university-wide-regulations/13-title-ix-sexual-harassment-and-university-sexual-misconduct)) for which the penalty might interrupt any student's academic career. The joint committee will be appointed by the deans of the undergraduate students and the Graduate School. The joint committee will be comprised of one faculty member and two undergraduate students from the Faculty-Student Committee on Discipline and one faculty member and two graduate students selected in accordance with the procedures of the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School. The chair of the joint committee will be drawn from either the Faculty-Student Committee on Discipline or the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School, and the secretary of the joint committee will be drawn from the other. The joint committee will conduct hearings and render decisions according to the procedures and standards of the Faculty-Student Committee on Discipline (see section **2.5.2** (/2023/students-and-university/25-university-discipline#comp252)).

Students whose cases fall under the jurisdiction of an ad hoc joint committee may request that the dean of the Graduate School and the dean of undergraduate students alone adjudicate the matter, waiving the right to a hearing by an ad hoc joint committee. All students who would fall under the jurisdiction of an ad hoc joint committee in such a case would need to agree to the request. If the deans agree to hear the case, the students retain the right to appeal the decision except on procedural grounds. There are no procedural appeals in such cases.

Where one or more undergraduate students and one or more graduate students are alleged to have committed a behavioral infraction for which precedents are available and for which the penalty will not interrupt the students' academic career, the Faculty-Student Committee on Discipline and the Subcommittee on Student Life and Discipline of the Faculty Committee on the Graduate School delegate jurisdiction to an associate dean of the Graduate School and one of the chairs of the Residential College Disciplinary Board, who will jointly investigate and adjudicate the case, assisted by other deans, investigators and directors in the Office of the Dean of Undergraduate Students and the Graduate School as necessary and appropriate. In investigating and adjudicating such cases, the associate dean of the Graduate School and the chair of the Residential College Disciplinary Board will follow the procedures and standards of the Residential College Disciplinary Board (see section **2.5.3** (/2023/students-and-university/25-university-discipline#comp253)).