**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>THE TRUSTEES OF PRINCETON UNIVERSITY,<br><br>Defendant. | Civil Action No. 24-CV-7125 (ZNQ)<br><br>Hon. Tonianne J. Bongiovanni, U.S.M.J.<br><br>**Joint Rule 26(f) Report and Discovery Plan**<br><br>Conference Date: November 17, 2026 |

Pursuant to Federal Rule of Civil Procedure 26(f), and D.N.J. Local Civil Rule 26, the parties, Plaintiff John Doe and Defendant The Trustees of Princeton University, by and through their respective counsel of record, hereby submit this Joint Rule 26(f) Report and Discovery Plan.

**1. Discussion of Facts, Claims, Defenses, and Relevant Issues.**

**Plaintiff's Position:**

Sometime in 2023, after a male friend at another university upset her, Jane Doe reported that he had threatened to choke her. When she found out he was about to sue her, she told John—in texts he submitted to Princeton—that she would lie under oath if she had to and could get her good friend, Sarah Smith, to lie for her, too. When John himself later upset Jane, both Jane and Sarah accused John of having choked them in separate incidents several months earlier.

Jane's and Sarah's stories hopelessly contradicted themselves, yet were never challenged by Princeton. It is undisputed that Jane first told Princeton John squeezed her throat and lifted her "for 5-6 seconds," but later said he merely pushed against her throat from the front. It is undisputed that Sarah first said John choked her, but also later said he merely pushed against her

throat from the front. It is undisputed that Jane (who initially claimed a memory blackout) said she learned of her choking from Sarah, but Sarah herself said she never saw whatever happened. It is undisputed that Sarah first claimed not to have seen any bruising on Jane's neck, but later claimed that she did. It is undisputed that both Jane and Sarah said they cut off contact with John the summer following their alleged incidents, but that John produced photographic evidence of both women *at his family home* more than a month after that date.

It is undisputed that Princeton—neither during its investigation nor at the hearing—asked either Jane or Sarah to explain *a single one* of these contradictions, despite interviewing them multiple times. It instead interviewed female witnesses who might corroborate parts of their claims, while simultaneously failing to interview know male witnesses who could undermine them. The only eyewitness to either alleged choking—Witness 4, present for Jane's—said he saw nothing of the sort. At the hearing, he and John were questioned longer and more aggressively than any other participant, including Sarah. Jane didn't even bother to show up.

According to an insider, at least some of the hearing panel members prejudged the case. They found John responsible on just two stated bases: (1) the allegedly "consistent" testimony of Jane and Sarah, and (2) alleged admissions by John in "text messages." The panel never said which of each complainant's stories it was crediting, much less how they could be deemed consistent. And the panel never identified which text message(s) supposedly contained an admission. None did.

Princeton did all of that against a sustained backdrop of pressure to credit claims of assault brought by women against men.

The legal issues in this case are especially well-refined because it is on remand from the Third Circuit, which published a lengthy opinion on Mr. Doe's claims. *See John Doe v. Princeton University*, 184 F.4th 193 (3d Cir. 2026) (hereafter "*Princeton IV*"). With respect to Mr. Doe's breach of contract claim, the legal issues are twofold. The first is whether Princeton breached its contractual promise to find Mr. Doe responsible only if there was "clear and persuasive" evidence of his guilt. *Princeton IV* identified eight allegations which, if proven, would show breach of a weaker contractual promise (guilt measured by a preponderance of evidence standard), and six of those eight items are already provable from documents the parties possess. The second is whether Princeton breached a contractual promise in denying Mr. Doe's appeal.

With respect to Mr. Doe's breach of the implied covenant claim, the legal issue is whether Princeton engaged in "subterfuges and evasions" in its performance of the contract, or acted unreasonably in exercising its discretion thereunder. *Princeton IV*, 184 F.4th at 212-13. The evidence relevant to this claim largely overlaps with the evidence relevant to breach of contract.

With respect to Mr. Doe's Title IX claim, the legal issue is whether Princeton's decision to find him responsible and to suspend him for two years was motivated, at least in part, by gender bias. Categories of evidence that the *Princeton IV* and other courts have found indicative of potential gender bias include the materials used to train hearing panelists; statements by hearing panelists or other important administrators suggesting gender bias; a rationale that is deeply illogical or contradicted by the great weight of the evidence; uneven treatment of the parties by the investigators or hearing panelists; and external or internal pressure on a university to act in gender-biased ways. *See, e.g.*, *Princeton IV*, 184 F. 4th at 204-10.

**<u>Defendant's Position</u>:**

In 2023, two individuals—Jane Roe, who was not a Princeton student, and Sarah Smith, a Princeton undergraduate—reported to the University that Plaintiff had physically assaulted them on separate occasions on campus. Plaintiff was also charged with serving alcohol to underage individuals in his dormitory room.

The University adjudicated these allegations under its published student-conduct code, the Rights, Rules, Responsibilities ("RRR"). A University investigator interviewed Plaintiff, both complainants, and multiple witnesses, and collected text messages and written statements. Much of that evidence came from Plaintiff himself, including his interview, his written account of the events, and the numerous text messages and supplemental statements he submitted.

On November 6, 2023, a hearing regarding the allegations against Plaintiff was held before a committee composed of two faculty members and three students, and chaired by the Dean of Students. Plaintiff attended the hearing with an adviser and had the opportunity to identify and question witnesses. The committee found Plaintiff responsible for two violations of the University's Personal Safety Policy and one violation of the Alcohol Policy, and imposed a two-year suspension. Plaintiff appealed the Personal Safety Policy finding and the sanction to a panel of senior University officials. The panel upheld both the finding of responsibility and the sanction.

Following the Third Circuit's reversal and remand, three claims remain for adjudication: breach of contract; breach of the implied covenant of good faith and fair dealing; and violation of Title IX. These claims present the following legal issues.

As to breach of contract, the issue is whether the University substantially violated the RRR in investigating, adjudicating, and resolving the charges against Plaintiff, including whether it applied the required "clear and persuasive" evidence standard and properly resolved his appeal.

Under New Jersey law governing the university–student relationship, the inquiry is whether the institution followed its own established procedures and whether those procedures were fundamentally fair.

As to breach of the implied covenant of good faith and fair dealing, at issue is whether the University acted in bad faith or with a malicious motive to deprive Plaintiff of the benefit of his bargain in conducting the investigation, hearing, and appeal. A related question is whether the evidence shows conduct independent of the alleged contract breaches, an inquiry that turns on whether Plaintiff can establish an improper motive.

As to Title IX, at issue is whether the University discriminated against Plaintiff on the basis of sex—that is, whether sex was a motivating factor in the decision to discipline him. The central question is whether Plaintiff can tie the challenged treatment to his sex rather than to his status as the accused, since an allegedly unfavorable or erroneous outcome does not, without evidence connecting it to sex, establish the claim. A related issue is whether generalized evidence of external or institutional pressure can support the claim absent a connection to the specific disciplinary action Plaintiff challenges.

The University's position is that it followed its established disciplinary procedures, applied the required evidentiary standard, afforded Plaintiff the process the RRR prescribes, and reached a result supported by the evidence before it—without bad faith and without regard to Plaintiff's sex. The University disputes that any variation in the complainants' descriptions of the physical contact undermines the outcome, as each version describes conduct prohibited by the RRR's Personal Safety Policy. The record also includes Plaintiff's own statements bearing on his responsibility, including a recorded telephone call and contemporaneous text messages.

**2. Discovery Plan**

(a) Discovery Conducted to Date

The parties have not yet conducted any discovery.

(b) Discovery Problems Encountered to Date

To date, the parties have not encountered any discovery problems.

(c) Anticipated Scope of Discovery

The parties anticipate seeking discovery related to the factual and legal bases for Plaintiff's claims and Defendant's defenses. With respect to his Title IX claim, Plaintiff intends to seek discovery on the topics listed in the final sentence of Plaintiff's Position in section 1, above. *See Princeton IV*, 184 F. 4th at 204-10.

(d) Computer-Based and Digital Discovery

The parties intend to request and produce limited computer-based or other digital information, collectively referred to as electronically-stored information ("ESI"). The parties have agreed to meet and confer as outlined in L.R. 26.1(d)(3) and will negotiate an agreement detailing the protocol by which any ESI will be searched for, retrieved, and produced.

(e) Changes in Limitation by the Federal Rules of Civil Procedure, Local Rules, or Standing Orders.

None anticipated at this time.

(f) Confidentiality Order

The parties intend to seek a confidentiality order related to the contemplated production of certain documents, including, but not limited to, Defendant's current and former students' personally identifiable information ("PII"), student records, and records related to Title IX or other conduct proceedings. The parties have discussed the potential need for protocols for the production of information—specifically Defendant's current and former students' PII in

education records—protected by the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g.

(g) Alternative Dispute Resolution

At this time, the parties do not believe that this case can be resolved by voluntary arbitration, mediation, the appointment of a special master, or any other special procedure. The parties will revisit the possibility of pre-trial resolution as discovery progresses.

(h) Limitations on Discovery Devices

At this time, the parties do not believe that there should be any limitation placed upon the use of any discovery device.

(i) Special Discovery Needs

Other than the agreements and processes outlined in Section 2(f), the parties do not currently have any special discovery needs.

(j) Discovery

(1) The parties have considered the scope of discovery permitted under Fed. R. Civ. P. 26(b)(4).

(2) Discovery will not be conducted in phases or be limited to particular issues.

(3) The Parties anticipate that they will each require no more than 5 depositions of fact witnesses, and in any event do not anticipate requiring leave to seek more than the 10 provided for under the federal rules.

(4) At this time, neither party anticipates requesting permission to serve more than 25 interrogatories.

(5) The parties do not currently anticipate calling expert witnesses at trial. The parties reserve the right to seek amendment of this Joint Discovery Plan to accommodate the disclosure and exchange of expert witness testimony if necessary.

**3. Proposed Case Management Schedule**

(1) Service of initial written discovery on or before November 17, 2026.

(2) Service of Fed. R. Civ. P. 26 Disclosures on or before November 24, 2026.

(3) Responses and objections to initial written discovery on or before December 8, 2026.

(4) Motions to amend or to add parties to be filed by November 30, 2026.

(5) Fact discovery to be completed by March 12, 2027.

(6) Dispositive motions to be filed by April 9, 2027.

(7) Oppositions to dispositive motions to be filed by May 7, 2027.

(8) Replies in further support of dispositive motions by May 21, 2027.

(9) Trial date: To be determined by the Court after the Court's decision on any Dispositive Motions.

Dated: October 27, 2026

Respectfully submitted,

**DYNAMIS LLP**

*/s/ Jamie Hoxie Solano*
Jamie H. Solano, Esq.
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
jsolano@dynamisllp.com

**DILLON PLLC**

Justin Dillon
Christopher Muha
Kimberly Blasey
1717 K Street NW
Washington, DC 20006
(202) 787-5872
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Attorneys for Plaintiff John Doe*

**SAUL EWING LLP**

*/s/ Amy L. Piccola*
Amy L. Piccola, Esq.
1735 Market Street, Suite 3400
Philadelphia, PA 19103 7504
(215) 972-8405 / Amy.Piccola@saul.com

*Attorneys for Defendant the Trustees of Princeton University*